**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **CANDICE CHAPMAN, et al.,** | ) | |
|    **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:15-cv-125-WKW** |
| | ) | |
| **THE CITY OF CLANTON,** | ) | |
|    **Defendant.** | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND
BRIEF IN SUPPORT OF ITS MOTION TO DISMISS**

Plaintiffs Candice Chapman, Michael Littlefield, and Steadman Kine submit this

responsive brief in opposition to the City of Clanton's ("Clanton" or "City") Motion to Dismiss

(Doc. 44, 44-1).

Date:   December 1, 2015

<div style="margin-left:50%">

Respectfully submitted,

s/Matthew Swerdlin
Matthew Swerdlin, Attorney at Law
1736 Oxmoor Road, # 101
Birmingham, AL 35209

s/William M. Dawson
William M. Dawson
1736 Oxmoor Road, # 101
Birmingham, AL 35209

s/J. Mitch McGuire
McGuire and Associates
31 Clayton St.
Montgomery, AL 36104

*Attorneys for the Plaintiffs*

</div>

## <u>Table of Contents and Authorities</u>

**I.     Introduction.** …………………………………………………………………………...1

*Carden v. The Town of Harpersville, et al.*, No. 2:15-cv-01381-RDP (N.D. Ala.)……………… 2

*Carter v. The City of Montgomery*, No. 2:15-cv-555-WKW (M.D. Ala.)………………………... 2

*Cleveland v. City of Montgomery, et al.*, No. 2:13-cv-00732-MHT-TFM (M.D. Ala.)……... 2, 21

*Hall v. The City of Fort Payne, et al.*, No. 4:15-cv-01656-JEO (N.D. Ala.)……………………... 2

*McCullough v. City of Montgomery, et al.*, No. 2:15-cv-00463-WKW-WC (M.D. Ala.)……….. 2

*Mitchell v. The City of Montgomery*, No. 2:14-cv-00186-MHT-CSC (M.D. Ala.)……… 2, 25, 27

*Ray v. Judicial Corrections Services, et al.*, 2013 WL 5428360 (N.D. Ala. 2013)……… 2, 21, 28

*Ray v. Judicial Corrections Services, et al.*, 2013 WL 5428395 (N.D. Ala. 2013)……………… 2

*Ray v. Judicial Correction Services, Inc., et al.*, No. 2:12-cv-02819-RDP (N.D. Ala. Filed Aug. 28, 2012)………………………………………………………………………………………… 2

*Reynolds v. Judicial Corr. Servs.*, No. 2:15-cv-00161-MHT-CSC (M.D. Ala.)……….... 3, 25, 27

*Watts v. City of Montgomery, et al.*, No. 2:13-cv-00733-MEF-CSC (M.D. Ala.)…………… 2, 21

*Woods v. The City of Columbiana*, No. 2:15-cv-00493-RDP (N.D. Ala.)………………………... 2

**II.     Legal Standard of Review Concerning Rule 12(b)(6) Motions to Dismiss.** ……..3

Rule 12, Fed. R. Civ. P. ………………………………………………………………………..3

*Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010)…………………………………………… 3

*Wilson v. Strong*, 156 F.3d 1131, 1133 (11th Cir. 1998)………………………………………3

**III.     The Plaintiffs Have Alleged Sufficient Facts Under *Iqbal* and *Twombly*.** ……….3

Rule 8, Fed. R. Civ. P. …………………………………………………………………………3

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1943 (2009)………………………………...3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 555, 556, 127 S. Ct. 1955 (2007)…………………………3

*Grech v. Clayton County*, 335 F.3d 1326, 1329-30 (11th Cir. 2003)…………………………7, 9

*Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011)………………………………………………3

i

**IV.    The Plaintiffs' § 1983 Claims are Viable and the City Should be Held Liable for its Illegal and Reprehensible Conduct.  ……………………………………7**

> **a.   Legal Framework Concerning Claims Brought Under 42 U.S.C. § 1983.**

42 U.S.C. § 1983……………………………………………………………… *passim*

*Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479 (11th Cir. 1991)………………………..9

*City of Canton v. Harris*, 489 U.S. 378, 389 (1989)……………………………………………….9

*Daniels v. Williams*, 474 U.S. 327 (1986)………………………………………………………...8

*Grech v. Clayton County*, 335 F.3d 1326, 1329-30 (11th Cir. 2003)…………………………..7, 9

*Mandel v. Doe*, 888 F.2d 783, 791 (11th Cir. 1988)……………………………………………8-9

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978)…………….8-9

*Parratt v. Taylor*, 451 U.S. 527 (1981)…………………………………………………………..8

*Polk County v. Dodson*, 454 U.S. 312, 326 (1981))……………………………………………..9

*Skop v. City of Atlanta*, 485 F.3d 1130, 1145 (11th Cir. 2007)………………………………….9

*Turquitt v. Jefferson County*, 137 F.3d 1285 (11th Cir. 1998)…………………………………..9

> **b.   The Court Must Reject the Argument that the Municipal Court was Solely an Arm of the State Judicial System.  …………………………………………9**

Ala. Code § 12-8-1, *et seq*……………………………………………………………………11

Ala. Code § 12-14-1, *et seq*……………………………………………………………*passim*

*Ass'Ad-Faltas v. City of Columbia*, 2010 U.S Dist. LEXIS 142785, 2010 WL 6549845 (D.S.C. Dec. 10, 2010)…………………………………………………………………………12

*Callahan v. City of Philadelphia*, 207 F.3d 668 (3d Cir. 2000)…………………………………12

*Griffin v. City of Milwaukee*, 2010 U.S. Dist. LEXIS 126905 at *30 , 2010 WL 4723420 (E.D. Wisc. Nov. 15, 2010)……………………………………………………………………12

*Hornsby v. Sessions*, 703 So. 2d 932 (Ala. 1997)………………………………………………..11

*House v. Cullman County*, 593 So. 2d 69 (Ala. 1992)…………………………………………...11

*In re Raphael*, 238 B.R. 69 (D.N.J. 1999)………………………………………………………12

*Kelly v. Municipal Courts*, 97 F.3d 902, 908 (7th Cir. 1996)……………………………………12

*Murphy v. Mobile*, 504 So. 2d 243 (Ala. 1987)……………………………………………………11

      **c.**    **The City Clearly Has Power Over its Municipal Court.** ………………**13**

      **d.**    **The City Controls the Prosecutors.** ………………………………………..**14**

      **e.**    **The City Controls Debt-Collection Through Probation.** ………………**15**

      **f.**    **The City Controls the Provision of Indigent Defense Services.** …………**16**

Ala. Code § 12-14-1, *et seq*……………………………………………………………*passim*

      **g.**    **The Rest of the City's Debt Collection Scheme Is Pervaded by City Policies and Practices.** …………………………………………………………..**17**

*De Luna v. Hidalgo County, Texas*, 853 F. Supp. 2d 623, 641-42 (S.D. Tex. 2012)……18, 21, 40

*Tucker v. City of Montgomery*, 410 F. Supp. 494 (M.D. Ala. 1976)………………………………18

      **h.**    **The City Has Other Mechanisms to Provide Relief.** ……………...............**18**

Ala. Code § 11-45-1, *et seq*……………………………………………………………………19

Ala. Code § 12-14-1, *et seq*……………………………………………………………………*passim*

Ala. Code § 15-1-1, *et seq*……………………………………………………………………..19

*Schoenvogel ex rel. Schoenvogel v. Venator Grp. Retail*, 895 So. 2d 225, 233 (Ala. 2004)…….19

      **i.**    **The Other Arguments Made By the City Are Unpersuasive.** ………………**19**

*Cleveland v. City of Montgomery, et al.*, No. 2:13-cv-00732-MHT-TFM (M.D. Ala.)……... 2, 21

*De Luna v. Hidalgo County, Texas*, 853 F. Supp. 2d 623, 641-42 (S.D. Tex. 2012)……18, 21, 40

*Jane Doe 5 v. City of Haltom City*, 106 Fed. App'x 906, 907 (5th Cir. 2004)…………………..20

*Mitchell v. The City of Montgomery*, No. 2:14-cv-00186-MHT-CSC (M.D. Ala.)……… 2, 25, 27

*Ray v. Judicial Corrections Services, et al.*, 2013 WL 5428360 (N.D. Ala. 2013)……… 2, 21, 28

*Smedley v. City of Ozark*, 2012 WL 512586, 2012 U.S. Dist. LEXIS 19494 (M.D. Ala. Feb. 1, 2012)……………………………………………………………………………19-20

*Watts v. City of Montgomery, et al.*, No. 2:13-cv-00733-MEF-CSC (M.D. Ala.)…………… 2, 21

**j.   Clanton Can and Should be Held Liable for its Highly Profitable Policies and Procedures.** ……………………………………………………………**22**

Rule 26.11(k), Ala. R. Crim. P. …………………………………………………………...22

*Ex parte Watson*, 757 So. 2d 1107, 1112 (Ala. 2000)…………………………………………...22

**V.    The City's Contract with JCS, Inc. Violates the Plaintiffs' Due Process Rights.** …………………………………………………………………………**22**

Ala. Const., art. I, § 22…………………………………………………………………...23

Ala. Code § 41-16-50(a)……………………………………………………………….......23

*Beavers v. Cnty. Of Walker*, 645 So. 2d 1365, 1373-74 (Ala. 1994)………………………........23

*Brown's Ferry Waste Disposal Ctr., Inc. v. Trent*, 611 So. 2d 226, 229-30 (Ala. 1992)……….23

*Kennedy v. City of Prichard*, 484 So. 2d 432, 433-35 (Ala. 1986)………………………………23

**a.   JCS, Inc. Has Direct Financial Incentives in the Probation Decisions that it Makes.** ……………………………………………………………………………**23**

Ala. Code. § 15-22-53……………………………………………………………….…25, 33

Ala. Code. § 15-22-54……………………………………………………………….…25, 33

Rule 27.4, Ala. R. Crim. P. ………………………………………………………………25, 33

*Burdette et al. v. Town of Harpersville, et al.*, 2010-cv-900183 at *1 (Shelby Co. Cir. Ct. July 11, 2012)………………………………………………………………………………………...27

*Mitchell v. The City of Montgomery*, No. 2:14-cv-00186-MHT-CSC (M.D. Ala.)…...2, 24-25, 27

*Ray v. Judicial Corrections Services, et al.*, 2013 WL 5428360 (N.D. Ala. 2013)…...2, 21, 27-28

*Reynolds v. Judicial Corr. Servs.*, No. 2:15-cv-00161-MHT-CSC (M.D. Ala.)………..  3, 25, 27

*Town of Harpersville, Alabama, et al. v. Judicial Corr. Servs.*, 58-cv-2015-900124 at 7-8 and 14-17……………………………………………………………………………………….27-28

**b.   Due Process Prohibits Neutral Government Officials From Having a Direct Financial Incentive in Their Enforcement Decisions.** …………………………**28**

*Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986)…………………………………………...29

*Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 878 (2009)…………………………28-29

*Connally v. Georgia*, 429 U.S. 245 (1977)………………………………………………………29

iv

*Dugan v. Ohio*, 277 U.S. 61 (1928)……………………………………………………...29

*Gibson v. Berryhill*, 411 U.S. 564 (1973)……………………………………………………29

*Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482 (1976)……………29

*Marshall v. Jerrico*, 446 U.S. 238 (1980)…………………………………………………..*passim*

*Tumey v. Ohio*, 273 U.S. 510 (1927)……………………………………………………...29, 32

*Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972)……………………………………29, 32

*Young v. U.S. ex rel. Vuitton*, 481 U.S. 787, 803-805 (1987)…………………………………31, 36

*Developments in the Law*, 128 Harv. L. Rev. 1723, 1737-38 (2015)………………………...31-32

     **c.  Because of the Important Rights at Stake in the Probation Context, the Neutrality of Probation Officers Is Vital. ……………………………………32**

Ala. Code. § 15-22-53…………………………………………………………………...25, 33

Ala. Code. § 15-22-54…………………………………………………………………...25, 33

Rule 27.2, Ala. R. Crim. P.  …………………………………………………………………33

Rule 27.4, Ala. R. Crim. P.  ……………………………………………………………25, 33

Rule 27.6, Ala. R. Crim. P.  …………………………………………………………………33

*Brown v. Butler*, 811 F.2d 938, 941 (5th Cir. 1987)………………………………………34

*Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)………………………………………………32, 42

*Griffin v. Wisconsin*, 483 U.S. 868, 879 & n.6 (1987)……………………………………34-35

*In re Yanks*, 882 F.2d 497, 497-98 (11th Cir. 1989)………………………………………37

*Marshall v. Jerrico*, 446 U.S. 238 (1980)…………………………………………………..*passim*

*Robertson v. U.S. ex rel. Watson*, 560 U.S. 272, 278 (2010) (Roberts, C.J. dissenting from dismissal as improvidently granted)……………………………………………..35

*Schiff v. Dorsey*, 877 F.Supp. 73, 77 & n. 1 (D.Conn.1994)……………………………34

*United States v. Dixon*, 187 F. Supp. 2d 601, 605 (S.D.W. Va. 2002)…………………………34

*United States v. Kone*, 591 F. Supp. 2d 593, 607 (S.D.N.Y. 2008)………………………...34

*United States v. Maury*, 530 Fed. App'x 205, 208 (3d Cir. 2013)………………………………34

*United States v. Robinson*, 2010 WL 1459382, at \*10, 2010 U.S. Dist. LEXIS 36126 (E.D.N.Y. Apr. 12, 2010)……………………………………………………………………...33-34

*United States v. Salerno*, 481 U.S. 739, 750 (1987)……………………………………32, 42

*United States v. Stegman*, 295 F. Supp. 2d 542, 550 (D. Md. 2003)……………………………34

*United States v. Story*, 716 F.2d 1088, 1090 (6th Cir. 1983)……………………………………34

*Warner v. Orange County. Dep't of Prob.*, 115 F.3d 1068, 1072 (2d Cir. 1996)………………34

*Williams v. People of State of N.Y.*, 337 U.S. 241, 249 (1949)…………………………………33

*Young v. U.S. ex rel. Vuitton*, 481 U.S. 787, 803-805 (1987)……………………………31, 36-37

*Youngberg v. Romeo*, 457 U.S. 307, 316 (1982)………………………………………………...32

Sharon Bunzel, Note, *The Probation Officer and the Federal Sentencing Guidelines: Strange Philosophical Bedfellows*, 104 Yale L.J. 933, 945 (1995)…………………………........34

**VI.     The City's Position Concerning Due Process and Equal Protection is Meritless.**  …………………………………………………………………………**38**

          **a.   Due Process.**  ………………………………………………………………**38**

*Barnett v. Hopper*, 548 F.2d 550, 554 (5th Cir.1977)…………………………………………...40

*Bearden v. Georgia*, 461 U.S. 660, 672-73 (1983)………………………………………….38-41

*Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)……………………………………..40

*De Luna v. Hidalgo County, Texas*, 853 F. Supp. 2d 623, 641-42 (S.D. Tex. 2012)……18, 21, 40

*Frazier v. Jordan*, 457 F.2d 726, 728–29 (5th Cir. 1972)………………………………………40

*Griffin v. Illinois*, 351 U.S. 12, 19 (1956)………………………………………………….39-40

*Tate v. Short*, 401 U.S. 395, 398 (1971)…………………………………………………………39

*Turner v. Rogers*, 131 S. Ct. 2507, 2520 (2011)…………………………………………….40-41

*United States v. Waldron*, 306 F. Supp. 2d 623, 629 (M.D. La. 2004)…………………………40

          **b.   Equal Protection.**  …………………………………………………………**41**

*Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)……………………………………………32, 42

*Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 779-81 (9th Cir. 2014)……………………………...42

*Pugh v. Rainwater*, 557 F.2d 1189, 1190 (5th Cir. 1977) (vacated on other grounds)…………..42

*Schilb v. Kuebel*, 404 U.S. 357, 365 (1971)………………………………………………………...42

*State v. Blake*, 642 So. 2d 959, 966-67 (Ala. 1994)………………………………………………...42

*United States v. Montalvo-Murillo*, 495 U.S. 711, 716 (1990)………………………………………42

*United States v. Salerno*, 481 U.S. 739, 750 (1987)……………………………………...32, 41-42

**VII.    The Plaintiffs Have Not Sued an "Improper Party."  …………………………...42**

42 U.S.C. § 1983………………………………………………………………………… *passim*

Rule 12, Fed. R. Civ. P.  …………………………………………………………………….42-43

Rule 19, Fed. R. Civ. P.  …………………………………………………………………….43-44

*Birmingham v. Graffeo*, 551 So. 2d 357 (Ala. 1989)……………………………………………44

*Davis Co. v. Emerald Casino, Inc.*, 268 F. 3d 477, 479-80, n.2, 4 (7th Cir. 2001)……………...43

*Ilan-Gat Eng'rs, Ltd. v. Antigua Int'l Bank*, 212 U.S. App. D.C. 188, 659 F.2d 234, 242 (D.C. Cir. 1981)……………………………………………………………………………………...43

*Kime v. Wise*, 634 F. Supp. 514, 518 (N.D. Ohio 1985)……………………………………..44-45

*Ott v. Moody*, 382 Ala. 288 (Ala. 1968)…………………………………………………………44

*Ploog v. HomeSide Lending, Inc.*, 209 F. Supp. 2d 863, 873 (N.D. Ill. 2002)…………………43

*RotecIndus., Inc. v. Aecon Group, Inc.*, 436 F. Supp. 2d 931, (N.D. Ill. 2006)…………………43

*Sever v. Glickman*, 298 F. Supp. 2d 267, 275 (D. Conn. 2004)…………………………………43

Wright and Miller, Federal Practice and Procedure § 1359 (2d. Ed. 2003)……………………..43

*Calendar   of   Our   History*   at   pg.   1,   available   at http://www.eastlakeohio.com/images/site/HistoricalSociety/Old-Eastlake-history.pdf (last visited Nov. 18, 2015)……………………………………………………………………………44

**VIII.    Both Federal Rule 69 and Alabama Code §§ 11-47-190 and -191 are Inapplicable and Completely Irrelevant.  …………………………………………………………45**

Rule 69, Fed. R. Civ. P.  …………………………………………………………………...45

Ala. Code § 11-47-190……………………………………………………………………...45-46

Ala. Code § 11-47-191……………………………………………………………………45-46

*Birmingham v. Corr*, 229 Ala. 321, 323, 157 So. 56, 1934 Ala. LEXIS 333 (Ala. 1934)………46

*Brown v. Fairhope*, 265 Ala. 596, 599, 93 So. 2d 419, 1957 Ala. LEXIS 353 (Ala. 1957)…….46

*Ellison v. Town of Brookside*, 481 So. 2d 890, 891-92 (Ala. 1985)……………………………..46

*Gamble v. Florida Dept. of Health & Rehab. Servs.*, 779 F.2d 1509, 1518 n.11 (11th Cir. 1986)……………………………………………………………………………45-46

*Oladeine v. City of Birmingham*, 118 F. Supp. 2d 1200, 1207 (N.D. Ala. 1999) (emphasis in original)……………………………………………………………………………..45

*Patrick v. Florala*, 793 F. Supp. 301, 302 (M.D. Ala. 1992)………………………………...45-46

**IX.      Conclusion. ……………………………………………………………...46**

## I.     Introduction.

The Plaintiffs filed their original complaint, supported by fifteen exhibits, on February 23, 2015.  Doc. 1.  After fully briefing the City's original motion to dismiss, *see* Doc. 7, 10-13, the City participated in mediation on its own behalf.  *See* Doc. 14, 16, 17, 22, 23, 24.  The Plaintiffs' first amended class action complaint seeks damages for themselves and all others similarly situated.  Doc. 42, 43.  The City then filed a motion to dismiss, largely raising the same issues that were contained in its original motion to dismiss.  Doc. 10, 44.

It is worth noting that the City continues to cling to the fiction that it is not a proper defendant in this action, when the City is the entity that imprisoned the Plaintiffs, and other similarly situated individuals, for failure to pay debts owed to the City.  The City—not the municipal court or any employee of the municipal court—is the entity (through its mayor, Billy Jo Driver) that contracted with a private probation company to collect money owed to the City.  Doc. 12-6.  The City is the entity that, pursuant to this contract with the private probation company, ordered the Plaintiffs, and other similarly situated individuals, to pay additional money to that company, money that was not authorized by any statute or law in Alabama.  *Id.*  The City is the entity that entered into the agreement settling the Plaintiffs' equitable claims, the benefits of which inure to the entire class the Plaintiffs now seek to represent.  Doc. 23, 23-1.  The City is the entity that agreed to be bound by the terms of the settlement agreement.  *Id.*  The City is the party that will face contempt sanctions if the Court decides that a violation of the settlement agreement occurs.  This lawsuit was filed by the Plaintiffs to hold the City accountable for the unconscionable actions that were well within the City's authority and control.

This litigation is one of at least six pending cases in which various Alabama municipalities are alleged to have perpetrated similar civil rights and constitutional violations

that are at issue in this case against Clanton.[1]  In many of these cases, the defendants have filed motions to dismiss that are based largely on the same arguments presented by Clanton here.  In *Ray v. Judicial Correction Services, Inc., et al.*, No. 2:12-cv-02819-RDP (N.D. Ala. Filed Aug. 28, 2012), Judge Proctor for the Northern District denied two such motions to dismiss by orders dated September 26, 2013. See *Ray v. Judicial Corrections Services, et al.*, 2013 WL 5428360 (N.D. Ala. 2013); *Ray v. Judicial Corrections Services, et al.*, 2013 WL 5428395 (N.D. Ala. 2013).  Additionally, three other cases were brought against the City of Montgomery in the Middle District of Alabama and resolved in the Plaintiffs' favor in 2014.[2]

In its Motion to Dismiss (Doc. 44, 44-1), the City makes distracting assertions and raises irrelevant and unsupported issues.[3]  Clanton spends much of its brief arguing that the facts contained in the Plaintiffs' complaint did not happen or could not have happened because they would have violated the law.  Among its outrageous claims, the City argues the JCS, Inc. contract was not binding on the court, that the City could not (or did not) enter into the JCS, Inc. contract, and that the City had absolutely no control over the administrative functions of the municipal court.  The "facts" as articulated by the City differ from the allegations contained in the complaint, and they do not support its motion to dismiss.  The City completely fails to show any pleading deficiency and makes only repetitive arguments in the futile attempt to characterize the municipal court as an allegedly independent arm of the state judicial system, despite the

---

[1] *See, e.g.*, *Woods v. The City of Columbiana*, No. 2:15-cv-00493-RDP (N.D. Ala.); *Carter v. The City of Montgomery*, No. 2:15-cv-555-WKW (M.D. Ala.); *McCullough v. City of Montgomery, et al.*, No. 2:15-cv-00463 -WKW-WC (M.D. Ala.); *Hall v. The City of Fort Payne, et al.*, No. 4:15-cv-01656-JEO (N.D. Ala.); *Carden v. The Town of Harpersville, et al.*, No. 2:15-cv-01381-RDP (N.D. Ala.); *Ray v. Judicial Correction Services, Inc., et al.*, No. 2:12-cv-02819-RDP (N.D. Ala.).  Plaintiffs ask the court to take judicial notice of these cases.

[2] *See Cleveland v. City of Montgomery, et al.*, No. 2:13-cv-00732-MHT-TFM (M.D. Ala.); *Watts v. City of Montgomery, et al.*, No. 2:13-cv-00733-MEF-CSC (M.D. Ala.); *Mitchell v. The City of Montgomery*, No. 2:14-cv-00186-MHT-CSC (M.D. Ala.).

[3] To the extent the City's motion can be construed to have raised arguments not addressed in this response but discussed in the Plaintiffs' response to the City's first motion to dismiss, the Plaintiffs respectfully request an opportunity to fully brief those issues.  To the extent necessary, the Plaintiffs additionally request the Court take judicial notice of that prior filing, including the attached exhibits, Doc. 12, Doc. 12-1 through 12-8.

complete lack of support for that proposition in the Alabama Constitution, the Alabama Code, and binding court precedent.  None of these efforts overcome the fact that the Plaintiffs' claims are properly pled and that the City's Motion should be denied.[4]

**II.      Legal Standard of Review Concerning Rule 12(b)(6) Motions to Dismiss.**

When evaluating motions to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept as true all facts as set forth in the complaint and draw all reasonable inferences in the Plaintiffs' favor.  *See, e.g. Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010) (citing *Wilson v. Strong*, 156 F.3d 1131, 1133 (11th Cir. 1998)).

**III.     The Plaintiffs Have Alleged Sufficient Facts Under *Iqbal* and *Twombly*.**

Under Rule 8, the Plaintiffs' pleading "must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Randall*, 610 F.3d at 708 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1943 (2009)).  The Court must accept as true all factual allegations contained in the complaint.  *Id.*  Complaints that state plausible claims for relief will survive motions to dismiss.  *Id.*  (citing *Iqbal*, 129 S. Ct. at 1949-50 and *Bell Atl. Corp. v. Twombly*, 550 U.S. 555, 556, 127 S. Ct. 1955 (2007)); *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011).  Section 1983 Plaintiffs need not meet a heightened pleading standard[5] simply because the Defendant raises immunity as a defense.  *Id.* at 709-10.

The City's only articulated argument concerning the complaint under *Iqbal*/*Twombly* is that any Fourth and Thirteenth Amendment claims were not pled.  Doc. 44 at 11-13.  The implication of the Fourth Amendment is briefly discussed in section V.c, *infra*.  The Plaintiffs

---

[4] In paragraph 46 of the complaint, the Plaintiffs refer to the "system of debt collection for traffic tickets."  The failure to include the term "municipal convictions" in that paragraph was an oversight, but the same debt collection scheme applied in Clanton to both misdemeanor and traffic convictions.  *See Reynolds v. Judicial Corr. Servs.*, No. 2:15-cv-00161-MHT-CSC (M.D. Ala.).

[5] A heightened pleading standard remains for cases governed by Rule 9, Fed. R. Civ. P.  *Randall*, 610 F.3d at 706-07 n.1.  The Plaintiffs have not alleged any facts or claims that fall within this exception.

3

have not brought any claims under the Thirteenth Amendment, mentioned only once in the Amended Class Action Complaint.  Doc. 43 at ¶ 9.  The City has not moved to dismiss any other claim contained in the complaint on these grounds, despite its conclusory statements concerning the facts underlying the Plaintiffs' § 1983 claims.  Doc. 44 at 16-18.  By implication, the City therefore concedes that each and every claim was properly pled.

To the extent the City's motion under *Iqbal/Twombly* and Rule 8 can be construed more broadly, those issues have been briefed below out of an abundance of caution.  The Complaint was the product of rigorous investigation and is filled with factual context providing the background essential to the claims for relief.   The complaint set forth the factual context necessary to understanding the scheme by which the City collected municipal court debt from some of its poorest citizens.  The City operated its unconstitutional policies through the use of the municipal court, municipal prosecutors, probation officers, police officers, and other City employees.  *See, e.g.*, Doc. 43 at ¶¶ 16-22, 25-31, and 33-62.  The named plaintiffs here were jailed because of their inability to make monetary payments to the City of Clanton, which had not followed any legal process recognizable in American law.[6]

Each day the Plaintiffs sat in jail reduced their debt owed to the City by $50; each fraction of a day counted for a fraction of the $50 daily figure.  None of the Plaintiffs was sentenced to the suspended jail time imposed by the municipal court.  Champan was sentenced to "28.3 days" for failing to pay $1,415 and "9.02 days"[7] for failing to pay $451.  Doc. 1-4, 1-5.  Littlefield was sentenced to "21.12 days" for failing to pay $1,056.  Doc. 1-8.  Kine was

---

[6] The City claims the Plaintiffs "elected to file a civil lawsuit" instead of appealing the orders jailing them for failing to pay the City.  Doc. 44 at 7-8.  The City ignores the strict 14-day deadline for filing appeals from municipal court orders, which had long since run by the time the instant lawsuit was filed.  Ala. Code § 12-14-70.  The Plaintiffs took the <u>only</u> recourse available to them.

[7] Chapman was sentenced to the "9.02 days" on the same day she was found guilty of that offense.  The City never even gave her a chance to pay the $451 fine.  Doc. 1-5.

sentenced to "51 days" for failing to pay $2,550.  Doc. 1-14.  These "sentences" bore no relation to the amount of time the Plaintiffs could have been imprisoned had their original suspended sentences been imposed.

The Plaintiffs were left to either remain in jail or raise exorbitant amounts of cash to buy their release.  The City operated a sophisticated scheme to use this basic threat of jail to generate revenue from very poor people.  The scheme involved City police, prosecutors, officials, court employees, "probation officers," and other City agents.  The Plaintiffs alleged this scheme in detail, providing the necessary factual context in which to understand the numerous ways this lawless system violated basic legal principles.  Doc. 43, doc. 1-1 through 1-15.

The Plaintiffs' complaint clearly satisfies the *Iqbal*/*Twombly* standard and the City has cited absolutely no legal authority to demonstrate otherwise.  The City placed each Plaintiff on private probation with JCS, Inc., the private probation company.  Doc. 43 at ¶¶ 19, 26, 35.  The City, through its prosecutor and probation officers, threatened the Plaintiffs with jail if they could not pay the amounts owed.  *See, e.g.*, Doc. 43 at ¶ 37.  The City, through its contract with JCS, Inc. and through the City Prosecutor, instituted revocation proceedings by filing a document entitled "Petition for Revocation of Probation and Statement of Delinquency Charges."  Doc. 43 at ¶¶ 21, 29, 39.  The City police force arrested each Plaintiff.  Doc. 43 at ¶¶ 20, 28, 38-39.  The City revoked the probation that each Plaintiff was serving, without notice or a hearing.  Doc. 43 at ¶¶ 20, 28, 38.  The City ordered JCS, Inc. to charge each Plaintiff an additional amount of money for the probation set-up fees and monthly supervision fees.  Doc. 43 at ¶¶ 19, 21, 26, 35.  The City calculated the amount of municipal court debt owed by each Plaintiff.  Doc. 43 at ¶¶ 21-22, 29-30, 40-41.  The City decided that each Plaintiff was to spend time in jail on their unpaid municipal court debt at the rate of $50 per day.  Doc. 43 at ¶¶ 21, 29, 39-40.  The City

failed to appoint each Plaintiff an attorney.  Doc. 43 at ¶¶ 22, 30, 40.  The City failed to offer any alternatives to incarceration for each Plaintiff's inability to pay their monetary debt.  Doc. 43 at ¶¶ 22, 30, 40.  Plaintiff Littlefield continues to live in fear of arrest by the City due to his release from jail (by the Chilton County Circuit Court after intervention of present counsel) before he served the entire "21.12 days" in jail for failure to pay the municipal court debt.  Doc. 43 at ¶ 32.

The treatment of the named plaintiffs is representative of the manner in which the City treated individuals that owed money to the City resulting from fines, costs, and probation fees associated with misdemeanor and traffic convictions.  Doc. 43 at ¶ 42.  The City operated its municipal court most Tuesdays.  Doc. 43 at ¶ 44.  The City assessed fines, fees, and costs on a finding of guilt in the municipal court and where full payment could not immediately be made, that money was payable to the City directly or through JCS, Inc.  Doc. 43 at ¶¶ 44-46.  The City contracted with JCS, Inc. to collect money owed to the City.  Doc. 43 at ¶ 46, Doc. 12-6.  The City, after consultation with JCS, Inc. would issue warrants of arrest for people owing money to the City through the private probation company.  Doc. 43 at ¶ 48.  The City issued and served arrest warrants for nonpayment of fines, fees, and court costs.  Doc. 43 at ¶ 54.  The City permitted JCS, Inc. personnel to be present in the municipal courtroom to pose as "probation officers," knowing the private probation company was not authorized by any state or federal law to act as probation officers and knowing employees of the private probation company did not act as neutral public court officers.  Doc. 43 at ¶¶ 50-52.  The City did not bring municipal debtors to court after arrests for failure to pay; these individuals were often not given court hearings and were simply ordered by the City to sit out their fines in the Chilton County Jail.  Doc. 43 at ¶ 56.  The policies and practices of the City's scheme resulted in a culture of fear among local residents

who were terrified of being shaken down for money by the City and JCS, Inc.  Doc. 43 at ¶¶ 58-61.

The Plaintiffs have set forth facts sufficient to satisfy the *Iqbal/Twombly* standard such that the Court could conclude that "[t]he treatment of Plaintiffs was caused by and is representative of the <u>City's policies and practices</u> concerning traffic tickets and misdemeanor fines, costs, and private probation fees."  Doc. 43 at ¶ 42 (emphasis added).  <u>The City authorizes the imposition of fines, fees, and costs</u> on a finding of guilt in its municipal court and refers those people who cannot pay at once to JCS, Inc.  Doc. 43 at ¶ 45, *see also* Doc. 1-6.  <u>The City supervises the probation through JCS, Inc.</u> and ensures that its fines, fees, and costs are paid, either in cash or in days spent in jail.  Doc. 43 at ¶¶ 42-63.  The City must be held responsible for the persistent, widespread practice of its own officials or employees that is so common and well settled as to constitute a custom that fairly represents municipal policy.  *Grech v. Clayton County*, 335 F.3d 1326, 1329-30 (11th Cir. 2003).  The named plaintiffs' claims are properly pled and City's Motion to Dismiss should be denied.[8]

## IV.    The Plaintiffs' § 1983 Claims are Viable and the City Should be Held Liable for its Illegal and Reprehensible Conduct.

Clanton claims the clear violations suffered by the Plaintiffs "fall squarely within the exclusive province of the Clanton Municipal Court, an arm of the State of Alabama."  Doc. 44 at 3.  According to the City, state law lays the blame for the flagrant unconstitutionality of the City's entire debt collection system at the feet of the City's rogue municipal court and/or municipal court judge (neither of which can be sued for injunctive relief or damages).  The City makes the outrageous claim that it "is absolutely powerless" to do anything about its debt collection methods.  Doc. 44 at 3.

---

[8] To the extent the Court decides otherwise concerning the sufficiency of the assertions contained in the complaint, the Plaintiffs respectfully request time to file another amended complaint.

As explained in detail below, the City's arguments must be rejected.  The City initially argues that the Plaintiffs' claims are against the municipal court,[9] despite the fact that the Plaintiffs named the City of Clanton as the defendant and set forth sufficient facts detailing the City's debt collection scheme.  Contrary to the City's attempts at distraction, as set forth in the complaint and below, it is clear that the City is responsible for the policies, practices, and procedures that its prosecutors, probation officers, public defenders, police officers, elected officials, and court employees have used in pursuit of debts owed to the City.  Furthermore, the Plaintiffs note that the City, through its Mayor, Billy Jo Driver—and not any employee of the municipal court—signed the settlement agreement that brought the Plaintiffs' equitable claims to a successful conclusion.  Doc. 23, 23-1.  It is incongruous for the City to bind itself (and its municipal court, by extension) through the settlement agreement and now take the position that it has no authority over that same court covered in part by that agreement.  In fact, it is clear from the settlement agreement that the City believes and acknowledges that it has the power to prevent the constitutional abuses alleged in the complaint, and that the City refused to exercise that power because of how profitable the debt collection scheme was for Clanton.

### a.  Legal Framework Concerning Claims Brought Under 42 U.S.C. § 1983.

To prevail on their claims brought under 42 U.S.C. § 1983, the Plaintiffs must show that the offending conduct was committed by a person acting under color of state law and that the conduct deprived the Plaintiffs of rights secured by the Constitution.  *Parratt v. Taylor*, 451 U.S. 527 (1981), overruled on other grounds, *Daniels v. Williams*, 474 U.S. 327 (1986).  The City is a "person" who may be sued under § 1983.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978).  To establish that the City acted under color of law, the

---

[9] Doc. 44 at II.A.

Plaintiffs must show that it adopted an official policy that was the moving force behind the claimed constitutional violations. *Skop v. City of Atlanta*, 485 F.3d 1130, 1145 (11th Cir. 2007).

An official policy can be either (1) a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy. *Grech v. Clayton County*, 335 F.3d 1326, 1329-30 (11th Cir. 2003) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); and citing *Monell*, 436 U.S. at 694; *Polk County v. Dodson*, 454 U.S. 312, 326 (1981)).

City policy "may be implicated . . . by pervasive city custom. *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479 (11th Cir. 1991) (citing *Mandel v. Doe*, 888 F.2d 783, 791 (11th Cir. 1988)). "[A] long-standing and widespread practice is deemed authorized by the policy-making officials because they must have known about it but failed to stop it." *Id.* at 1481. The Court must only consider a few simple facts to find meritless the City's assertions that the Plaintiffs cannot prevail on their § 1983 claims.[10]

### b. The Court Must Reject the Argument that the Municipal Court was Solely an Arm of the State Judicial System.

The City spends more than a quarter of its brief (*see* sections II.B.1 through II.B.8), Doc. 44 at 18-30, quoting state law provisions in the futile attempt to disclaim liability solely because

---

[10] The City cites three times to *Turquitt v. Jefferson County*, 137 F.3d 1285 (11th Cir. 1998), for the proposition – inapplicable in the Plaintiffs' case – that "local governments can never be liable under § 1983 for the acts of those whom the local government has no authority to control." *See* Doc. 44 at 15, 18, 33. *Turquitt* is completely inapplicable for several reasons, including because in that case, the employee, as a Sheriff, was an actor of the state, not the local government. In this case, all of the relevant actors were employees of the City, including those acting pursuant to a contract with the City, signed by its mayor.
     The other arguments raised by the City, including the supporting cases contained in Doc. 44-1, fail for all the reasons stated in this brief, including the fact that they are irrelevant.

its municipal court is part of the State's unified judicial system.  While the City's brief contains a paucity of analysis or argument on this issue, and its out-of-context assertions are very misleading, the basic point that municipal courts are part of the state court system and that municipal judges are bound by rules set by the Supreme Court is uncontroversial.  But it is also irrelevant to the question of whether the City plays a role in the jailing and continued detention of its debtors and whether the City is powerless to do anything to stop it.

Obviously a unified judicial system necessitates a degree of control over all judges by the highest court of the State.  But no one in this case is suggesting that the City force a judge to contradict state rules.  This case involves whether the City can take in revenue from its unconstitutional policies and practices and then pretend that it is powerless to stop the entire regime of debt collection that the City knows is unlawful and yet retains because it is profitable—a regime in which the City enlists a veritable army of employees to effectuate.

The City overstates its claim by ignoring ways in which the municipal court is a creature of the City.  In addition to providing the prosecutors, probation officers, and public defenders, the City also provides "appropriate facilities and necessary supportive personnel" for the municipal court.  *See* Ala. Code § 12-14-2.  The City is responsible for hiring (or appointing) and employing the municipal judges and ensuring that those judges are fit for office.  Every aspect of a municipal court's operations, including its revenues, is controlled by City employees and intertwined with City programs.  In reality, the municipal court is not one thing or the other, but an institution controlled by the City and by the State in different ways.   In any case, the City is responsible for how its employees and officers use the municipal court to collect revenues.

Due to the City's repetitious arguments contained in several short sections, Plaintiffs' counsel has streamlined and consolidated its response to this section of the City's motion to

dismiss.  In section II.B.1, the City argues that its municipal court was established by Alabama's constitution, not by Clanton.[11]  Clanton clearly overlooks the fact that every city is given the choice under state law whether to establish a municipal court, and that Alabama law gives cities the choice, at any time, to terminate its use of a municipal court and to re-establish it whenever a city sees fit.  *See* Ala. Code § 12-14-1; § 12-14-17, § 12-14-19.

In Section II.B.2, the City cites to representation in Alabama's Judicial Conference, pursuant to Ala. Code. § 12-8-1, *et seq.*  In Section II.B.3, the City asserts that municipal courts are governed entirely by state law.  Sections II.B.4 and II.B.5 concern the powers of municipal court judges.  Doc. 44 at 21-25.  Section II.B.6 concerns administrative rules and procedures. Doc. 44 at 26-27.  These sections do not contain any argument that counsel can decipher that supports the City's motion; they simply quote cases and sections of the Alabama Constitution and Alabama Code.  Moreover, the City concedes that it has power over the municipal court simply by choosing whether or not to establish one if it deems fit: "Should a municipality elect not to have a municipal court, as is permitted by law, then those cases of which it had jurisdiction must be transferred to the district court of the county in which the city or town is located."  Doc. 44 at 21 (emphasis added).

In Section II.B.7, the City claims that it would be inappropriate under the Canon of Judicial Ethics to have municipal court judges influenced by another branch of government. Doc. 44 at 27.  This argument, no doubt true as far as it goes, fails for all of the reasons stated above, including that it is irrelevant.  The City has the power to ensure that the debtors that it

---

[11] Clanton also cites to *Hornsby v. Sessions*, 703 So. 2d 932 (Ala. 1997), *House v. Cullman County*, 593 So. 2d 69 (Ala. 1992) and *Murphy v. Mobile*, 504 So. 2d 243 (Ala. 1987) for the proposition that municipal courts are a part of Alabama's unified judicial system.  While these cases do state as such, they are irrelevant in response to the claims raised in the amended complaint and offer no support to the City's motion beyond out-of-context quotations.

pursues in its enforcement proceedings are not illegally kept in jail without anyone improperly influencing a judge's decision in any particular case.[12]

Section II.B.8 is filled with random federal cases that are irrelevant for the simple fact that the vengeful actions taken against the Plaintiffs were perpetrated not by the municipal court or the municipal court judge, but by Clanton itself.[13]  The Plaintiffs named the City of Clanton as the defendant.  The issue in this case is whether the City can be held liable for the well-pled policies and procedures it implemented to collect municipal court debts, not whether the municipal court or judge could be held liable.

The Plaintiffs have claimed, and supported with sufficient facts, that because City appointees have acted as City policymakers, the City is therefore responsible.  *See* Doc. 43 at ¶¶ 42-63.   Municipal court judges do not act as judicial officers when they set, as a matter of policy, the $50 per day rate for City debts.  This rate, for example, could be modified at any time by the City Council and the City government, without court order.   The City cannot credibly claim that it has no control over this policy that it uses to calculate its debts, revenues, and the time it requires people to serve in its jail.  Nowhere in the City's Motion does the City explain why presiding judges acting in an administrative role in setting court-wide policy in matters

---

[12] It would not be appropriate for the City to direct judges to make particular rulings in individual cases, such as decisions involving sentences or terms of probation.  But the Plaintiffs are not trying to have the City control whether a judge finds a particular person guilty of trespass or drug possession at a trial or lets in a particular piece of evidence.  This is not like suing the City because a criminal defendant does not like a particular verdict issued by a particular judge.  This case involves a set of open policies and practices that together make up a scheme of significant City revenue, coordinated by the City at the highest levels.

[13] *See* Doc. 44 at 27-30 (citing *Callahan v. City of Philadelphia*, 207 F.3d 668 (3d Cir. 2000) (dismissing § 1983 case as to judicial defendants, but not the city or law enforcement officers); *In re Raphael*, 238 B.R. 69 (D.N.J. 1999) (holding a federal court could not order a municipal court to reinstate a debtor's license that was suspended prior to the filing of bankruptcy); *Kelly v. Municipal Courts*, 97 F.3d 902, 908 (7th Cir. 1996) (granting Eleventh Amendment immunity to municipal court – which "is almost akin [in Indiana] to a state circuit court" – employees in employment discrimination action) (emphasis added); *Ass'Ad-Faltas v. City of Columbia*, 2010 U.S Dist. LEXIS 142785, 2010 WL 6549845 (D.S.C. Dec. 10, 2010) (recommending dismissal pursuant to *Rooker-Feldman* and immunity, neither of which were raised by the City); *Griffin v. City of Milwaukee*, 2010 U.S. Dist. LEXIS 126905 at *30 , 2010 WL 4723420 (E.D. Wisc. Nov. 15, 2010) (dismissing claims because, unlike in the instant complaint, "the Plaintiffs have not alleged that the claimed constitutional violations were pursuant to an official policy, widespread custom, or deliberate act of a decision-maker of the municipality or department")).

12

dealing with City prosecutions, City contracts, and City revenues would not be considered City policymakers.  Nor does the City explain why everyday policies implemented by its judges – policies that result in enormous revenues for the City – would not be City policies given the City's control over their employment and over whether to subject its citizens to those policies.

The City and its prosecutors clearly have the authority to decide not to collect from the Plaintiffs until the Executive is satisfied that the City has procedures in place to do so lawfully. If the City has the authority to cease collecting debts that it is owed until it is satisfied that its probation officers, public defenders, prosecutors, and other employees follow procedures that are constitutional, it also has the authority to draft procedures to guide that decision and to protect against the other constitutional violations asserted in the Plaintiffs' well-pled complaint.

### c. The City Clearly Has Power Over its Municipal Court.

The City has ultimate control over whether and how its facilities and employees are used to treat debtors.  Even if the municipal court was an entirely separate entity with no connection to the City and no intertwined role in the City's debt-collection efforts, which plainly it is not, the City would not be forced to participate in flagrant constitutional violations.  It is up to the City to create a scheme for handling the money owed to it by municipal court defendants in a lawful way.  The City openly adopted the current policy through the actions of its employees and agents.  The City used its "probation officers" to institute revocation proceedings against the Plaintiffs in the name of the City and its police officers to arrest the Plaintiffs.  Together, the City prosecutor, JCS, Inc., and the municipal court decided whether to proceed with the revocations against the Plaintiffs in their absence and without the appointment of counsel, thus illegally ordering their fines converted to days.  The City took additional steps in furtherance of its scheme against poor debtors by contracting with the Chilton County jail to imprison them,

knowing that they are only imprisoned because they cannot afford to pay their debts owed to the City.  The City need not have a police force, employ a prosecutor, operate a municipal court, or contract with the County jail to incarcerate the Plaintiffs.  But since it does, it is responsible for making sure that its employees and agents follow the Constitution.  City employees acting under color of state law have an obligation not to violate the United States Constitution.

Alabama law is also clear that the Mayor has power to remit any fines and costs and authority to commute any sentence or jail time imposed by the municipal court.  *See* Ala. Code § 12-14-15.  The Mayor and the City also have an independent obligation to follow the United States Constitution, Alabama Constitution, and laws of the state of Alabama.  They cannot knowingly keep human beings locked in jail when those people have been jailed illegally, even if the City had not played an integral role—through its prosecutors and probation officers and failure to provide representation—in putting them there (which it did, *see infra* at IV.c-f) and even if the City were not accepting and spending revenues from the debt collection jailing scheme (which it is, *see infra* at IV.d-e, IV.j).  This clear legal authority of the Mayor should end the matter concerning the City's claim that it is an improper defendant or powerless when it comes to the Municipal Court.  For that reason, and the additional arguments described below, the City's motion should be denied.

### d.  The City Controls the Prosecutors.

It is obvious the City has control over whether and how to collect the debts that it is owed.  The City's prosecutors—lawyers who were hired by and represent the City government—control which cases are brought, which cases are dismissed, what offers are made, what evidence is presented, what disposition is requested, and so on.[14]  It is central to the American adversarial system that the Executive makes such decisions; in this case, that means decisions about which

---

[14] *See* Doc. 12-5.

debtors should be jailed for non-payment, what evidence to seek and questions to ask about their financial status, and every other relevant decision about what to advocate for a case's disposition.

When the City, through its prosecutors,[15] pursues the pervasive jailing of debtors under procedures known to be unlawful to those prosecutors and that are unlawful by virtue of its failure to follow the law, the Mayor certainly has the power under state law to commute the sentences obtained and refuse to allow the City to perpetuate constitutional violations.  But it is precisely because this jailing is so profitable to the City that the City does not wish to exercise this power or to change the conduct of its prosecutors (not to mention the conduct of its probation officers, public defenders, clerk's office employees, and police officers*, see infra*).

**e.   The City Controls Debt-Collection Through Probation.**

The <u>City</u> is the entity that contracted with JCS, Inc. and, after the filing of this lawsuit, ended its contract with JCS, Inc.  Debtors are arrested and brought to the City court on the motion of JCS, Inc., the private company whose contract is with the <u>Mayor</u>—not with a City judge and not with a separate and supposedly impartial Municipal Court representative.  *See* Doc. 12-6.  Every aspect of the probation payment-plan system relates to the contract that the Mayor signed with the private company.  Thus, the City's Motion flies in the face of how the City court itself operates.  For example, the Mayor's contract with JCS, Inc. contains many binding provisions of policy and procedure, including dictating how probation revocations will be handled, setting how fines and fees will be collected for the City from court cases, and mandating conditions of court orders, such as the frequency of supervision meetings with a probation officer and the amounts that a person is ordered by the court to pay to JCS, Inc. in fees.

---

[15] The "Petition for Revocation of Probation and Statement of Delinquency Charges" filed against the Plaintiffs were written and signed in the name of the <u>City Prosecutor</u>; stating: "David B. Karn, in his/her capacity as City Prosecutor and will respectfully show unto the Court" the alleged grounds for the revocations.  *See, e.g.*, Docs. 1-3, 1-7, 1-13.

*See id.*  Most tellingly, the Mayor's contract binds the municipal court, stating that "the Court agrees that each Court order shall" require the person to pay a "probation fee of $40" and a "set-up fee of $10." *See id* at 4 (emphasis added).[16]

The City is responsible for its own contract with JCS, Inc. and for how debtors are jailed as a result.  People are being arrested by the City because of actions and representations by JCS, Inc., with whom the City contracted, prior to any examination of their indigence or the reasons for their non-payment.  Pursuant to the Mayor's contract, JCS, Inc. actually sends out its own notices, in the name of the City, Municipal Court, and city prosecutor, in which it threatens probation revocation for non-payment.  *See id.*; *see also* Docs. 1-3, 1-7, 1-13.  If a person pays to JCS, Inc. the entire amount owed on his or her municipal debt, their cases would likely be closed with no further involvement from the municipal court.  Each Plaintiff was eventually arrested because they did not pay JCS, Inc.  The private probation company also set the amount of each Plaintiff's monthly payment.[17]

### f.   The City Controls the Provision of Indigent Defense Services.

State law requires the City to provide indigent defense services in the City court: "A municipality which retains its court shall provide indigent defense services as otherwise provided by law."  Ala. Code § 12-14-9 (emphasis added).  By statute, the City—not the Municipal Court—failed to provide representation to each Plaintiff in any hearing where they faced jail time or were merely informed via video conference from the jail of a previously-imposed sentence.  The City, through its Mayor, can enter into contracts with various public defenders to provide indigent defense services in the City court.  The City Council can also properly appoint

---

[16] JCS, Inc. then entered into its own contracts with probationers that often included additional liberty restrictions above and beyond the City's conditions.
[17] The municipal court only deals with "probation revocation" hearings when the City and JCS, Inc. filed the petitions for revocation.  JCS, Inc. brings nonpaying probationers to the court's attention and submits letters that it supposedly mails to debtors without the court's advanced knowledge or approval.

or hire indigent defense attorneys to provide such services.  The public defender and municipal court would thus be bound in numerous ways, such as with respect to procedures for reporting costs, cases, and clients.  The City has the power to do that, of course, because it controls who is arrested, who is prosecuted, who is offered deals to dismiss some cases and not others, which debts are forgiven, and so forth.  Perhaps if the City complied with its obligation to provide adequate indigent defense services, debtors would not have become inmates.

### g.  The Rest of the City's Debt Collection Scheme Is Pervaded by City Policies and Practices.

In addition to the City's direct control over prosecution and its contracts that determine the selection, compensation, and behavior of its probation officers and public defenders, the City's debt collection regime is defined by numerous City policies and practices: the time unlawfully jailed people spend in jail is tied directly to the amount of money they owe in municipal court debt, rather than the suspended sentences each received for the offenses; debtors are forced to sit in jail to extinguish their debts to the City at a standard rate of $50 per day; the City's prosecutors and probation officers have a policy and practice of advocating incarceration and revocation without any inquiry into indigence and without any of the required notice; those jailed for non-payment are not appointed or represented by an attorney in the revocation proceedings; those jailed for non-payment are not informed of their appellate rights by any judge, attorney, or City employee; the City executes warrants for "noncompliance" without valid summonses having been issued; and the City does not provide the standard Affidavit of Substantial Hardship or require its attorney representatives to ensure that the form or its equivalent is used as is required by *Turner*.

Even ignoring all of the intertwined City policies that together constitute the City's debt collection enterprise, one basic fact remains: the open and flagrant constitutional violations in the

City court—violations condemned by this Court in *Tucker v. City of Montgomery*, 410 F. Supp. 494 (M.D. Ala. 1976)—are the City's responsibility.  The City need not allow its prosecutors, employees, and contract workers openly to operate in that illegal manner; it need not require unlawfully jailed debtors to remain in jail; and it need not accept and spend the enormous revenues that fill its coffers.  Even apart from the roles of all of these other City actors, the issue of City liability for the practice of jailing people without *Bearden* hearings was discussed recently in *De Luna v. Hidalgo County, Texas*, 853 F. Supp. 2d 623, 641-42 (S.D. Tex. 2012), in which the court easily concluded, in a lengthy and thoughtful analysis, that a County was liable for the open and consistent jailing of people for debts without a *Bearden* inquiry.

    **h.   The City Has Other Mechanisms to Provide Relief.**

The City has other obvious mechanisms within its exclusive control to provide relief to the Plaintiffs.  The City government has the authority to pass ordinances and to make rules that govern the City's debt collection processes.  *See, e.g.*, Ala. Code § 12-14-7 (municipal court required to take judicial notice of City ordinances).  To take one simple example, the City could require by ordinance or policy that Affidavits of Substantial Hardship be printed, displayed, and completed in all cases seeking collection of monetary debts.  It has not done that.  Because the City has the authority, so long as its laws do not violate state or federal law, to set rules for its court and for those who prosecute and defend cases there, it is laughable for the City to suggest that it is powerless to do anything to ensure proper process in debt-collection cases.

In addition to the power to create rules and procedures, the City can also pass substantive laws.  The City could, for example, by ordinance, make it a criminal offense for any public employee to order someone jailed for non-payment of debt without inquiring into the person's indigence.  Or, the City could, by ordinance, require the termination of any City employee who

18

orders a person jailed for non-payment of debt without such an inquiry.  These thought experiments reveal the absurdity of the City's claim that it has no power to promulgate reasonable policies that could put an end to the illegalities in its debt-collection scheme.

Nothing cited by the City remotely challenges the basic principles and facts at the heart of this case.  The City's separation of powers argument that the City cannot control the Municipal Court, *see, e.g.*, Doc. 44 at II.C, is clearly wrong as a matter of state law.  *See, e.g.*, *Schoenvogel ex rel. Schoenvogel v. Venator Grp. Retail*, 895 So. 2d 225, 233 (Ala. 2004) (holding that the legislative branch has authority, so long as it does not violate the constitution, to determine rules of procedure for the courts).  The Alabama code is full of legislatively mandated court procedures that govern the daily operations of Alabama's courts.  *See, e.g.*, Ala. Code § 15-1-1, *et seq.*  In making this separation of powers argument, nowhere does the City explain why the City's legislature does not have the ability and the obligation to promulgate procedures for its City court.  Alabama cities have the power to "adopt ordinances and resolutions not inconsistent with the laws of the state to carry into effect duties conferred by . . . any other applicable provisions of law," Ala. Code § 11-45-1, and the authority to "provide for the safety" and "order" "of the inhabitants of the municipality," Ala. Code § 11-45-1.  Surely the "applicable" law must include the Due Process and Equal Protection Clauses of the United States Constitution, and ensuring safety and order for citizens surely includes rules to ensure that people in Clanton are not illegally put in jail simply because of their wealth status.

### i.  The Other Arguments Made By the City Are Unpersuasive.

The remaining arguments made by the City change nothing about this analysis.  In *Smedley v. City of Ozark*, 2012 WL 512586, 2012 U.S. Dist. LEXIS 19494 (M.D. Ala. Feb. 1, 2012), the Plaintiff alleged that the City allowed the municipal court judge to exceed his

authority by convicting the defendant without probable cause, imposing an excessive fine and sentence, and notifying the state of the conviction.  As the Court so aptly noted, *Smedley* was dismissed because "[r]egardless of how Smedley frame[d] the issues or who he sue[d], it [was] clear that he [was] complaining about his conviction and sentence in Municipal Court in Ozark, Alabama."  2012 U.S. Dist. LEXIS 19494 at *3-4.  The Court, due to the fact that the claims against the city were "frivolous and based on an indisputably meritless legal theory," found in conclusory fashion that Smedley's "complaint about policy and custom lack[ed] merit."  *Id.* at *4, *8.  *Smedley* was not a case where a town's prosecutors, police officers, probation officers, magistrates, clerks, municipal judges, and public defenders participating in a common enterprise to jail people without following procedures that complied with the Constitution in pursuit of City revenue from which they all benefited.[18]

It makes sense that the City does not have control over every independent judicial act such as those claimed in *Smedley*.  But the question of policy and practice is a deeply factual one about whether a set of conduct and actions can fairly be attributed to the City.  Wherever that line is, this case is clearly beyond it.  For years, the City has openly operated a flagrantly unconstitutional scheme in which its own employees from a variety of departments and its own contract workers have been the key players.  It has kept and retained these employees and contractors, including the municipal judges, despite the legal authority to remove them.  It has also kept collecting all of the proceeds generated by this scheme month after month.  Never once

---

[18] Another case cited by the City, *Jane Doe 5 v. City of Haltom City*, 106 Fed. App'x 906, 907 (5th Cir. 2004), contains almost no legal analysis and no discussion of any purported city policy.  Instead, it summarily concluded that a city was not liable for a judge incarcerating a person without providing a lawyer or an indigency inquiry. With respect to the City's obligation to provide an attorney, the unpublished case's unexplained conclusion is clearly erroneous under Alabama law.  But the rest of the case suffers from the same flaw.  Because whether a set of policies and practices exists such that a City is fairly held responsible for them is a fact-intensive inquiry, a case without any explanation of those circumstances offers no guidance.  There is no indication in that case, for example, that the City's prosecutors, probation officers, public defenders, or debt-collection policies played any role in the illegal jailing or that there was a widespread system of such unlawful collection.

did the City release illegally detained debtors or cease its participation in rampant violations of *Bearden* and *Turner*.

The City fails to cite both *Hidalgo County* (see section IV.c.iv, *infra*) and also the recent opinion in *Ray v. Judicial Corrections Services, et al.*, 2013 WL 5428360, 2013 U.S. Dist. LEXIS 139480 (N.D. Ala. Sept. 26, 2013), which deals with a similar suit against the City of Childersburg, Alabama and JCS, Inc.[19]   The City of Childersburg raised a similar set of arguments to defeat liability for jailing indigent people without proper process, claiming that Alabama law shielded the municipality from liability for judicial acts by its municipal court judges.   *Id.* at *7-8.   Without even needing to address all of the facts, circumstances, and arguments raised by the Plaintiffs in this case concerning the intertwined city policies and practices, the court in *Ray* simply noted that the City's conduct in entering into a contract with JCS, Inc., which allegedly charged supervision fees without regard to indigence, sought revocation and arrest warrants without conducting indigency hearings, and then pursued revocation without requesting indigency determinations, was effectively a "moving force" behind the systemic municipal court constitutional violations alleged in that case.

This is not to suggest that the municipal judges are blameless.   This case will reveal shocking behavior by the attorney[20] hired and retained by the City to be its municipal judge—behavior all the more tragic because it was solicited, encouraged, tolerated, ratified, and exploited at every turn by numerous other arms of the City government.   It is merely to suggest

---

[19] The City also ignores related debtors' prison cases that recently settled against the City of Montgomery that resulted in significant systemic changes to the manner in which that city collected municipal court debt.  *See, e.g.*, *Mitchell, et al. v. The City of Montgomery*, 2:14-cv-186-MHT (M.D. Ala. 2014); *Cleveland v. City of Montgomery*, 2:13-cv-732-MEF (M.D. Ala. 2014); *Watts v. City of Montgomery*, 2:13-cv-732-MEF (M.D. Ala. 2014).

[20] The part-time Clanton Municipal Judge, Hollis Jackson, Jr., is the son of the Clanton City Attorney, John Hollis Jackson Sr.  The two lawyers also operate a private practice together in downtown Clanton.

that the City has the power to prevent and remedy the kind of rampant, illegal conduct engaged in as a matter of policy and practice by City employees in the pursuit of City revenue.

### j.   Clanton Can and Should be Held Liable for its Highly Profitable Policies and Procedures.

The City's cursory and out-of-context arguments are smoke and mirrors—a factually and legally erroneous attempt to evade any responsibility for the debt collection scheme that is controlled by the City at virtually every stage at enormous profit to the City.[21]   The City's Motion should be denied because the City has complete power to put in place laws, rules, and procedures to ensure that its debt collection scheme does not keep people in City jail because of their poverty.  The City mischaracterizes the debt that people incur through misdemeanor and traffic cases as "penalty for their crimes."  *See* Doc. 44 at 7.  This is completely incorrect under Alabama law as fines, fees, and costs become civil debt that may <u>only</u> be collected as any other civil judgment.  *Ex parte Watson*, 757 So. 2d at 1112; *see also* Rule 26.11(k), Ala. R. Crim. P. Regardless of how the debts arose, the City cannot collect that debt in such a way that jails people because of their poverty.  The City has a constitutional obligation and the direct power to ensure that its facilities and employees are not used to perpetrate egregious constitutional violations.

### V.      The City's Contract with JCS, Inc. Violates the Plaintiffs' Due Process Rights.

One of the most troubling aspects of the Clanton's scheme is that it sets up a "probation" system in which the "probation officer" has a direct and personal financial stake in the outcomes of the probationers' legal proceedings.  The City's scheme goes against every fundamental principle of neutrality on which the American judicial system is founded.

---

[21] In 2013, the "Total Fines" collected by Clanton was $292,994, almost double from the $150,119 collected in 2009, the first year of the City's contract with JCS, Inc.  Also in 2009, the City collected almost 30% more with JCS, Inc. doing the collecting than the amount the City had budgeted.  *See* Doc. 12-1, 12-2, 12-3, 12-4.

As described in the Complaint, the Mayor of Clanton's contract with JCS, Inc. sets up a payment structure in which the company makes profit only if its supervisees pay, and it makes more profit the longer they are forced to be on probation.  Doc. 43 at ¶ 45-47.  Indigent supervisees who cannot pay therefore hurt the company's bottom line by costing it money to keep them on probation when they are not paying JCS, Inc. its monthly fee.  *Id.* at ¶¶ 47-49.

The problem here is with the specific terms of the contract that the City's Mayor signed with JCS, Inc., which ensure not a neutral agent standing in for a state-employed probation officer, but a self-interested decision-maker with a personal financial conflict of interest in the specific results of specific cases.  This arrangement cannot be squared with the way American courts operate.[22]

The City fails to set forth any argument concerning the Plaintiffs' due process claims concerning the City's contract with JCS, Inc.  Doc. 44, 44-1.  In its 42 page brief, the words "due process" appear only twice, in the City's chart attached as an exhibit where the City reproduces, verbatim, the claims raised in the Amended Class Action Complaint.  Doc. 44-1.  These baseless conclusions are soundly refuted elsewhere in this brief, *infra*, but out of an abundance of caution, this response includes the following arguments concerning the City's violation of the Plaintiffs' due process rights by contracting with JCS, Inc.

### a.  JCS, Inc. Has Direct Financial Incentives in the Probation Decisions that it Makes.

One of the pillars of any probation system is that probation officers are supposed to be neutral arms of the court.  *See infra* at IV.c.  The City of Clanton instead chose to create what

---

[22] The City of Clanton's contract with JCS, Inc. that set up this financial conflict of interest was also highly unusual and  unlawful under state law because it set up those incentives as part of granting a monopoly to JCS, Inc. without any competitive bidding process as required by state law.  Ala. Const., art. I, § 22; Ala. Code § 41-16-50(a); *see also Beavers v. Cnty. Of Walker*, 645 So. 2d 1365, 1373-74 (Ala. 1994); *Brown's Ferry Waste Disposal Ctr., Inc. v. Trent*, 611 So. 2d 226, 229-30 (Ala. 1992); *Kennedy v. City of Prichard*, 484 So. 2d 432, 433-35 (Ala. 1986).

JCS, Inc. calls an "offender funded" model.  It is that payment structure, not the concept of using a private company, which is unlawful.  Unlike other contracts, in which a private company is hired to house all prisoners or bids to handle all of a county's probation services for a fixed sum not tied to any individual's case, in this model, the private company depends directly on the probationers that it supervises to make a profit.  If the probationers are not made to pay, the company does not profit.  Furthermore, unlike a classic debt collection arrangement in which cities and counties across the country contract with collection agencies to recover unpaid court debt in which civil collection agents are merely given percentages of the money that they bring in or in which they buy the debt at a reduced price, the City of Clanton set up an arrangement in which the debt collectors themselves, financial incentives included, take over a critical neutral court function.

Neutral probation officers are law enforcement actors who use their expertise to work with supervisees and their discretion to bring to the court's attention for prosecution violations of the court's probationary orders.  Clanton's particular arrangement therefore introduces several egregious illegalities into the system because neutral probation officers play several fundamental roles in the criminal system:

- Probation officers first recommend the initial conditions of supervision (JCS, Inc. actually uses a standard form of conditions to which it agreed with the City). Probation agents are even consulted about whether a person represents a good fit for probation supervision;[23]
- Probation officers decide when and why to petition for revocation.  A court does not even find out about a violation of probation unless the probation officer chooses to bring it to the Court's attention for enforcement.  Probation officers must make experienced judgments about whether to work with someone to help bring them into compliance or whether to petition for revocation after each late arrival to a scheduled meeting or each missed payment or other technical violation.  The probation officer

---

[23] In Montgomery, for example, prior to firing JCS, Inc., the City gave JCS, Inc. veto power over whether to accept a person on probation, and JCS, Inc. used this power to refuse to allow the people on probation if the person had previously been an unprofitable probationer who did not make payments.  *Mitchell et al. v. City of Montgomery*, No. 14-cv-186, Doc. 26 at ¶ 131 (M.D. Ala.).

therefore plays an important role in deciding which violations trigger enforcement proceedings; Alabama law explicitly entrusts them with that discretion. Ala. Code. § 15-22-54; Rule 27.4, Ala. R. Crim. P. Indeed, probation officers also decide in the first place how often to require in-person meetings or whether to allow probationers to report by phone.[24] Therefore, a violation concerning "failure to report" could be wholly dependent on a reporting schedule itself devised by the probation officer as well as the probation officer's policies on when to move for revocation based on conduct purportedly in violation of that policy. Indeed, JCS, Inc. orders its probationers to appear in court for revocation hearings without even going through the City court or even notifying the court in advance;

- At revocation hearings initiated by the probation officer, the probation officer is the main witness testifying on disputed issues of compliance. If there is a factual dispute about whether the person missed a payment or failed to report, the neutral probation officer must offer testimony under oath in order to establish a violation. In courtrooms across Alabama and around the country, the probation officer's testimony is often the single crucial factor in the legal proceeding determining whether a violation has occurred by a preponderance of the evidence;

- After revocation, the probation officer is consulted on the recommended sanction— i.e. should this person be jailed, terminated and let go, or put back on probation for an extended period? At this juncture, the court often inquires of the probation officer the probation officer's thoughts and observations about the character, effort, and future prospects of the probationer. In municipal court, JCS, Inc. is even consulted with respect to whether it is willing to take back a particular defendant on probation. In other federal cases in Alabama, JCS, Inc. has kept people on probation longer than the two-year maximum allowed by state law in order to collect additional fees and refusing to accept back on probation those who had not been profitable probationers in the past. *See Mitchell et al. v. City of Montgomery,* No. 2014-cv-186 (M.D. Ala. 2014); *see also* Doc. 12-7.

- In everyday supervision, the probation officer is responsible for explaining the conditions of a person's probation, explaining the law applicable to those conditions, and helping the person comply with or modify those conditions as necessary.

Even a brief look at the incentives of JCS, Inc. as they relate to these core roles of the neutral probation officer illustrates the problem. The company has a direct financial incentive:

- To "work with" and not to revoke a person who is committing technical violations of probation so long as the person is making the payments that contribute to the company's revenues and profits. On the other hand, the company has an incentive to get indigent probationers off of its books, even if they are not committing violations, because supervising them loses the company money;

---

[24] JCS, Inc. in Clanton requires probationers, including the Plaintiffs to show up at its office in Jemison for appointments, which is a great distance to travel for poor people or people who do not have a driver's license or reliable access to transportation. *See Reynolds v. Judicial Corr. Servs.,* No. 2:15-cv-00161-MHT-CSC (M.D. Ala.).

25

- To apply payments to its own fees first, so that the person does not pay down their court costs and fines, thereby shortening the time in which the person remains on probation and making payments to JCS, Inc.;
- To supervise and advise probationers in ways that help the company: it has an incentive to misrepresent or withhold basic legal facts and principles from probationers, such as that they cannot be put in jail solely based on their inability to pay. Neutral enforcement officials have the duty to explain basic principles to probationers and to help them understand that their ability to pay is always a constitutionally critical question concerning whether or not they can be jailed for nonpayment. Instead, a private agent with a financial conflict of interest has an incentive to conduct the totality of its interactions in a manner that does everything possible to collect money. Thus, JCS, Inc. is incentivized against helping indigent probationers (or even informing probationers of their right to) seek modification of their conditions. If a probationer having financial difficulties brings those problems to the attention of JCS, Inc., the company has an incentive to avoid informing the person that the person can seek reduction or waiver of the costs and payments and actually has a disincentive to help them. To the contrary, JCS, Inc. has an incentive in the form of financial profit to misrepresent the law and to tell probationers that they will be revoked if they do not pay;
- To control who gets placed on probation by refusing to accept people who, in the past, were unprofitable and to help determine the conditions of probation, including the amount and frequency of payment owed, whether and when to charge a "set up" fee, what to consider a legitimate excuse for not reporting, when to allow reporting by phone, and whether alternate reporting hours are available for those with different schedules. To the contrary, a neutral officer would have the incentive to help an indigent person comply with the conditions of probation and to help them modify conditions that constitute a hardship;
- To withhold notification to the court of technical violations as long as a probationer is paying but to inform probationers that JCS, Inc. will petition for revocation based on a single non-appearance or late appearance if the person subsequently stops making payments; to create onerous reporting conditions that lead to technical violations that JCS, Inc. can then use to coerce payments;
- To keep and extend the terms of probation for people who are making payments at least equal to JCS, Inc.'s monthly fee for as long as possible, even if they are committing violations and to revoke people who cannot pay, even if they are otherwise in complete compliance with the terms of probation. This includes routinely extending terms of probation beyond the two year statutory maximum without informing probationers that the extensions were unlawful;
- To make all decisions about the frequency and manner of reporting, when and why to petition for revocation, what testimony to offer in support of revocation, and what recommendation to make after revocation based on what conditions will produce more probation fees and lower supervision costs;
- To seek revocation for nonpayment without investigating or testifying about the person's ability to pay in order to send a message to the probationer and other probationers about what happens when JCS, Inc. does not get its money;

26

- To manage its revocation docket in a self-interested way by summoning people to court for revocation but allowing people to remove themselves from the JCS, Inc.-controlled docket by making monetary payments.

The results of these "offender funded" incentives are not just troubling in theory; they have been disastrous in practice. After a similar lawsuit was filed in this Court against the City of Montgomery and after Judge Fuller issued a preliminary injunction finding that the City was violating the constitutional rights of the Plaintiffs,[25] the City of Montgomery fired JCS, Inc.; the private probation company has also had its contracts cancelled with approximately twenty other Alabama municipalities in the past year or two. The City of Clanton and JCS, Inc. have also been sued in this Court for running a RICO racketeering enterprise based on a pattern of extortion in their debt-collection scheme using self-interested "probation officers" to collect money from traffic tickets through unlawful threats. *See Reynolds v. Judicial Corr. Servs.*, No. 2:15-cv-00161-MHT-CSC (M.D. Ala.).

Similarly, the Shelby County Circuit Court shut down the entire municipal court of Harpersville, Alabama, based on similar egregious debt-collection activity of that municipality and JCS, Inc. *Burdette et al. v. Town of Harpersville, et al.*, 2010-cv-900183 at *1 (Shelby Co. Cir. Ct. July 11, 2012). Confronted with some of the same practices that exist in Clanton, the state Circuit Court concluded that the City and JCS, Inc. were operating what amounted to a "judicially sanctioned extortion racket" and violating "almost every safeguard afforded by the United States Constitution." *Id*. at *2. The federal court in the Northern District of Alabama has also denied motions to dismiss filed by Childersburg and JCS, Inc. in a similar lawsuit stemming from this "offender funded" probation scheme. *Ray v. Judicial Corr. Servs.*, 2013 U.S. Dist. LEXIS 139480, 2013 WL 5428360 (N.D. Ala. Sept. 26, 2013). The Cities of Harpersville and Childersburg, Alabama, have also recently brought a state court action against JCS, Inc., alleging

---

[25] *See Mitchell et al. v. City of Montgomery,* No. 2014-cv-186 (M.D. Ala. 2014).

in relevant part that JCS, Inc. (1) breached its contract with those cities by "act[ing] beyond its authority and outside the terms of [the] contracts[s] . . . by, among other acts, us[ing] threats of revoking probation, increase[ing] fines and costs and jail time for purposes of collection . . . [and] increasing the monthly fee . . ." and (2) fraudulently and negligently allowed its employees "to be referred to as 'probation officers' [and to] carry badges" "with a seal" without permission from the municipality. *Town of Harpersville, Alabama, et al. v. Judicial Corr. Servs.*, 58-cv-2015-900124 at 7-8 and 14-17 (Doc. 12-8).

The source of much of these illegalities are the incentives built into the "offender funded" scheme, in which JCS, Inc. has a personal and direct incentive to threaten people with jail if they do not pay without explaining their rights to seek waiver and modification of costs and to enforce those threats by issuing revocation petitions and recommending jail or extension of probation in order to send a message to individual probationers and other probationers about what happens when they do not pay. The City of Clanton has been a willing partner in this enterprise, allowing JCS, Inc. to summon its probationers to court appearances in violation of Alabama law concerning summonses, and then to use its jail to "revoke" probationers who have not paid their fees without providing meaningful inquiries into their ability to pay. Remarkably, the City claims that it is not liable for the patterns of misconduct by JCS, Inc. even though the conduct occurred repeatedly, in the open, and in the very way encouraged by contract.

**b. Due Process Prohibits Neutral Government Officials From Having a Direct Financial Incentive in Their Enforcement Decisions.**

The Due Process Clause ensures the neutrality of American court proceedings. The Supreme Court has repeatedly upheld the principle that judges and other neutral administrative decisionmakers must be free from financial conflicts of interest in the cases that they hear, including both direct financial conflicts and indirect perceived financial conflicts. *See Caperton*

*v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 878 (2009) ("The Court was thus concerned with more than the traditional common-law prohibition on direct pecuniary interest. It was also concerned with a more general concept of interests that tempt adjudicators to disregard neutrality."); *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972) ("[T]he test is whether the mayor's situation is one which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused . . . Plainly that 'possible temptation' may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court.").[26]

While most of the Supreme Court cases have applied to judicial officers or administrative boards, the Supreme Court explained in *Marshall v. Jerrico*, 446 U.S. 238 (1980), that the principles of neutrality extend to government enforcement actors, even in civil cases. Although the most stringent restrictions on neutrality are at their peak with respect to judges, who must avoid even the appearance of an <u>indirect</u> conflict of interest as opposed to direct financial conflicts of interest, the Supreme Court made clear that the principles of neutrality still have important application to government agents whose job is to bring enforcement actions. In *Jerrico*, the Court explained that serious due process problems would be implicated if there were "a realistic possibility that the assistant regional administrator's judgment will be distorted by the prospect of institutional gain as a result of zealous enforcement efforts." *Id.* at 250. The Court explained:

> Moreover, the decision to enforce—or not to enforce—may itself result in significant burdens on a defendant or a statutory beneficiary, even if he is ultimately vindicated in an adjudication. A scheme injecting a personal interest,

---

[26] *See also Tumey v. Ohio*, 273 U.S. 510 (1927); *Dugan v. Ohio*, 277 U.S. 61 (1928); *Gibson v. Berryhill*, 411 U.S. 564 (1973); *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482 (1976); *Connally v. Georgia*, 429 U.S. 245 (1977); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986).

financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions.

*Id*. at 249-50 (citations omitted).

It is important to understand *Jerrico*'s concerns in some detail.  In *Jerrico*, the Court found that the constitutional barrier had not been crossed because the federal scheme conferred no *direct* benefit to the enforcement official, and the indirect institutional benefit to the Employment Standards Administration was too minuscule to play any role in enforcement decisions concerning child labor regulations.  Notwithstanding its warnings about financial bias, the Court held that the bias alleged in *Jerrico* was "exceptionally remote" since "[n]o government official stands to profit economically" and the sums collected through penalties comprise "substantially less than 1% of the budget" of the agency.   *Id.* at 245.  Moreover, any small amount of money remitted to administrators was based on expenses and not based on how much enforcement officers brought in through their cases, and were thus not profits that might affect decisions because the office would not benefit at all from getting more money from those against whom the laws were enforced.  Indeed, the money remitted to the regional divisions was not even used, and "the sums that were not spent were returned to the Treasury."   *Id.* at 246.  Because of this statutory structure, the Court held that the financial benefit was "too remote and insubstantial to violate the constitutional constraints" given that "the enforcing agent is in no sense financially dependent on" the enforcement decisions.  *Id*. at 251.[27]

Any reasonable reading of *Jerrico* reveals that all of the Supreme Court's "serious" fears (and several more) are realized by Clanton's probation officer funding arrangement.  Not only

---

[27] *Jerrico* also explicitly reserved the situation in which financial incentives might lead to incentives to make decisions in particular cases (such as for a profitable or non-profitable probationer) as opposed to general financial incentives relating to overall zealousness.  *Id.* at 250 n.12 ("In particular, we need not say whether different considerations might be held to apply if the alleged biasing influence contributed to prosecutions against particular persons, rather than to a general zealousness in the enforcement process.").

does City rely on the collection of this debt as a major source of funding for its own budget and for the budget of its court, but, more importantly, for JCS, Inc. the collection of this money is <u>its entire source of revenue and profit</u>.  While the agency in *Jerrico* did not distribute the miniscule fraction of 1% of the money based on enforcement collections, the opposite is true with Clanton's contract with JCS, Inc.  Every extra dollar that JCS, Inc. is able to collect in fees from probationers (from every extra month for which JCS, Inc. can extend a person's probation) goes directly to JCS, Inc., and the money that it extracts from its probation cases is 100% of its revenue.

Consider another example: *Jerrico*'s analysis of the incentives reveals that it would not tolerate a regime in which criminal prosecutors were paid based on whether they obtained a conviction.  *Young v. U.S. ex rel. Vuitton*, 481 U.S. 787, 803-805 (1987) (condemning prosecution in which a prosecutor has a financial interest).  Such a regime would shock the conscience of American lawyers.  *Id.*  But this is almost exactly what Clanton has done for municipal probation officers.  The entire budget (i.e. 100% of all revenue and all profits) of the City's probation agency comes directly from the probation entity's enforcement decisions. *Jerrico*'s analysis was limited to the more nebulous consideration of whether there was a perceived "institutional" incentive because the enforcement actor in *Jerrico* did not profit directly from the way it handled its cases.  Here, though, the central feature of the City's contract is the personal profit of the probation company.[28]  As explained by the *Harvard Law Review*: "When a private probation company decides which violations to enforce based on financial

---

[28] It would be as if, prior to a federal revocation hearing, for example, the Court learned that the probation officer bringing the petition, meeting with the judge, testifying at the hearing, and recommending a disposition was offered $1,000 if the defendant's probation was extended for an extra year.  Such a situation would be intolerable, and the Court would certainly not countenance such an arrangement because it goes against every basic notion of how government decisionmaking should be made.  The Court would demand a report and recommendation and testimony from a probation officer who did not stand to gain $1,000 based on the outcome.

motives, a direct, personal, substantial, pecuniary interest is the whole reason the arrangement exists." *See Developments in the Law*, 128 Harv. L. Rev. 1723, 1737-38 (2015) (quoting *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972) and *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)). "In [the traditional] arrangement, probation officers are usually court employees, so their conduct is both protected and governed by the principles that apply to other judicial officers.  But a business whose only work is to extract fees from probationers is simply a debt collector backed by carceral power."  *Id.* at 1729; *see also id.* at 1730, 1737-1739 (explaining the due process problems with the "offender funded" self-interested probation officer model).

### c. Because of the Important Rights at Stake in the Probation Context, the Neutrality of Probation Officers Is Vital.

All of these principles are further strengthened by the fundamental interests at stake in the probation context.  Even as *Jerrico* warned of serious concerns with financial conflicts of interest, that case dealt with the relatively lower stakes of pursuing civil enforcement actions for regulatory penalties.  Here, fundamental liberty is at stake,[29] and the probation revocation decisions of JCS, Inc. result in people being put in jail.  The City holds court only once per week, every Tuesday afternoon.  Any person arrested pursuant to a discretionary decision by JCS, Inc. to seek revocation can spend up to six days in jail until the person might have a chance to confront the self-interested probation officer, assuming the person is granted a hearing and has not already been revoked, as happened to the Plaintiffs.  Even then, if the representations and testimony of JCS, Inc. are believed on disputed issues of fact and revocation is granted, the person can be sent to jail for longer terms or placed back on lengthy periods of onerous "payment plan" probation.

---

[29] *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982) (freedom from bodily restraint is a "core" due process right); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); *United States v. Salerno*, 481 U.S. 739, 750 (1987) (recognizing "fundamental nature" of the right to liberty from jail).

In addition to the power to determine who is arrested and when, Alabama law bestows enormous powers on probation officers, including:

- That the probation officer has discretion under Alabama law to decide whether to petition for revocation or not when they learn of a violation.  Rule 27.4, Ala. Rule Crim. P. ("If either the prosecutor or the probation officer responsible for supervision of the probationer has reasonable cause to believe that probationer has violated a condition or a regulation of probation or has acted contrary to the instructions issued by the probation officer, the prosecutor or the probation officer may petition the sentencing court to revoke probation.");
- That a court "may, upon the recommendation of the officer supervising the probationer, terminate all authority and supervision over the probationer prior to the declared date of completion of probation." Ala. Code § 15-22-54(b);
- That any probation officer may arrest any probationer without a warrant.  Ala. Code § 15-22-54(d) ("[A] written statement by the probation officer setting forth that the probationer has, in his or her judgment, violated the conditions of probation, and the statement shall be sufficient warrant for the detention of the probationer in the county jail or other appropriate place of detention until the probationer is brought before the court.");
- That the probation officer has the power to conduct investigations for the court and to use a variety of means "to bring about improvements in their conduct and condition"). Ala. Code § 15-22-53;
- The probation officer can also modify the officer's binding instructions or ask at any time for modification of probation conditions. Rule 27.2, Ala. Rule Crim. P. ("A probation officer may modify or clarify any instructions which the officer has issued.  A probationer or a probation officer, at any time prior to absolute discharge, may request the sentencing court to modify or to clarify any condition or regulation.").  The Alabama Rules contemplate revocation concerning whether the probationer has violated "an instruction issued by the probation officer."  Rule 27.6, Ala. Rule Crim. P.

Because of these functions vital to the functioning of legal cases, the Supreme Court long ago recognized the importance of neutral probation officers in "modern" American approaches to criminal justice.  *See Williams v. People of State of N.Y.*, 337 U.S. 241, 249 (1949) (discussing the importance of the role of the "modern" probation officer as a neutral information gatherer and explaining that their role is "given a high value by conscientious judges who want to sentence persons on the best available information rather than on guesswork and inadequate information").   Federal courts have overwhelmingly emphasized that probation officers are an "arm of the court" and "neutral agents" whose role is to assist the court.  *United States v.*

*Robinson*, 2010 WL 1459382, at *10, 2010 U.S. Dist. LEXIS 36126 (E.D.N.Y. Apr. 12, 2010) (noting that supervising probation officer is "a neutral information gatherer for the Court" in revocation proceedings); *United States v. Stegman*, 295 F. Supp. 2d 542, 550 (D. Md. 2003) (probation officers, with power to investigate and recommend revocation are "neutral agents for the courts"); *United States v. Dixon*, 187 F. Supp. 2d 601, 605 (S.D.W. Va. 2002) ("T]he supervising probation officer [] must always be a neutral repository of information for the prosecutor and the defendant, and yet remain the confidential agent of the Court."); *United States v. Maury*, 530 Fed. App'x 205, 208 (3d Cir. 2013) ("In general, a probation officer acts as a 'confidential adviser to the court' and a 'neutral information gatherer with loyalties to no one but the court.' But a probation officer may also bring information to the attention of the court that supports the request for revocation and, thus, may play a role 'adverse to the defendant in some respects.'") (citation omitted). As a result, courts routinely protect the special relationship between the judge and the neutral probation officer. *See, e.g.*, *United States v. Story*, 716 F.2d 1088, 1090 (6th Cir. 1983) ("[I]t is not improper for the court to hold presentence conferences with the probation staff.").[30]

In *Griffin v. Wisconsin*, 483 U.S. 868, 879 & n.6 (1987), the Supreme Court explicitly relied on the special character of the neutral probation officer's supervisory role to allow home searches of probationers based on less than probable cause, and to hold that a warrant from a

---

[30] *See also United States v. Kone*, 591 F. Supp. 2d 593, 607 (S.D.N.Y. 2008) ("The probation officer, on the other hand, is not a partisan advocate aligned with either the prosecution or the defendant. He is a neutral adviser to the court.") (citing *Warner v. Orange County. Dep't of Prob.*, 115 F.3d 1068, 1072 (2d Cir. 1996) (describing probation officer's role as "a neutral adviser to the court") (citing Sharon Bunzel, Note, *The Probation Officer and the Federal Sentencing Guidelines: Strange Philosophical Bedfellows*, 104 Yale L.J. 933, 945 (1995) (describing historical role of probation officer as "neutral information gatherer with loyalties to no one but the court")); *Schiff v. Dorsey*, 877 F.Supp. 73, 77 & n. 1 (D.Conn.1994) (describing analogous role of federal probation officer and concluding that "the sentencing judges need for complete and accurate information about an offender requires that he enjoy a relationship of the utmost trust and confidentiality with the federal probation officer") *Brown v. Butler*, 811 F.2d 938, 941 (5th Cir. 1987) (the probation officer "is an arm of the court charged with assisting the court in arriving at a fair sentence").

judge was not needed because "the search decision should be left to the expertise of probation authorities rather than a magistrate" because "there is an ongoing supervisory relationship—and one that is not, or at least not entirely, adversarial—between the object of the search and the decisionmaker."[31]

Basic neutrality is therefore of particular importance for probation officers in the criminal system because of the possibility of fundamental deprivations of core rights. As Chief Justice Roberts forcefully explained in *Robertson v. U.S. ex rel. Watson*, 560 U.S. 272, 278 (2010) (Roberts, C.J. dissenting from dismissal as improvidently granted): "Our entire criminal justice system is premised on the notion that a criminal prosecution pits the government against the governed, not one private citizen against another."  *Robertson* involved a different issue: the use of private parties to pursue contempt proceedings for the violation of civil court orders and in whose name such actions were brought.  Although *Robertson* did not involve any hint that the private enforcement actors had a financial interest in the outcome of the proceedings as in Clanton, four justices nonetheless highlighted some of the foundational principles called into question by private prosecutors:

> Allegorical depictions of the law frequently show a figure wielding a sword—the sword of justice, to be used to smite those who violate the criminal laws . . .  A basic step in organizing a civilized society is to take that sword out of private hands and turn it over to an organized government, acting on behalf of all the people.

*Id*. at 283 (internal citations omitted).  Those concerns are realized in Clanton, where JCS, Inc.'s profit is linked directly to the decisions that made by its private probation officers.

---

[31] The Supreme Court went on to explain the need to rely on the probation officer given the enormous value of the neutral probation agent:  "[T]he probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society. The agency, moreover, must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances."

The Supreme Court applied these principles in *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 803-805 (1987), when it confronted prosecutors with a direct financial interest in the proceedings.  After discussing the paramount importance of a financially neutral prosecutor under various constitutional, statutory, and ethical provisions,[32] the Court enumerated numerous ways in which enforcement decisions—such as who to investigate, how that investigation was "shaped," and what resolution would be offered to the defendant—could be influenced if the enforcement agent had a financial interest in the outcome.  *Id*. at 805-06. The Court concluded that "as will generally be the case, the appointment of counsel for an interested party to bring the contempt prosecution in this case at a minimum created <u>opportunities</u> for conflicts to arise, and created at least the <u>appearance</u> of impropriety."  *Id*. at 806 (emphases in original).

The Supreme Court's subsequent discussion is seamlessly applicable to the discretion granted to JCS, Inc.:

> As should be apparent, the fact that the judge makes the initial decision that a contempt prosecution should proceed is not sufficient to quell concern that prosecution by an interested party may be influenced by improper motives. A prosecutor exercises considerable discretion in matters such as the determination of which persons should be targets of investigation, what methods of investigation should be used, what information will be sought as evidence, which persons should be charged with what offenses, which persons should be utilized as witnesses, whether to enter into plea bargains and the terms on which they will be established, and whether any individuals should be granted immunity. These

---

[32] The Supreme Court explained:

> If a Justice Department attorney pursued a contempt prosecution for violation of an injunction benefiting any client of that attorney involved in the underlying civil litigation, that attorney would be open to a charge of committing a felony under § 208(a). Furthermore, such conduct would violate the ABA ethical provisions, since the attorney could not discharge the obligation of undivided loyalty to both clients where both have a direct interest.  The Government's interest is in dispassionate assessment of the propriety of criminal charges for affronts to the Judiciary.  The private party's interest is in obtaining the benefits of the court's order. While these concerns sometimes may be congruent, sometimes they may not.  A prosecutor may be tempted to bring a tenuously supported prosecution if such a course promises financial or legal rewards for the private client.  Conversely, a prosecutor may be tempted to abandon a meritorious prosecution if a settlement providing benefits to the private client is conditioned on a recommendation against criminal charges.

*Id*. at 805.

decisions, critical to the conduct of a prosecution, are all made outside the supervision of the court.

*Id*. at 807 (emphasis added); *see also, e.g.*, *In re Yanks*, 882 F.2d 497, 497-98 (11th Cir. 1989) (invalidating contempt prosecution relating to bankruptcy debt when "the trustee was in an adversarial position as compared to the debtor . . . and was a beneficiary of the bankruptcy court order, the violation of which was the subject of [the] contempt prosecution").

The Supreme Court was clear in *Jerrico* and *Vuitton* to explain that standards of neutrality for civil enforcement agents or prosecutors are less stringent than standards on judges. But in both cases it made clear that the direct personal financial interests of an agent with power over decisions that affect fundamental liberty would be intolerable:

> That state official has the power to employ the full machinery of the state in scrutinizing any given individual.  Even if a defendant is ultimately acquitted, forced immersion in criminal investigation and adjudication is a wrenching disruption of everyday life.  For this reason, we must have assurance that those who would wield this power will be guided solely by their sense of public responsibility for the attainment of justice.

*Id*. at 814.

The situation in Clanton is much worse.  In Clanton, probation officers are not supposed to be adversarial; they are supposed to be neutral arms of the court.  Moreover, unlike the prosecutors in *Vuitton*, probation officers in Clanton actually testify, thereby providing not only the enforcement decisions about whom to target, when to target them, what investigation to do, and what deal to offer them, but they actually constituted the evidence against the person as well.  Finally, the case decisions in Clanton directly impact the entirety of JCS, Inc.'s profits in the city.  As discussed elsewhere in this Response, the City's entire scheme is merely an effort to collect unpaid debts by using a "probation system" instead of the well-established mechanism for collecting civil judgments.  None of these City probationers would be on probation with JCS,

Inc. if they could afford to pay their fines, costs, fees, and surcharges. JCS, Inc. "probation" officers provide none of the services or expertise of actual probation officers as that term is understood in American and Alabama courts. Although JCS, Inc. officers retain all of the power to petition to modify or revoke, to give binding instructions to supervisees, to order summonses to court, to testify under oath, and to recommend sentences, their only purpose in Clanton was to collect money. There is no dispute that financial incentives that lie at the core (and indeed, constitute the entirety) of the City's "probation" scheme.

The City utterly fails to confront this claim except in conclusory fashion as it relates to § 1983 liability and it cites none of the relevant federal precedent on self-interested law enforcement or judicial officials. Nor does it cite a single case in which any federal court has upheld any kind of similar arrangement for civil government attorneys, probation officers, or criminal prosecutors.

### VI. The City's Position Concerning Due Process and Equal Protection is Meritless.

Similar to section V, *infra*, the City utterly and completely fails to set forth any argument concerning the Plaintiffs' due process and equal protection claims. Doc. 44, 44-1. In its 42 page brief, the words "due process" appear only twice and the words "equal protection" appear only once, in the City's chart attached as an exhibit where the City reproduces, verbatim, the claims raised in the Amended Class Action Complaint. Doc. 44-1. These baseless conclusions are soundly refuted in section IV, *infra*, but out of an abundance of caution, this response includes the following arguments concerning the City's violation of the Plaintiffs' due process and equal protection rights.

#### a. Due Process.

Although the City does not identify or contest the constitutional principles at issue in this case, those principles are well-established. In *Bearden v. Georgia*, 461 U.S. 660, 672-73 (1983),

the Supreme Court explained that to "deprive a probationer of his conditional freedom simply

because, through no fault of his own he cannot pay a fine . . . would be contrary to the

fundamental fairness required by the Fourteenth Amendment."  As a result, *Bearden* held that a

court must engage in a meaningful inquiry into whether the failure to pay was "willful."  *Id*. at

672.  The Supreme Court criticized the local court's lack of attention to the constitutional

principles that ensure that the poor will not be jailed because they are poor:

> The focus of the [state] court's concern, then, was that the petitioner had
> disobeyed a prior court order to pay the fine, and for that reason must be
> imprisoned.  But this is no more than imprisoning a person solely because he
> lacks funds to pay the fine, a practice we condemned in *Williams* and *Tate*. By
> sentencing petitioner to imprisonment simply because he could not pay the fine,
> without considering the reasons for the inability to pay or the propriety of
> reducing the fine or extending the time for payments or making alternative orders,
> the court automatically turned a fine into a prison sentence.

*Id*. at 674.  While *Bearden* has constituted the definitive articulation of the Supreme Court's

jurisprudence on jailing the poor for nonpayment of fines for over 30 years, it was itself founded

on a long line of precedent.  In *Tate v. Short*, 401 U.S. 395, 398 (1971), the Court held that

imprisoning a defendant who was unable to pay a fine violated the Fourteenth Amendment:

"[T]he Constitution prohibits the State from imposing a fine as a sentence and then automatically

converting it into a jail term solely because the defendant is indigent and cannot forthwith pay

the fine in full."  *See Bearden*, 461 U.S. at 667-68 (holding that "if [a] State determines a fine or

restitution to be the appropriate and adequate penalty for [a] crime, it may not thereafter imprison

a person solely because he lacked the resources to pay it").  These cases and the cases that they

rely on articulate some of the most fundamental principles of the American legal tradition.  *See*

*Griffin v. Illinois*, 351 U.S. 12, 19 (1956) ("There can be no equal justice where the kind of trial a man gets depends on the amount of money he has.").[33]

The Supreme Court has made clear that the basic principles forbidding jailing people for their poverty constitute a mixture of its equal protection and due process doctrines. *Bearden*, 461 U.S. at 665 ("Due process and equal protection principles converge in the Court's analysis in these cases."). The substance of the legal doctrine forbids a government from jailing a person for nonpayment unless the person had the ability to pay but willfully refused. In *Turner v. Rogers*, 131 S. Ct. 2507, 2520 (2011), the Supreme Court explained the procedural component to these cases: the state must figure out whether the nonpayment was willful in an open and fair way. *Turner* held that South Carolina's incarceration of a man for unpaid child support payments "violated the Due Process Clause" because the court had imprisoned him without complying with sufficient process. Whether the jailing is pursuant to probation revocation proceedings as in *Bearden*, pursuant to formal contempt proceedings as in *Turner*, or pursuant to no recognizable legal process as in Clanton, the Court explained the basic procedural protections that a government must provide before jailing a person for non-payment:

---

[33] The federal courts have scrupulously guarded these rights. In *Frazier v. Jordan*, 457 F.2d 726, 728–29 (5th Cir. 1972), the court held that an alternative sentencing scheme of $17 dollars or 13 days in jail was unconstitutional as applied to those who could not immediately afford the fine. Because those people would be jailed if they could not pay the $17 fine, the city court's order of imprisonment was unconstitutional. *Id.* at 728 (condemning the municipal court scheme because it created a system in which "[t]hose with means avoid imprisonment [but] the indigent cannot escape imprisonment."); *see also, e.g.*, *Barnett v. Hopper*, 548 F.2d 550, 554 (5th Cir.1977) ("To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws."), vacated as moot, 439 U.S. 1041, (1978); *De Luna v. Hidalgo County*, 853 F. Supp. 2d 623, 647-48 (S.D. Tex. 2012) ("[T]he Court finds that … before a person charged with a … fine-only offense may be incarcerated by Hidalgo County for the failure to pay assessed fines and costs, this deprivation of liberty must be preceded by some form of process that allows for a determination as to whether the person is indigent and has made a good faith effort to discharge the fines, and whether alternatives to incarceration are available."); *United States v. Waldron*, 306 F. Supp. 2d 623, 629 (M.D. La. 2004) ("It is well established that our law does not permit the revocation of probation for a defendant's failure to pay the amount of fines if that defendant is indigent or otherwise unable to pay. In other words, the government may not imprison a person solely because he lacked the resources to pay a fine."). Cases decided by the former Fifth Circuit prior to September 30, 1980 are binding precedent in the Eleventh Circuit under *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

> Those safeguards include (1) notice to the defendant that his "ability to pay" is a critical issue in the … proceeding; (2) the use of a form (or the equivalent) to elicit relevant financial information; (3) an opportunity at the hearing for the defendant to respond to statements and questions about his financial status, (e.g., those triggered by his responses on the form); and (4) an express finding by the court that the defendant has the ability to pay.

*Id*. at 2519. The Court held that Turner's imprisonment was unconstitutional because the South Carolina court did not comply with the procedures that were essential to "fundamental fairness":

> He did not receive clear notice that his ability to pay would constitute the critical question in his civil contempt proceeding. No one provided him with a form (or the equivalent) designed to elicit information about his financial circumstances. The court did not find that Turner was able to pay his arrearage, but instead left the relevant "finding" section of the contempt order blank. The court nonetheless found Turner in contempt and ordered him incarcerated. Under these circumstances Turner's incarceration violated the Due Process Clause.

*Id*. at 2520. The City flagrantly violated these basic principles as a routine matter.

Clanton routinely did not even bother to hold any hearings, let alone to hold the kind of hearing required by the U.S. Constitution. Indeed, the duration of the Plaintiffs' jailing was not pursuant to any revocation finding as in *Bearden* but instead was determined solely by how much money they could pay, had already paid, and still owed to the City. When the City of Clanton did conduct court hearings, people were not provided any meaningful inquiry into their indigence. *See, e.g.*, Doc. 43 at ¶¶ 18-22, 28-30, 37-40, 53-57, 72-74, 76-82. As a result, the City of Clanton set up a scheme that routinely kept people in jail in cases in which the entire process could be ended by making a monetary payment without providing them any opportunity to demonstrate their inability to pay. The City of Clanton does not cite or engage with any of this precedent, and its Motion must be denied.

### a. Equal Protection.

Because freedom from physical confinement is a fundamental right, the City's disparate treatment of its poorest defendants must meet heightened scrutiny. *See United States v. Salerno*,

481 U.S. 739, 750 (1987) (recognizing the "fundamental nature of this right" to pretrial liberty); *United States v. Montalvo-Murillo*, 495 U.S. 711, 716 (1990) (holding that release prior to trial is a "vital liberty interest"); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); *Schilb v. Kuebel*, 404 U.S. 357, 365 (1971) ("[A] statutory classification based upon suspect criteria or affecting 'fundamental rights' will encounter equal protection difficulties unless justified by a 'compelling governmental interest.'").[34]   In any event, there is no rational basis for allowing represented debtors or debtors who can afford to make monetary payments to remain free while arresting and detaining unrepresented and impoverished debtors.  *See, e.g.*, *State v. Blake*, 642 So. 2d 959, 966-67 (Ala. 1994) (striking down a rule that forced indigent arrestees to stay in jail for up to 72 hours prior to an initial hearing when wealthier arrestees were allowed to pay bond for their release because the Alabama Supreme Court could find no rational basis for such disparate treatment).  The City of Clanton does not cite or engage with any of this precedent, and its Motion must be denied.

## VII.  The Plaintiffs Have Not Sued an "Improper Party."

The City cites to no rule, case, or statute supporting dismissal on the nebulous grounds of suing an "improper party."  Certainly this is not a cognizable ground for dismissal under Rule 12.  Out of an abundance of caution, counsel construes the City's motion as one made pursuant to Rule 12(b)(7) for failure to join a party under Rule 19.  For the following reasons, this argument should be denied.

---

[34] Following *Salerno*'s heightened scrutiny, federal circuit courts have applied strict scrutiny when considering the government deprivation of bodily liberty.  *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 779-81 (9th Cir. 2014) ("We apply heightened scrutiny here because the Proposition 100 laws infringe a 'fundamental' right."); *Pugh v. Rainwater*, 557 F.2d 1189, 1190 (5th Cir. 1977) (vacated on other grounds).

The legal standard for motions brought under Rule 12(b)(7) is as follows: "a ruling on a motion to dismiss for failure to join a necessary and indispensable party requires the Court to accept the allegations of the complaint as true, and the Court may go outside the pleadings and look at extrinsic evidence." *RotecIndus., Inc. v. Aecon Group, Inc.*, 436 F. Supp. 2d 931, (N.D. Ill. 2006) (citing *Davis Co. v. Emerald Casino, Inc.*, 268 F. 3d 477, 479-80, n.2, 4 (7th Cir. 2001)). "[T]he defendants have the burden of showing that the plaintiff has failed to join a necessary and indispensable party." *Id.* (citing *Ilan-Gat Eng'rs, Ltd. v. Antigua Int'l Bank*, 212 U.S. App. D.C. 188, 659 F.2d 234, 242 (D.C. Cir. 1981); *Ploog v. HomeSide Lending, Inc.*, 209 F. Supp. 2d 863, 873 (N.D. Ill. 2002)).

"The courts are loathe to grant motions to dismiss of this type.  Thus, a 12(b)(7) motion will not be granted because of a vague possibility that persons who are not parties may have an interest in the action.  In general, dismissal is warranted only when the defect cannot be cured." *Sever v. Glickman*, 298 F. Supp. 2d 267, 275 (D. Conn. 2004) (quoting Wright and Miller, Federal Practice and Procedure § 1359 (2d. Ed. 2003)) (quotation marks omitted).

Rule 19(a)(1) concerns required joinder of parties.  There are two circumstances where a party must be joined.  The first is if the court cannot accord complete relief among the existing parties.  Rule 19(a)(1)(A).  The second is if the party to be joined claims an interest in the litigation and is so situated that disposing of the action in that party's interest will either "impair or impede" his ability to protect that interest[35] or leave an existing party open to the risk of "double, multiple, or otherwise inconsistent obligations."[36]

While the City failed to identify what party or parties are indispensable, it appears to argue that the municipal court, the municipal court judge, or JCS, Inc. should have been named

---

[35] Rule 19(a)(1)(B)(i), Fed. R. Civ. P.
[36] Rule 19(a)(1)(B)(ii), Fed. R. Civ. P.

as a defendant.  For the reasons set forth in section IV, *infra*, concerning municipal liability under § 1983, this argument is due to be denied.  Moreover, it is clear that complete relief can be afforded based on the settlement already obtained concerning the Plaintiffs' equitable claims and the Court's retention of jurisdiction to enforce that settlement.  Doc. 23, 23-1.  The only issues remaining before the Court are damages and attorneys' fees.  The Plaintiffs have claimed that the City violated their civil rights.  The complaint set out sufficient facts to support their claims, *see* section IV, *infra*.  The City can satisfy any damages amount that a jury or the court awards in favor of the Plaintiffs.[37]  The City can protect the interests of the municipal court and the municipal court judge.  There is zero risk in double, multiple, or inconsistent outcomes, especially if the class is certified.  Doc. 43, 43-1, 43-2.

The cases cited by the City[38] all generally concern powers granted to a municipality. *Kime* is the only case that is remotely applicable to the City's asserted position.  The Court granted Lake County, Ohio's motion to dismiss because that defendant had absolutely no connection to the actions of the city prosecutor, police department, or any other actor employed by Eastlake, Ohio, a municipality incorporated in 1951.[39]  "Obviously, the city prosecutor for the City of Eastlake is not the law enforcement arm of Lake County . . .."  *Kime*, 634 F. Supp. at 518.  Notably, the Court did not dismiss the claims made against the City of Eastlake, the city prosecutor, or the city police officers; additionally, no claims were brought against the municipal court for the City of Eastlake.  As the Plaintiffs in this case are not seeking to hold Chilton

---

[37] Counsel can think of nothing that would stop the City from utilizing the third-party practice tools provided in the Federal Rules should the City believe it is entitled to payment from any other entity if and when damages are awarded.

[38] *See* Doc. 44 at pg. 35-37 (citing *Birmingham v. Graffeo*, 551 So. 2d 357 (Ala. 1989); *Ott v. Moody*, 382 Ala. 288 (Ala. 1968); *Kime v. Wise*, 634 F. Supp. 514 (N.D. Ohio 1985)).

[39] *Calendar of Our History* at pg. 1, available at http://www.eastlakeohio.com/images/site/HistoricalSociety/Old-Eastlake-history.pdf (last visited Nov. 18, 2015).

County (or any other governmental body) liable for the actions of Clanton, *Kime* offers no support for the City's position.  The City's motion as to an "improper party" must be denied.

**VIII.   Both Federal Rule 69 and Alabama Code §§ 11-47-190 and -191 are Inapplicable and Completely Irrelevant.**

While the City appears to contest liability, it prematurely puts forth Rule 69, Fed. R. Civ. P., and Ala. Code § 11-47-191, in support of dismissal, both of which concern post-judgment collection of damages.  Doc. 44 at 37-40.  As discussed in great detail above, the Plaintiffs have sought to hold the City liable for its own reprehensible conduct.  The City, in concert and via contract with JCS, Inc., imprisoned countless numbers of indigent debtors and collected exorbitant sums of money from anyone that could not afford to pay their municipal court debt immediately.

Rule 69 deals with post-judgment collections and is premature to be raised now.  If, however, the court deems the City to have conceded liability by raising this issue, the Plaintiffs respectfully request the opportunity to fully brief the issue after a judgment is entered.  Section 11-47-190 of the Alabama Code is similarly irrelevant.  That section of the Alabama Code cannot, "without more, determine whether an indemnity exists in this case.  This question must be decided pursuant to principles of equity in <u>federal</u> practice.  Neither can these code provisions limit the <u>amount</u> of recovery under <u>federal</u> law." *Oladeine v. City of Birmingham*, 118 F. Supp. 2d 1200, 1207 (N.D. Ala. 1999) (emphasis in original).  "The availability of damages under § 1983 is a question of <u>federal law</u>." *Oladeine v. City of Birmingham*, 118 F. Supp. 2d 1200, 1207 (N.D. Ala. 1999) (emphasis in original); *see also Patrick v. Florala*, 793 F. Supp. 301, 302 (M.D. Ala. 1992) (citing *Gamble v. Florida Dept. of Health & Rehab. Servs.*, 779 F.2d 1509, 1518 n.11 (11th Cir. 1986)).  "[S]tate statutes purporting to limit the damages available in a suit

against a state actor are not applicable to suits brought under § 1983." *Florala*, 793 F. Supp. at 302.

Going as far back as at least 1934, Alabama courts have specified when § 11-47-190 and -191 are applicable, and that is in tort, not for civil rights violations: "These statutory provisions are limited to cases where the injury results from the initial wrongful act of some third person for whose acts the city is not responsible under the doctrine of respondeat superior, and the city's liability arises from negligent failure to remedy the conditions created by such third person." *Birmingham v. Corr*, 229 Ala. 321, 323, 157 So. 56, 1934 Ala. LEXIS 333 (Ala. 1934); *see also Brown v. Fairhope*, 265 Ala. 596, 599, 93 So. 2d 419, 1957 Ala. LEXIS 353 (Ala. 1957); *Ellison v. Town of Brookside*, 481 So. 2d 890, 891-92 (Ala. 1985). Furthermore, because the instant case has absolutely "nothing to do with the defects or conditions of [Clanton's] streets, alleys, public ways or buildings" the joinder and notice provisions of §§ 11-47-190 and -191 are simply not triggered. *Ellison*, 481 So. 2d at 891-92 (quotation marks omitted). This argument is frivolous and due to be denied.

## IX.   Conclusion.

The City's motion is due to be denied on all grounds.

Date:   December 1, 2015

Respectfully submitted,

s/Matthew Swerdlin
Matthew Swerdlin, Attorney at Law
1736 Oxmoor Road, # 101
Birmingham, AL 35209

s/William M. Dawson
William M. Dawson
1736 Oxmoor Road, # 101
Birmingham, AL 35209

s/J. Mitch McGuire
McGuire and Associates
31 Clayton St.
Montgomery, AL 36104

*Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on the 1st day of December, 2015, notice of this filing was served on the following, via the Court's CM/EF system:

James W. Porter, II
R. Warren Kinney
Porter, Porter & Hassinger, P.C.
Box 128
Birmingham, AL 35201-0128

Will Hill Tankersley
Gregory C. Cook
L. Conrad Anderson IV
Chase T. Espy
Balch & Bingham LLP
1901 6th Ave. N. Ste. 1500
Birmingham, AL 35203

*Attorneys for the City of Clanton*

s/Matthew Swerdlin

47