**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **CANDICE CHAPMAN, MICHAEL LITTLEFIELD,** | ) | |
| **STEDMAN KINE, DEANGELO BARNETT, TRACY** | ) | |
| **DUBOSE, individually and for a class of** | ) | |
| **similarly situated persons or entities.** | ) | |
| | ) | |
| **Plaintiffs;** | ) | |
| **v.** | ) | **CIVIL ACTION NO:** |
| | ) | **2:15-cv-00125-RCL-WC** |
| **THE CITY OF CLANTON, a municipal corporation;** | ) | |
| **JUDICIAL CORRECTION SERVICES, LLC.,** | ) | |
| **a limited liability company, f/d/b/a** | ) | **CLASS ACTION** |
| **JUDICIAL CORRECTION SERVICES, INC.;** | ) | |
| **CHC COMPANIES, INC., a corporation; and** | ) | |
| **CORRECT CARE SOLUTIONS, LLC,** | ) | |
| **a limited liability company.** | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | ) | |

**SECOND AMENDED AND RESTATED COMPLAINT**

COME NOW, Candice Chapman, Michael Littlefield, Stedman Kine, Deangelo

Barnett, and Tracy Dubose (hereinafter "Plaintiffs"), individually and on behalf of those

similarly situated, upon personal knowledge as to themselves and their own acts, and upon

information and belief as to all other matters, by and through their undersigned counsel,

and file this Second Amended and Restated Complaint as follows:

**JURISDICTION**

1.       The Court has jurisdiction over this matter because it concerns a controversy

arising under the Constitution of the United States.  28 U.S.C. §1331.  This is a civil rights

action brought under 42 U.S.C. §§ 1983 and 1988.

2.       This Court also has jurisdiction of this action by virtue of 28 U.S.C. §§

1343(a)(3) and 1343(a)(4), authorizing jurisdiction of claims brought under 42 U.S.C. §

1983 to enforce civil rights guaranteed by the United States Constitution.  The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

3.     This action also seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2022.

4.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391 (b) and (c).

## PARTIES TO THE COMPLAINT

5.     The Plaintiff Candice Chapman is an individual resident of Jemison, Chilton County, Alabama.

6.     The Plaintiff Michael Littlefield is an individual resident of Clanton, Chilton County, Alabama.

7.     The Plaintiff Stedman Kine is an individual resident of Clanton, Chilton County, Alabama.

8.     The Plaintiff Deangelo Barnett is an individual resident of Toccoa, Stephens County, Georgia.

9.     The Plaintiff Tracy Dubose is an individual resident of Clanton, Chilton County, Alabama.

10.     The classes which the individual Plaintiffs seek to represent consist of:

> All individuals who have in the past, or may in the future, assigned by the Clanton municipal courts to "probation" with JCS for the collection of fines;
>
> AND
>
> All individuals who, despite their indigency, were incarcerated, or may be subject to incarceration, without consideration of their indigency for failure to pay fines, charges and fees from the Clanton Municipal Court.

2

11.     The City of Clanton, Alabama, ("Clanton") is a municipal corporation located within Chilton County, Alabama.  The City Council and Mayor control the policy making for Clanton and also hired the municipal court judge and contracted for the services of JCS, a private probation company, to collect its municipal court fines.

12.     The Defendant Judicial Correction Services, LLC (hereinafter "JCS") is a Delaware limited liability company that was previously known as Judicial Correction Services, Inc.   Judicial Correction Services, Inc. converted to Judicial Correction Services, LLC on December 28, 2015 (filed with the state of Delaware on January 27, 2016.) Judicial Correction Services, Inc. was formed in Delaware on December 10, 2001 - file number 3466819. In 2004, JCS registered as a foreign corporation doing business in the State of Alabama and in this District. JCS marketed itself as "not a social service agency," but a "for profit"company which offered services to governmental entities "free of charge" to the cities as "an offender paid system."   JCS has publically stated that it is no longer doing business in the State of Alabama.  At all times, JCS operated under the color of state law.

13.     The Defendant CHC Companies, Inc. ('CHC') (also hereinafter "JCS") is a Delaware corporation, registered as a foreign corporation and doing business in the State of Alabama. JCS is, upon information and belief, a wholly-owned and fully integrated corporation of CHC Companies, Inc. CHC Companies, Inc. also does business under the name of Correctional Healthcare Companies and employed and directed employees in the JCS operations from October 1, 2011 until June 24, 2014 when it was purchased by and merged into Correct Care Solutions, LLC. ('CCS').

14.     The Defendant Correct Care Solutions, LLC ('CCS') (also hereinafter "JCS") is a Kansas limited liability corporation, registered as a foreign limited liability company and

doing business in the state of Alabama. On June 24, 2014, CCS purchased CHC Companies, Inc. and has merged CHC's operations, its businesses and its headquarters with its own. The CCS home office and headquarters are now in Nashville, Tennessee, from which it now directs and controls the operations of all its merged corporations, including CHC Companies, Inc. The JCS operations are part of a division known as CCS's State and Federal Division, which is managed by Don Houston. CCS controls the accounting, litigation and other operational aspects of the JCS operations contained within this division and employs all the personnel within the JCS operations and that division.

## FACTS

15.     The Plaintiffs bring this action because the policy and practices of Clanton and JCS have violated the Plaintiffs' statutory and constitutional rights and those of persons similarly situated in the collection of municipal court fines, fees and costs.

16.     The City of Clanton and its city court contracted with JCS which operates a "for profit" enterprise that markets its services to various municipal governments and has contracted with over 100 cities and towns throughout Alabama. JCS's marketing approach to these cities emphasizes that its fees will be paid by the "offender" before the municipal court and that its efforts will improve collection of court fines and costs at no cost to the city.

17.     The JCS approach is highly systemized and uniform throughout the Alabama municipal courts in which it operates, including its operation in Clanton.

18.     Under the system established by JCS, its employees are not required to have criminal justice or legal training, nor are they required to have any social work education or meet any minimum law enforcement standards as is required of state probation officers.

4

Instead, JCS requires only that its employees be 21 years old, a non felon, with two years of college who complete 40 hours of training by JCS on its processes.  On satisfying those requirements, JCS employees are then labeled "Probation Officers"[1] and previously permitted to carry the JCS issued badge in collecting its fees, court fines and costs.

19.    Clanton, by contract, policy and practice, has unlawfully delegated to JCS many administrative and judicial functions of its municipal court, clothing it with the color of state law for the collection of court fines, costs and the JCS private fees.

20.    Additionally, the contract includes a requirement that every court order will require probationers to pay JCS an additional, monthly fee. The agreement between Clanton and JCS was signed by the city mayor and binds Clanton's municipal court stating "the City and Court enter into this agreement with JCS to provide probation services upon the terms set forth below, including the following Exhibits:

    Exhibit A - Uniform Standards of Probation Supervision

    Exhibit B - Services Provided by JCS

    Exhibit C - Compensation to JCS

21.    Clanton, through its mayor Billy Joe Driver, approved the no bid contract with JCS, the City, and the court beginning on February 9, 2009 and continued the relationship until May 27, 2015 when the City of Clanton gave its 30-day notice to JCS that it was terminating its contract.

22.    During the February 9, 2009 to May 27, 2015 period, the City of Clanton was fully aware of the practices and system of JCS and jointly participated in those practices

---

[1]In contrast, even a judicial volunteer is required to meet greater and more specific qualifications, careful screening, specific training and continual oversight established by the Administrative Office of Courts ('AOC').  See Ala. Rule of Judicial Administration Rule 42.

as a matter of its policy and practice.  The City of Clanton also approved the employment of John Hollis Jackson III as judge of its municipal court.

23.     At the Clanton Municipal Court which operated under the JCS contract and system, a person unable to fully pay fines and costs when levied was automatically placed on probation with JCS, even when there was no jail sentence adjudicated.  This was routinely done with no investigation into the indigency of the individual or the reasons for their inability to pay the fine and costs. The probation orders supplied by JCS then required the individual to make payment to JCS of the fines, costs and additional monthly fees as required under Clanton's contract with JCS.

24.     The City has contracted with JCS to collect those payments, referring to this system of debt collection for traffic tickets as "probation." JCS operates what it calls an "Offender Funded Model" of probation, promising the City that it will not charge the City for its services. Instead, JCS charges debtors – those who cannot afford to pay their tickets immediately – additional monthly fees for the ability to be on "probation," typically $40 per month in addition to whatever is owed to the City. JCS also charges an initial "set up" fee when a person is placed on "probation." The "probation" payment plans are part of the general policy practice established under the contract between the city and JCS.

25.     For a number of years, Clanton, as a matter of its policy and practice, implemented the JCS system.  That system and JCS's "Probation Tracker" software used at Clanton are highly systemized and focus on collections of fines and its fees -- not traditional probation services.  For instance, the "probation officer" does not visit the probationer's home, job or family, and has contact with them only at the JCS office in collecting fees and fines.

26.     The mechanics of collection is detailed in the training manual used by JCS.

6

JCS's training manual instructs its employees on the use of its computer systems in tracking the payments made by the "offenders" and provides court forms to order probation and payments to JCS. The JCS training system also provides sample letters for use after probation is ordered, threatening the "offender" that their inability to pay could result in "a warrant for your arrest or a hearing set by the court."  *See* Exhibit A.  Similar JCS forms instruct the "offender" that they can avoid the court date if they pay an amount determined by JCS.  Notice to the offender of these JCS set "court dates" was handled by JCS by regular mail with no proof of service and no consideration of returned mail showing no receipt.  *See* Exhibit B.

27.     Similarly, the setting for any hearing on petitions instituted by JCS was done by JCS and adopted by Clanton. JCS set the hearings and provided testimony against the "offender." *See* Exhibit C.

28.     Finally, Clanton issues warrants for arrest based on JCS's request when a person does not attend the post-conviction court hearing JCS and Clanton have demanded. These warrants list the previously adjudicated offense as the charge for which the law enforcement officer should arrest the person. *See* Exhibit D. The approach was all part of the policy and practice of Clanton.

29.     Under this system and practice, once on probation to collect the fines, "offenders" who cannot keep up their payments to JCS at Clanton are continually threatened and if payments are not forthcoming, then required to reappear at post-conviction "compliance" hearings where the judge threatens them with arrest if they do not pay promptly. Clanton police officers attend these "compliance" hearings.

30.      If a person misses payments or pays less than the amount ordered, JCS  is

7

given the discretion to decide whether to petition the City for "revocation" of probation which requests that the person be arrested and jailed. The City routinely follows this request.

31.     Under this system and practice, when a JCS "probationer" does not attend one of these "compliance" hearings, warrants are issued by the City citing the original offense that has already been adjudicated. These arrests result from JCS reporting that the "offender" failed to comply with their probation order – that is, they failed to pay or appear at the JCS offices as JCS directed. The arrests and incarceration on these charges occur without any determination of contempt or willfulness in these arrests.  Under this system, the "offender" arrested is jailed for an undetermined period of time with bond set by the city magistrate to approximate the money claims to be owed on the balance at JCS. Unlike legitimate probation systems where a probationer would be entitled to a finding of the reasons for revocation, appointed counsel and, at worse, suffer jail time equating to the original sentence, the system and practice at Clanton denies all those safeguards.

32.     As a matter of policy and practice at Clanton while operating with JCS, the Court proceedings were closed to the public in violation of both state and federal law.

33.     The City Council and Mayor control the policy making for Clanton and also hires the municipal court judge and contracted for services of JCS at the municipal court. The decision to use this JCS system was an administrative decision of Clanton, by and through its mayor, and not a decision of the Chief Justice, or any other employee of the Administrative Office of Courts ('AOC').

34.     Clanton, through its contract, pattern and practice, has clothed JCS with the appearance of state authority and has previously even allowed JCS employees to carry badges. The JCS employees attended each municipal court session and are referred to

as "probation officers" in the operation of the municipal court and city clerk's office, though none have such authority under Alabama statutes.

35.     This public ruse was maintained by Clanton and JCS for purposes of imposing and collecting fines and costs from citizens such as the Plaintiffs, and was accomplished by allowing JCS to control the money, determine how much each municipal court "offender" must pay each month, how much will be credited for each payment to the collection "services" of JCS each month, and how much of it JCS would rebate to Clanton toward the fines adjudged.

36.     This system, policy and practice, as a matter of routine, violates the rights of persons such as the Plaintiffs and the classes they seek to represent by imposing fines and charging fees to indigent persons with no hearing or consideration of their indigency and by converting fines to jail time.

37.     Despite the lack of authority to do so, Clanton, as part of its policy and practice, allows JCS to use threats of revoking probation, arrest, increased fines and costs and jail time for purposes of collection. Under the system operated by Clanton, JCS's request to incarcerate an individual and/or impose unreasonable bond requirements was routinely accepted by City personnel as a matter of policy without conducting delinquency or probation hearings and without making any findings, much less any determination of indigency or appointment of counsel before taking such punitive action. Furthermore, the threats and jailing were done by Clanton and JCS despite the fact that both have a significant financial stake in the proceedings and both have knowledge of the probationers' poverty.

38.     The collective actions of Clanton and its agent JCS are inextricably interwoven with each other and routinely result in court costs and fines which exceed the

statutory maximum of $500 for municipal courts.  Similarly, the periods of "probation" imposed for purposes of collecting fines and fees for JCS routinely exceed the two-year statutory maximum for municipal probations, all of which results in Clanton taking action to detain and otherwise incarcerate individuals without any jurisdiction to do so.

39.     After improperly imposing probation even when no jail sentence is involved, incarceration then follows if the fine, together with the fees added by JCS, are not paid as dictated.  The collection purpose of this system is emphasized by the fact that probation is terminated once full payment is made and by the fact that no one who is able to immediately pay their fine is put on "probation."

40.     Under the Clanton system and its policy and practice, its agent JCS has a monetary interest to conduct its role as "probation officer" in a way that maximizes its personal profit and not as a neutral court officer.

41.     Under the scheme implemented by the Clanton policy and practice, its agent JCS decides whether to initiate probation revocation proceedings, and makes recommendations to the city judge about that revocation, and requests that warrants be issued – all while financially interested in the outcome of these strong-arm collection efforts.

42.     Under the scheme implemented by the Clanton policy and practice, its agent JCS undertakes no determination of the reasons for nonpayment, and does not consider such things as the Plaintiffs' disability, unemployment or lack of assets in regard to the nonpayment of the fines and routinely seeks collection from exempt income such as Social Security Disability payments.

43.     Under the scheme implemented by the Clanton policy and practice, its agent JCS denies any responsibility to determine indigency, and provides no instruction to its

employees for the consideration of indigency despite the fact that it knows when it "probationers" do not have a job, are in jail, and are filing for or receiving disability.

44.    Under the scheme implemented by the Clanton policy and practice, after simple fines are converted to "probation" for payment, jail often results for the "offender" who does not meet the payment schedule.  This system uses JCS's conclusion of a "probation violation" to incarcerate individuals who, had they been financially able to pay, would have paid only a fine with no probation whatsoever.

45.    Under its scheme implemented by the Clanton policy and practice, Clanton, which is also financially interested, takes advantage of its control over its police force and jail facilities to deny these "offender"/debtors the statutory and constitutional protections that every other Alabama debtor may invoke against a private creditor by allowing JCS to use or threaten debtors of the City with arrest and jail as coercion for payment.

46.    Under this scheme, it is the policy and practice of Clanton to jail people when they cannot afford to pay debts owed to the City resulting from prior traffic tickets or fines and to jail them with knowledge of their poverty and without considering alternatives to imprisonment.

**THE PLAINTIFFS**

47.    Plaintiffs and others similarly situated are individuals who were unable to fully pay fines levied by the Clanton Municipal Court, and who, as a result, were assigned to JCS for "probation" for purposes of collecting the fine. Many of the Plaintiffs are currently or were formerly indigent and, despite that indigency, were incarcerated, or may be incarcerated in the future, for failure to pay charges and fees for services allegedly rendered by JCS to Clanton with which it contracts.

11

**CANDICE CHAPMAN**

48.     Candice Chapman ('Ms. Chapman') is an individual resident of Jemison, Chilton County, Alabama.

49.     On April 3, 2014, Ms. Chapman was driving a vehicle that Clanton police officer David Bone pulled over. Clanton police officer Faulkner was following Officer Bone and pulled in behind him. Both officers approached the vehicle and requested to search it. Ms. Chapman consented to a search of the vehicle and Officer Bone found a small amount of marijuana. She was charged with possession of marijuana and released.

50.     On May 13, 2014, Ms. Chapman appeared in the Clanton Municipal Court and pled guilty to the misdemeanor offense of possession of marijuana. She was given a 30-day suspended jail sentence and assessed a $251 fine and court costs of $650. Her total debt to the City for this offense was $901.

51.     Ms. Chapman could not pay the fine and cost immediately and was ordered to JCS 'probation' pursuant to the City's contract and practice with JCS.

52.     Ms. Chapman told the JCS employee that she could not immediately pay the fees totaling $901, so the JCS employee filled in the 'probation' order requiring her to pay $140 a month and to show up at the JCS office within the week to begin making payments.

53.     Ms. Chapman's 'probation' also required that she pay JCS a $10 set up fee and $40 a month for every month she was on JCS 'probation.'

54.     Ms. Chapman was arrested in Wal-Mart on May 25, 2014, and charged with shoplifting.

55.     On May 27, 2014, Ms. Chapman's ex-husband went to the JCS office and paid $40 for her.  JCS kept $20 and applied $20 to her Clanton fines. JCS also directed

that Ms. Chapman come back in three days and pay the remaining $100 on her $140 monthly 'payment plan.'

56.    Ms. Chapman went to the JCS office on May 30th and paid $100. The JCS employee told her to come back on June 13th with $140. JCS kept $30 of her $100 payment -- $10 for its 'start-up' fee and $20 for its monthly 'probation fee' - and sent $70 to Clanton for it to apply against Ms. Chapman's fines. This was all done pursuant to JCS's contract and practice with the City of Clanton.

57.    On June 27, 2014, Ms. Chapman went to the JCS office and paid $40; the JCS employee told her to come back in three days with the remaining $100. JCS kept $20 and sent $20 to Clanton to apply against Ms. Chapman's fines.

58.    On or about July 15 2014, Ms. Chapman was found guilty in the Clanton Municipal Court of the misdemeanor offense of theft of property. She was given a 30-day suspended jail sentence and assessed a $250 fine and court costs of $251 for a total debt to the City of $624 for this offense. She was not able to immediately pay the fine and costs.

59.    Despite her indigency she was, once again, ordered to JCS 'probation' pursuant to the City's contract and practice with JCS.

60.    Ms. Chapman told the JCS employee that she could not immediately pay the fees totaling $501, so the JCS employee filled in the 'probation' order requiring her to pay $140 a month and to show up at the JCS office within the week to begin making payments.

61.    Ms. Chapman's 'probation' also required that she pay JCS a $10 set up fee and $40 a month for every month she was on JCS 'probation.' People before the Clanton City court who could immediately pay their fines and costs were not sent to JCS and did not have to pay these extra fees.

62.    Ms. Chapman continued to struggle to pay these escalating fines and fees.

13

63.     On or about August 19, 2014, Ms. Chapman pled guilty in the Clanton Municipal Court to the misdemeanor offense of promoting prison contraband. She was assessed a $200 fine and court costs of $251 for a total debt to the City of $451 for this offense. The "Bench Notes" are ambiguous at best as to the jail sentence she received, but they read in relevant part that Chapman "currently has 28 day sentence (sic) to serve on probation [illegible]" and that she will be sentenced "to serve 9 additional days in county (sic) jail" for this offense.

64.     Once again, since she could not afford to pay the fines and court costs for these offenses, the City put her on a "payment plan" with JCS. Once again, she was charged an initial $10 set-up fee and an additional fee of $40 per month in addition to what was owed to the City for as long as the balance remained unpaid.

65.     On September 19, 2014, police from Clanton arrested Chapman. The police took her to the Chilton County jail, which houses municipal court inmates. At the time of the arrest, Chapman was not aware that there was a warrant out for her arrest and did not know the reason for the arrest. Chapman was also not aware that her probation on the first two cases had already been revoked in her absence on September 9, 2014.

66.     Chapman later found out that JCS filed a document entitled "Petition for Revocation of Probation and Statement of Delinquency Charges" on or about August 26, 2014.  The total amount that Chapman was alleged to have owed for the first two tickets was then $1,293. JCS further alleged that she failed to pay the monthly supervision fees that totaled $60, for an overall total of $1,353.

67.     Chapman's debt owed to the court for the first two offenses was converted to days in jail on or about September 22, 2014. Chapman was sentenced to "28.3 days" in jail "in lieu of payment" of $1,415 owed for her court debt. For the third offense,

Chapman's debt of $451 was immediately "converted to days in jail in lieu of payment" upon the finding of guilt. She was not appointed an attorney and was never offered community service as an alternative to paying the fine and court costs.

68.    When she was jailed, Chapman was indigent. By the time of her release, on or about October 26, 2014, Chapman had served approximately 37 days in jail due to her nonpayment of court debt.

69.    Despite knowing that she was indigent, the City of Clanton and its agent JCS demanded payment and threatened jail if they did not receive money by specific dates. Clanton also demanded that Ms. Chapman attend city court periodically and explain how she was doing on making her payments.

70.    Neither the City nor JCS had the authority to demand additional fees or the onerous "reporting" requirements because she could not pay the fines.

71.    Neither the City nor JCS evaluated her financial situation and she has never had an attorney appointed to represent her.

72.    Throughout this period of time, JCS has provided no services to Ms. Chapman and has acted merely as a collection agency for Clanton charging additional fees, and despite knowledge that Ms. Chapman  was unable to pay these fines and was indigent, JCS demanded payment of excessive fines and fees while threatening jail and using the city police to jail her.

**MICHAEL LITTLEFIELD**

73.    Michael Littlefield (Mr. Littlefield') is an individual resident of Clanton, Chilton County, Alabama.

74.    In the spring of 2010, Mr. Littlefield was stopped by a Clanton police office

for an improper tag. The officer charged him with improper tag and driving with license suspended.

76.     Mr. Littlefield was unable to immediately pay the fines for these offenses, so he was unable to sign the back of the uniform traffic citation and send a check or money order to resolve these cases. As such, and pursuant to Clanton's policy and practice, Mr. Littlefield had to go to the Clanton City court to tell the court personnel that he could not pay.

76.     Clanton did not allow people to plead guilty with the City magistrate and begin making payments to the magistrate when they could not immediately pay. Rather, Clanton, pursuant to its contract and practice with JCS, required people who could not immediately pay the fines to appear in City court where the City judge would place those people on JCS 'probation.'

77.     On June 29, 2010, Mr. Littlefield appeared in Clanton's municipal court. He was ordered to pay $320 for DWS and $173.50 for improper tag. He was not sentenced to any jail time; he did not have a lawyer, and he told the City judge that he was unable to pay either of the amounts in full. The judge did not give Mr. Littlefield any other alternatives such as community service and, instead, ordered him to JCS 'probation' pursuant to the City's contract and practice with JCS.

78.     Mr. Littlefield also told the JCS employee that he could not immediately pay the fees totaling $493.50, so the JCS employee filled in the 'probation' order requiring him to pay $140 a month and to show up at the JCS office within 48 hours to begin making payments.

79.     Mr. Littlefield's 'probation' also required that he pay JCS a $10 set up fee and $40 a month for every month he was on JCS 'probation.' People appearing before the

Clanton City court who could immediately pay these fines did not have to go to Clanton's court and were not placed on "probation" with JCS.

80.     Mr. Littlefield remained unable to pay the fines, costs and fee and within a few months Clanton had issued a warrant for his arrest. The police arrested Mr. Littleton and he stayed in jail until such time as Clanton released him for 'time served.' Clanton's practice of jailing indigent people for their inability to pay is known as 'pay or stay' and those attending Clanton's court quickly learn that this policy is enforced by the City judge, City clerks, and the City's police.

81.     The summer of 2014 Mr. Littlefield was again stopped by a Clanton police officer for an expired tag. The officer charged him with expired tag and driving with no insurance.

82.     Once again, Mr. Littlefield was unable to immediately pay the fines for these offenses, so he was unable to sign the back of the uniform traffic citation and send a check or money order to resolve these cases. As such, and pursuant to Clanton's policy and practice, Mr. Littlefield had to go to the Clanton City court to tell the court personnel that he could not pay.

83.     On June 29, 2010, Mr. Littlefield appeared in Clanton's municipal court. He was ordered to pay $504 for no insurance and $229 for expired tag. He was not sentenced to any jail time; he did not have a lawyer, and he told the City judge that he was unable to pay either of the amounts in full. The City judge did not give Mr. Littlefield any other alternatives to pay for his crimes such as community service. Rather, Mr. Littlefield was ordered to JCS 'probation' pursuant to the City's contract with JCS.

84.     Mr. Littlefield told the JCS employee that he could not immediately pay the fees totaling $708, so the JCS employee filled in the 'probation' order requiring him to pay

$140 a month and to show up at the JCS office within the week to begin making payments.

85.     Mr. Littlefield's 'probation' also required that he pay JCS a $10 set up fee and $40 a month for every month he was on JCS 'probation.' People appearing before the Clanton City court who could immediately pay their fines did not have to go to Clanton's court and were not assigned "probation" with JCS.

86.     Mr. Littlefield remained unable to pay and within a few months Clanton had issued a warrant for his arrest. The police arrested Mr. Littleton and he stayed in jail until such time as Clanton released him for 'time served.' Clanton's practice of jailing indigent people for their inability to pay is known as 'pay or stay' and those attending Clanton's court quickly learn that this policy is enforced by the City judge, City clerks, and actively enforced by the City's police.

87.     On November 4, 2014, Littlefield pled guilty to the misdemeanor offense of illegal possession of prescription drugs. He did not have a lawyer at the time and did not contest the charge, even though he was later informed that he had a valid defense to the charge based on an illegal search and seizure. He was given a 30-day suspended jail sentence and assessed a fine of $251 and court costs of $736. His total debt to the City was $987.

88.     Because he could not pay the fines and court costs, once again the City put him on a "payment plan" with JCS. He was charged an initial $10 set-up fee and an additional fee of $40 per month in addition what was owed to the City for as long as the balance remained unpaid.

89.     Littlefield has worked sporadically in the past two years for a disabled neighbor, sometimes earning $50 per day of work. At most, he has worked three to four days per week over the past two years. Some weeks he did not work at all. He earned at

most $1,000 per month. Based on his stated income, Littlefield was barely subsisting at the federal poverty line.[2] Littlefield was struggling to survive and had to rely on family members to help pay for housing, food, and other basic necessities. After pleading guilty, he was unable to pay JCS or the City.

90.     On Friday night, December 19, 2014, police from Clanton came to Littlefield's mother's house, where he lives, and arrested him and took him to the Chilton County jail, which houses municipal court inmates. At the time of the arrest, Littlefield was not aware that there was a warrant out for his arrest and did not know the reason for his arrest. Littlefield also was not aware that the municipal court had set a revocation hearing for December 2, 2014. He never received a copy of this document or notice that his case was set for a revocation on that date. Because he was not aware of the hearing, he did not appear in municipal court. Littlefield later found out that his probation was revoked in his absence and that a warrant was issued for his arrest. The warrant stated "Cash Bond Only $1,056.00."

91.     He later found out that JCS signed a "Petition for Revocation of Probation and Statement of Delinquency Charges" on or about November 24, 2014. The total amount that Littlefield was alleged to have owed for this ticket was then $1,106. JCS alleged that he failed to pay fines, fees, and costs in the amount of $1,056, rather than the $987 imposed by the court.  Additionally, the document assessed a $50 payment for a monthly supervision fee, which curiously was listed at only $40 in the body of the document. No reason had been given why JCS added an additional $10 for the monthly supervision fee or how they arrived at the $1,056 or $1,106 amounts.

---

[2]This number likely substantially overstates Mr. Littlefield's financial resources; The federal poverty line for an individual was $11,670 in 2014.

92.     Littlefield was never again brought before the municipal court for this matter. Three days after his arrest, he was informed that the court "converted to days in jail in lieu of payment" for the costs and fines, which allegedly totaled $1,056 (as opposed to the $987 assessed by the court in December 2014 or the $1,106 claimed by Judicial Correction Services).  He was ordered to serve "21.12 days" in jail at the rate of $50 per day. He was not appointed an attorney and was never offered community service as an alternative to paying the fines and court costs.

93.     At the time he was jailed, Littlefield did not own a house, car, financial instruments, or any other significant assets.  He did not have a bank account and struggled just to survive.

94.     Mr. Littlefield was released before his 21.12 days were served. As such, the City continues to claim he owes a balance on the fines, costs and fees and in jeopardy of the same unconstitutional treatment pursuant to the City's ongoing policies and practices. He has the ongoing fear of imminent imprisonment resulting from the City's policies and practices with respect to municipal debt collection.

95.     Despite knowing that he was indigent, the City of Clanton and its agent JCS demanded payment and threatened jail if they did not receive money by specific dates. Clanton also demanded that Mr. Littlefield attend city court periodically and explain how he was doing on making his payments.

96.     Neither the City nor JCS had the authority to demand additional fees or the onerous "reporting" requirements because he could not pay the fines.

97.     Neither the City nor JCS evaluated his financial situation and he has never had an attorney appointed to represent him.

98.     Throughout this period of time, JCS has provided no services to Mr. Littlefield

and has acted merely as a collection agency for Clanton charging additional fees, and despite knowledge that Mr. Littlefield was unable to pay these fines and was indigent, JCS demanded payment of excessive fines and fees while threatening jail and using the City police to jail him.

**STEDMAN KINE**

99.     Stedman Kine ('Mr. Kine') is an individual resident of Clanton, Chilton County, Alabama.

100.    The summer of 2011 Mr. Kine was eighteen (18) years old and was charged by the Clanton police with minor consumption of alcohol.

101.    Mr. Kine appeared in the Clanton Municipal Court on August 2, 2011 and was assessed $150 and $421 court costs for his crime; he was not given any jail time for the charge.

102.    Mr. Kine was unemployed and lived with his parents. He told the court personnel that he was unable to immediately pay the $571 penalty as he did not have a job.

103.    Pursuant to its contract and practice with JCS, the Clanton City court put Mr. Kine on JCS 'probation' for JCS to collect the City fees from Mr. Kine.

104.    Pursuant to its contract and practice with the City and the City's court, JCS charged Mr. Kine a $10 set up fee and $40 each month he was on 'probation.' Mr. Kine told JCS that he did not have a job and could not pay, but JCS demanded that he come to the JCS office and pay $145 a month.

105.    Mr. Kine was unable to pay and within weeks JCS was threatening that he would have to return to court to explain, again, why he could not pay if he did not pay JCS

the $145 it demanded.

106.   When Mr. Kine did not pay JCS the $145, JCS scheduled a revocation hearing for him demanding that he come to the Clanton City court on September 13, 2011, where JCS would request his probation be revoked.

107.   Despite the fact that Mr. Kine was not given jail time for his crime, and despite the fact that Mr. Kine did not receive notice of the hearing, JCS requested that the City court issue a warrant for his arrest when he did not appear at the revocation hearing JCS scheduled.

108.   Clanton complied with JCS's request and, on September 14, 2011, issued a warrant for Mr. Kine's arrest.

109.   That same day, September 14, 2011, Mr. Kine's mother went to the JCS office and paid $250 to have Clanton recall the warrant on her son.

110.   JCS took the $250 from Mr. Kine's mother and kept $90 for its fees ($10 set up fee and $80 for 2 months of 'probation' fees -- August and September) and sent the City of Clanton $160 to apply against Mr. Kine's court cost.

111.   Mr. Kine continued to be indigent and unable to pay and JCS once again scheduled a revocation hearing because he could not pay the $200 JCS demanded.

112.   Once again, JCS scheduled its revocation hearing for October 25, 2011. Mr. Kine did not receive notice of the hearing and, as such, did not appear.

113.   Despite the fact that Mr. Kine did not receive notice of the JCS established hearing, Clanton complied with the JCS request and issued a warrant for his arrest.

114.   In 2012 Mr. Kine was arrested for his inability to pay these fines pursuant to Clanton's warrant; despite the fact that he was never sentenced to time in jail for his crime of minor consumption, and despite the fact that his mother paid $250 against his City fines

22

and fees.

115.   Pursuant to its policy, Clanton demanded that Mr. Kine pay a cash bond to secure his release from jail. The cash bond set by the City totaled the amount JCS stated he owed the City and it.

116.   When Mr. Kine was unable to pay the cash bond demanded, he was kept in jail for days and given 'time served' -- despite the fact that he had never been sentenced to jail.

117.   In the spring of 2013, Clanton police cited Mr. Kine with the crime of littering.

118.   Since Mr. Kine was unable to immediately pay the littering fine, he was required to appear in Clanton's Municipal Court, which was Clanton's practice and policy. People who could immediately pay their littering fines were not required to appear in City court and could send in the fine by mail.

119.   On May 14, 2013, Mr. Kine appeared in Clanton's City court and was assessed $250 in fines and $251 in court costs for his crime of littering; he was not given any jail time.

120.   Mr. Kine was unemployed and lived with his parents. He told the City judge that he was unable to immediately pay the $501 penalty as he did not have a job.

121.   Pursuant to its contract and practice with JCS, the Clanton City court put Mr. Kine on JCS 'probation' for JCS to collect the City fines and costs from Mr. Kine.

122.   Pursuant to its practice and contract with the City and the City's court, JCS charged Mr. Kine a $10 set up fee and $40 each month he was on 'probation.' Mr. Kine told JCS that he did not have a job and could not pay but JCS demanded that he come to the JCS office and pay $145 a month.

123.   Mr. Kine was unable to pay and within weeks JCS was threatening that he

would have to return to court to explain, again, why he was unable to pay.

124.    JCS followed its procedures and within a few months, on July 23, 2013, Mr. Kine was again placed on warrant status with JCS.

125.    Mr. Kine was arrested and jailed.

126.    Mr. Kine could not pay the cash bond demanded so he stayed in jail.

127.    On September 17, 2013, Mr. Kine was in jail and appeared via video at the Clanton City court to answer for the charge of criminal trespass.

128.    Once again, Mr. Kine was assessed $200 in fines and $374 in court costs for his crime of trespass; he was not given any jail time.

129.    Mr. Kine was in jail at the time and told the City judge that he was unable to immediately pay the $574 penalty as he did not have a job and had been unable to pay the cash bond required for his release on the current charge.

130.    Despite knowledge of his poverty and pursuant to its contract and practice with JCS, the Clanton City court put Mr. Kine on JCS 'probation' for JCS to collect the City fines and costs from Mr. Kine.

131.    On October 7, 2013, Mr. Kine went to the JCS office to 'report' for his 'probation' of trespass. He did not have any money as he was just released from jail and did not have a job.

132.    Despite knowledge of his indigency and pursuant to its contract and practice with the City and the City's court, JCS charged Mr. Kine a $10 set up fee and $40 each month he was on 'probation.' Mr. Kine told JCS that he did not have a job and could not pay, but JCS demanded that he come to the JCS office and pay $145 a month.

133.    On October 16, 2013, Mr. Kine went to the JCS office and paid $10.  JCS told him that he needed to pay $135 by October 18, 2013.

134.    On October 23, 2013, a woman reported to the JCS office on Mr. Kine's behalf and paid $20.

135.    Mr. Kine was unable to go to the JCS office and pay as he did not have reliable transportation or a steady job.

136.    On November 20, 2013, Mr. Kine went to the JCS office and paid $19; the JCS employee told him to come back the 25th with $25.

137.    When he continued to be unable to go to the JCS office and pay as demanded, JCS scheduled its revocation hearing for April 1, 2014. Mr. Kine did not receive notice of the hearing and, as such, did not appear.

138.    Despite the fact that Mr. Kine did not receive notice of the JCS established hearing, Clanton issued a warrant for his arrest.

139.    On July 6, 2014, Mr. Kine was a passenger in a vehicle which was stopped by Clanton police officer Kevin Quinley for failure to wear seatbelts. When the vehicle stopped, Mr. Kine exited the vehicle and ran thinking that Clanton had again issued a warrant for his arrest. Officer Quinley pursued him, physically put Mr. Kine on the ground, subdued him and charged Mr. Kine with the crimes of attempting to allude police, resisting arrest and possession of marijuana.

140.    For these crimes, Mr. Kine was assessed fines and court costs totaling $1,989 which he could not pay.

141.    Once again, pursuant to its contract and practice with JCS, the Clanton City court assigned him to probation with JCS -- despite knowledge of Mr. Kine's indigency.

142.    Pursuant to its contract and practice with the City and the City's court, JCS charged Mr. Kine a $10 set up fee and $40 each month he was on 'probation.' Mr. Kine told JCS that he did not have a job and could not pay, but JCS demanded that he come

to the JCS office and pay $140 a month.

143.  Once again, Mr. Kine could not pay and, within months, JCS requested that Clanton issue another warrant for Mr. Kine's arrest.

144.  On November 19, 2014, Clanton issued three (3) warrants for Mr. Kine's arrest -- a warrant for each crime that had previously been adjudicated. These warrants demanded cash bonds of $624, $551 and $451, representing the amount claimed to be owed by Mr. Kine on each charge.

145.  On November 21, 2014, Clanton City police again arrested Mr. Kine and brought him to the Chilton County jail.

146.  Mr. Kine was unable to pay the cash bonds, so Clanton converted his costs and fines to jail time and required that he spend fifty-four (54) days in jail. If Mr. Kine had been able to pay the costs and fines, he never would have been on JCS 'probation' and he would have been released from jail once payment was made.

147.  When he was jailed, Mr. Kine did not own a house, car, financial instruments, or any other significant assets. He did not have a bank account and continues to rely on the support of family members to survive. By the time of his release, on January 11, 2015, Kine had served approximately 51 days in jail due to his nonpayment of fines, fees, and costs.

148.  Mr. Kine has been unable to keep constant employment due to difficulties with his health. Mr. Kine has at all times has been below the poverty level.

149.  Despite knowing that he was indigent, the City of Clanton and its agent JCS demanded payment and threatened jail if they did not receive money by specific dates. Clanton also demanded that Mr. Kine attend City court periodically and explain how he was doing on making his payments.

150.    Neither the City nor JCS had the authority to demand additional fees and onerous "reporting" requirements because he could not pay the fines.

151.    Neither the City nor JCS evaluated his financial situation and he has never had an attorney appointed to represent him.

152.    Throughout this period of time, JCS has provided no services to Mr. Kine and has acted merely as a collection agency for Clanton charging additional fees, and despite knowledge that Mr. Kine was unable to pay these fines and was indigent, JCS demanded payment of excessive fines and fees while threatening jail and using the City police to jail him.

**DEANGELO BARNETT**

153.    Deangelo Barnett ('Mr. Barnett') is an individual resident of Toccoa, Stephens County, Georgia.

154.    On September 21, 2010, Mr. Barnett was brought before the Clanton Municipal Court on the charge of "Public Intoxication." For his crime, Mr. Barnett was fined $150 and assessed $382 in court costs, totaling $532 in money owed to the City of Clanton.

155.    Mr. Barnett informed the court personnel that he was unable to immediately pay $532 because he struggled to pay his bills. He lived with his mother and worked when he could find jobs. He had not graduated from high school and it was hard to find a job that paid well and that allowed him to work a full work week.

156.    Despite knowledge that Mr. Barnett could not immediately pay the fines because of his poverty, Clanton made no investigation of his indigency and instead ordered that Mr. Barnett be assigned to JCS for the "payment plan."

27

157.    As directed, Mr. Barnett went to the room where the JCS employee required him to fill out an intake form and sign a paper that he later learned was a probation order.

158.    Pursuant to its contract and practice with the City and the City's court, JCS charged Mr. Barnett a $10 set up fee and $40 each month he was on 'probation.' Additionally, JCS demanded that Mr. Barnett make monthly payments to it for $145 per month. Mr. Barnett told JCS that he could not pay $145 a month because he did not earn much money, but JCS demanded that he come to the JCS office and pay $145 a month.

159.    In addition to the financial difficulty of paying $145 a month, JCS also required Mr. Barnett to travel to its Columbiana office to make these payments.

160.    On November 3, 2010, Mr. Barnett traveled to Columbiana and paid JCS $145. JCS kept $70 ($10 set up fee and $60 in 'probation fees') and sent $75 to the City of Clanton for it to apply this amount against Mr. Barnett's fines and court costs, leaving a $457 balance.

161.    Mr. Barnett had to work an entire week to pay JCS $145 as he brought home approximately $300 every other week but, within the month, JCS was calling Mr. Barnett demanding its monthly $145.

162.    When he remained unable to go to the JCS office and pay as demanded, JCS scheduled its revocation hearing for January 5, 2011, stating that it would cancel the hearing if it received $250.

163.    Mr. Barnett did not receive notice of the hearing and, as such, did not appear.

164.    Despite the fact that Mr. Barnett did not receive notice of the JCS appointed hearing, Clanton issued a warrant for his arrest.

165.    On June 29, 2011, Mr. Barnett was arrested on the warrant that was issued because he could not pay JCS and Clanton demanded a cash bond for his release.

166.   Mr. Barnett's family and friends gathered enough money to satisfy Clanton and secure his release. From this cash bond that Mr. Barnett's family paid, Clanton sent JCS $100 it had demanded for Mr. Barnett's release. The $100 Clanton sent to JCS was in addition to the amount the City kept for its fines and fees.

167.   At all times throughout this process, Mr. Barnett was indigent, was not provided an attorney and JCS did not provide him any services other than that of a debt collector.

168.   On July 2, 2013, Mr. Barnett was again brought before the Clanton Municipal Court on charges of "driving while revoked" and "possession of marijuana." He was assessed $551 in fines and $844 in costs for a total of $1,395.

169.   Once again, because Mr. Barnett could not pay immediately, he was once again placed on 'probation' with JCS and ordered to pay JCS an additional $40 per month and a $10 set up fee. JCS once again set his monthly payment amount at $145 per month.

170.   Mr. Barnett continued to be indigent and struggled to find consistent work. At all relevant times, he was unable to pay JCS as it demanded because he did not have the money. He told the City of Clanton and JCS that he was unable to pay due to being laid off from work, not getting regular hours, and only bringing home several hundred dollars every other week when he did have work. Nevertheless, JCS continued to hound him for payments, which he could not make.

171.   In January 2014, Mr. Barnett was pulled over and charged with no seat belt and driving while revoked and once again had to appear in Clanton City court. As was the policy and practice of Clanton, Mr. Barnett was assessed a money fine despite the fact that he  stated he could not pay. He was not given any alternative punishment for his crimes such as community service nor was he offered or provided an attorney.

172.    Once again, because Mr. Barnett could not pay immediately, he was placed on 'probation' with JCS on the JCS form and ordered to pay JCS an additional $40 per month and a $10 set up fee. JCS once again set his monthly payment amount at $145 per month.

173.    Mr. Barnett's fines and costs totaled $590 for the charges of no seat belt and DWLR. On his probation order paperwork, JCS designated that this 'probation' run concurrent with his current 'probation' which he was struggling to pay off.

174.    From July 2013 to late June 2014, Mr. Barnett made meager payments as he was able. In fact, Mr. Barnett made twenty-five (25) payments to JCS over that year -- $25-$40 payments almost every other week. His efforts did not satisfy JCS and his balance with the City was not going down much because JCS was taking almost half of every payment for its profit.

175.    From July 2013 to June 2014, Mr. Barnett paid JCS Six Hundred Eighty Dollars ($680), yet his City balance was only reduced by $350 which meant that he still owed the City of Clanton $1,045 on his first 'probation' and $590 on his second JCS 'probation' in late June 2014.

176.    On June 27, 2014, Mr. Barnett went to the JCS office and paid $40; JCS kept $20 and sent Clanton $20 to apply against his balance. Mr. Barnett was then told that he would have to appear in Clanton's City court on July 16, 2014 to explain why he was not paying JCS $145/month.

177.    Mr. Barnett once again went to the Clanton City court and explained that he did not have any assets, property or any other financial means to pay the fines and fees assessed against him.

178.    Mr. Barnett was not provided an attorney nor was he given an alternative,

non-monetary punishment.  Rather, he was thrown in jail and told that if someone came and paid his balance in full he would be released. Neither Mr. Barnett nor his family members could pay the City of Clanton all the money it demanded, so Mr. Barnett stayed in jail for 33 days to "serve out" his fines and costs with the City of Clanton.

179.   Neither the City of Clanton nor JCS considered the fact that Mr. Barnett was poor and unable to pay nor was he given alternative forms of punishment such as community service or payment over time without additional fees.

180.   Throughout this period of time, JCS has provided no services to Mr. Barnett and has acted merely as a collection agency for Clanton charging additional fees. Despite knowledge that Mr. Barnett was unable to pay these fines, and was indigent, the City of Clanton and JCS demanded payment of excessive fines and fees while threatening jail and ultimately incarcering Mr. Barnett.

**TRACY DUBOSE**

181.   Tracy Dubose ('Ms. Dubose') is an individual resident of Clanton, Chilton County, Alabama.

182.   Ms. Dubose was brought before the Clanton Municipal Court on May 21, 2013, on charges of "possession of paraphernalia." At that time, Ms. Dubose informed Clanton and its agent JCS that she was on disability and did not have assets and valuables to pay a money fine. Nevertheless, she was fined $251 and ordered to pay $590 in court costs, totaling $841.

183.   Ms. Dubose was not financially able to immediately pay the $841 fines, so the Clanton City court, pursuant to its agreement and practice with JCS, ordered her to "probation" with JCS for the collection of the fines. Pursuant to its agreement with the City,

JCS used its form 'probation order' which it required Ms. Dubose to sign. JCS charged her a $10 set up fee and $40 per month for every month she had a balance outstanding. Additionally, JCS required her to pay a minimum monthly payment of $85 and drive to its Jemison office to pay.

184.    At all times, Ms. Dubose was and has been disabled and indigent receiving Social Security Income. As such, she was not always able to pay the $85 monthly JCS payment.

185.    Despite knowledge of her indigency and disability, Clanton and JCS demanded payment and threatened jail if they did not receive the $85 each month -- which they would split -- $45 to the City and $40 to JCS.

186.    Despite her poverty, Ms. Dubose made monthly or bi-monthly payments as she could. When Ms. Dubose made a payment, JCS would often take half of the amount Ms. Dubose paid and apply it to the JCS fees they claimed she owed instead of the court costs.

187.    During that time, Ms. Dubose also struggled to find transportation to the JCS office in Jemison, where she was required to report. When JCS did not receive the money it demanded from Ms. Dubose, JCS would hound her relatives, seeking payment.

188.    Neither the City nor JCS had the authority to demand additional fees and onerous "reporting" requirements because Ms. Dubose could not pay the fines.

189.    Despite her poverty, on June 6, 2014, Ms. Dubose was finally able to pay her City fines in full and pay JCS what it claimed she owed. By this time, Ms. Dubose had traveled to the JCS Jemison office approximately 33 times and had paid Clanton $841 and its agent JCS $520 in 'probation' fees, which is $520 more than other people adjudicated for the same offense who were able to pay immediately.

32

190.    Neither the City of Clanton nor JCS considered Ms. Dubose's indigency and she has never had an attorney appointed to represent her. Further, Ms. Dubose was never given alternative forms of punishment such as community service or payment over time without additional fees.

191.    Throughout this period of time, JCS has provided no services to Ms. Dubose and has acted merely as a collection agency for Clanton charging additional fees. Despite knowledge that Ms. Dubose was unable to pay these fines, was indigent and on disability, the City of Clanton and JCS demanded payment of excessive fines and fees while threatening jail.

## PLAINTIFFS' CLASS ALLEGATIONS

192.    The Classes which the named Plaintiffs seek to represent consist of:

> All individuals who have been in the past, or may be in the future, assigned by the Clanton Municipal Court to "probation" with JCS for the collection of fines.

> AND

> All individuals who, despite their indigency, were incarcerated, or may be subject to incarceration, without consideration of their indigency for failure to pay fines, charges and fees from the Clanton Municipal Court.

193.    The members of the Classes and subclasses are so numerous that joinder of all members is impracticable.

194.    As of this time, the exact number in the Classes is unknown but would be more than one thousand and is ascertainable.

195.    Plaintiffs' treatment by the Defendants is typical of the members of the Classes and subclasses and is ongoing.

196.    Plaintiffs will fairly and adequately protect the interests of the Classes and

have retained counsel who are competent and experienced in class litigation.  Plaintiffs have no interests that are adverse or antagonistic to the Classes.

197.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by many Class members may be small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged.

198.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely members of the Class. Among the questions of law and fact common to the Class are:

a.    Whether policy and practice of automatically placing on "probation" at additional cost all municipal offenders who cannot immediately pay fines and costs is legal;

b.    Whether the policy and practice of converting unpaid fines and costs to days of incarceration, without any determination concerning an individual's ability to pay, is legal;

c.    Whether the policy and practice of requiring every order of the municipal court to require probation fees for JCS is legal;

d.    Whether the policy and practice of incarcerating individuals for failure to pay fines and costs with no finding of willfulness is legal;

e.    Whether the policy and practice of incarcerating individuals for failure to appear when no notice of the hearing provided by the court is legal;

f.    Whether the policy and practice of incarcerating individuals for an offense that has been adjudicated with no jail sentence and with no finding

of willful contempt is legal;

g.      Whether the policy and practice of charging an additional fee for "failure to appear" to a post-conviction hearing on an illegal "probation" is legal;

h.      Whether the policy and practice of failing to appoint counsel for indigent defendants when a jail sentence is involved is legal;

i.      Whether the policy and practice of failing to make any inquiry into indigency before imposing fines and costs is legal;

j.      Whether the policy and practice of failing to give adequate notice of the charge and nature of a probation revocation hearing, failing to provide a probation revocation hearing, failing to make written findings concerning the reasons for revoking probation and the evidence relied upon, failing to hold a hearing to determine indigency before revoking probation and otherwise imposing incarceration, failing to make written findings concerning an individual's willful nonpayment of fines and costs before imposing incarceration for nonpayment, is legal;

k.      Whether the policy and practice of imposing fines and court costs that exceed that statutory maximum for municipal fines is legal;

l.      Whether the policy and practice of extending "probation" for municipal offenses beyond 24 months is legal;

m.      Whether a municipality can legally enter a no bid contract binding upon its municipal court.

199.   Clanton and JCS have acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with

respect to the Class as a whole.

200.    Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a Class Action. The data concerning the Class members and the transaction details and amounts on each charge is largely computerized by Clanton and by its agent JCS.

201.    The names and addresses of the Class members are a matter of public record and are also kept by JCS and Clanton and notice can be provided to the Class members via First Class U.S. Mail or other appropriate means as may be directed by the Court.

## COUNT ONE - DENIAL OF DUE PROCESS
## CITY OF CLANTON

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

202.    The Plaintiffs aver that Clanton, acting under color of state law in violation of 42 U.S.C. § 1983, has denied their right to due process and the rights of the Class members.

203.    By contract and its policy and practice, Clanton has delegated many administrative and judicial functions of its municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

204.    That no bid agreement was signed by the City mayor and binds Clanton's municipal court stating, "the City and Court enter into this agreement with JCS to provide probation services upon the terms set forth below, including the following Exhibits:

   Exhibit A - Uniform Standards of Probation Supervision

   Exhibit B - Services Provided by JCS

Exhibit C - Compensation to JCS

205.    Clanton, through its mayor and/or council, approved the agreements with JCS.

206.    Clanton, through its mayor and council, also approved the employment of John Hollis Jackson III as judge of its municipal court.

207.    Municipalities are prohibited from laws, ordinances and policies which are in conflict with state law.  *See Ala. Code* Section 11-45-1.  *Also see, Ala. Const.* Article 4 Section 89.

208.    State law also dictates a separation of the branches of government.  *Ala. Const.* Article 3, Section 43.[3]   Under that doctrine, legislative powers granted to cities and towns are exercised by the city council, *Ala. Code,* Section 11-43-43, while the mayor of the city is responsible for executive duties.  *Ala. Code,* Section 11-43-83.  If the town establishes a municipal court, its administration is supervised by the Chief Justice of Alabama.  *Ala. Code,* Section 12-2-7 *et. seq*.; *Ala Const.,* Article 6, Section 139.

209.    Municipal mayors have the executive power to execute and enforce contracts[4] and the city councils have the legislative power to enact regulations and

---

[3]Ala. Const. Art. III, Section 43 states:
In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.

[4]Ala. Code Section 11-43-83 - The mayor shall see that all contracts with the town or city are faithfully kept or performed. He shall execute all deeds and contracts and bonds required in judicial proceedings for and on behalf or performed. He shall execute all deeds and contracts and bonds required in judicial proceedings for and on behalf of the city or town and no sureties shall be required on such bond. He shall perform such other executive duties, in addition to those prescribed in this article, as may be required of him by the council.

ordinances,[5] but neither the mayor nor the council has the power to invade the administration of its judiciary.

210.    Clanton has exceeded its statutory  authority and acted in conflict with state statute and constitutional limitations when, acting through its mayor, it contracted with JCS to bind its municipal court to include probation and fees for JCS in every court order entered by its hired judge.  That action and the policy and practice which implemented the JCS system essentially sold the court process for purposes of increasing income to the city.

211.    The illegal agreement, policy and practice of Clanton invades and overrides the judicial authority and court administration reserved to the municipal judge and the Chief Justice.

212.    Probation is only appropriate when an individual has been sentenced to jail time and not when only a fine has been assessed as is the case with some of the Class members.  As a result, the Clanton policy and contract to include probation in every court order results in a practice which continually deprives indigent misdemeanants of their constitutional rights.

213.    The policy and practice of Clanton are also in violation of the Alabama Constitution.  Article I, Section 20 *Ala. Const.* specifically prohibits imprisonment for the payment of debts, yet the policy enforced at Clanton regularly jails misdemeanants upon the recommendation of its agent JCS for failure to pay fines, fees and costs.  Article I, Section 16 *Ala. Const.* requires that all persons shall before conviction be bailable by

--------

[5]Ala. Code Section 11-43-43 - All legislative powers and other powers granted to cities and towns shall be exercised by the council, except those powers conferred on some officers by law or ordinance. The council shall perform the duties required by this title and other applicable provisions of law.

sufficient surety, but despite this prohibition, misdemeanants are regularly jailed without lawful conviction under any contempt proceedings or probation violation.

214.   Some of the Plaintiffs and Class members were imprisoned, and some repeatedly, under these policies and practices of Clanton for their failure to pay fines, costs and the added fees mandated by the illegal contract between Clanton and JCS.  None of the Plaintiffs were accorded any hearing or consideration of their indigency before being jailed, nor were any provided notice of charges, a hearing on charges levied that might result in imprisonment, or provided assistance of counsel before being imprisoned.

215.   At the Clanton Municipal Court, a person unable to fully pay fines and costs when levied was automatically placed on "probation" with JCS for purposes of collecting the fine.  The Clanton system used the JCS orders and forms even when there is no jail sentence imposed.  This was routinely done with no investigation into the indigency of the individual or the reasons for their inability to pay the fine and costs.  The order forms supplied by JCS under the agreement with Clanton then required the individual to make payments to JCS, rather than the city clerk, of the fines, costs and additional monthly fees.

216.   Clanton, through its city clerks, actively enforced these requirements as part of its practice including the policy and procedures established under this contract and remits money to JCS when a JCS "probationer" paid the City the full amount JCS demanded.

217.   Clanton, through its contract, practice and policy, has clothed its agent JCS with the appearances of state authority and has previously allowed JCS employees to carry badges.  Under these practices and policies, JCS employees were allowed to attend each municipal court session and referred to "probation officers" in the operation of the municipal court and city clerk's office, though none have such authority under Alabama statutes.

218.    Under this system, policy and practice at Clanton, "offenders" were not permitted to pay fines at the city clerk's office, but are instead directed to make all payments, including those for fines, restitution, probation fees and court costs, to JCS at the JCS office at hours and locations set by JCS.

219.    Clanton's policy and practice also allows JCS to control the money collected from persons such as Plaintiffs and to determine how much each such municipal court "offender" must pay each month.

220.    Clanton's policy and practice also allows JCS to determine how much of the collected sums will be credited to the collection "services" of JCS each month and how much of it will rebate to Clanton toward the municipal court fines adjudged.

221.    This system, as a matter of routine, violates the rights of persons such as the Plaintiffs and the classes they seek to represent by imposing fines and charging fees to indigent persons with no hearing or consideration of their indigency.

222.    Despite the lack of authority to do so, Clanton's practice and policy permits and approves JCS, at its discretion, to use threats of revoking probation, increased fines and costs, arrest and jail time for purposes of collection.

223.    Under this system, should an individual fail to pay to the satisfaction of JCS, Clanton permits and approves JCS setting payment and reporting schedules and determining when that the individual's "probation" should be revoked, or when to impose additional fines and costs.

224.    Under the system, policy and practice at Clanton, JCS's determination to incarcerate an individual and/or impose unreasonable release requirements is routinely accepted by city personnel without conducting delinquency or probation hearings and without making any findings, much less any determination of indigency or appointment of

40

counsel before taking such punitive action.

225.    Clanton permitted JCS to control and dictate these functions and, as a consequence, this routinely resulted in court costs and fines which exceeded the statutory maximum of $500 for municipal courts.  Similarly, the periods of "probation" imposed for purposes of collecting fines and fees at Clanton routinely exceed the two-year statutory maximum, all of which result in action to detain and otherwise incarcerate individuals without any jurisdiction to do so.

226.    The municipal court judge employed by Clanton does no investigation of indigency as a matter of practice and policy.

227.    Under the system at Clanton, after simple fines are illegally converted to "probation" for payment, jail often results for the "offender" who does not meet the payment schedule set by JCS and enforced by Clanton.  This policy and practice used and accepted JCS recommendations for the issuance of a warrant of arrest to incarcerate individuals whose original obligation was only the payment of a fine.

228.    Under the policy and practice at Clanton, each of the Plaintiffs was first fined, but then automatically placed on "probation" even though no jail sentence was adjudicated for most.  Though each of the Plaintiffs was indigent, Clanton made no investigation of that matter.  When the Plaintiffs were unable to pay the fines, costs and additional JCS fees that Clanton agreed to levy, recommendations from JCS were made and followed by Clanton to incarcerate some of them for undetermined times unless bonds were made in amounts closely approximating the sums sought by JCS collection efforts.

229.    Many individuals who could not pay their fines and added fees, such as the Plaintiffs and Class members, were jailed for the original charge against them - which was already adjudicated. The folks were jailed without any hearing on willful refusal to pay

41

(contempt charge), without a proper revocation hearing in which they were given an opportunity to present evidence of why they could not pay, and without being given a lawyer.

230.    Though a determination of willful refusal to obey a court order as required by *Ala. Code* §15-18-62 can lawfully lead to incarceration, no such determinations are made under the system at Clanton.

231.    Clanton adopts and implements JCS's recommendations to revoke a person's "probation" and its recommendation to arrest the person and bring them into court again to explain why they cannot pay. The City accepts JCS's recommendations and issues arrest warrants to incarcerate individuals who cannot pay - many of whom had no jail sentence for their original offense.

232.    In this process of converting fines to jail time, Clanton does not give adequate notice to the "offender" of the nature of any lawful charge, its fails to conduct hearings, fails to make written findings concerning the reasons for any probation revocation or the evidence relied upon, and fails to make written findings concerning any willful nonpayment of fines and costs before imposing incarceration for failure to pay fines and costs.

233.    Under this policy and practice at Clanton, when a simple fine is transformed into a jail sentence of an undetermined time, the City fails to provide counsel for the "offenders."

234.    After jailing an "offender," Clanton acts to further violate the Plaintiffs' constitutional rights by arbitrarily granting early release to some individuals while denying it to others under similar circumstances without any rational basis other than payments it has secured.  As a result, there is no consistent standard of review or logical system under which those incarcerated are granted release.

42

235.     As a proximate consequence of this deprivation of due process, the Plaintiffs and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

## COUNT TWO
## DENIAL OF DUE PROCESS BY JCS

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

236.    The Plaintiffs aver that JCS, acting under color of state law in violation of 42 U.S.C. § 1983, has denied them their right to due process and has denied those rights to the Class members and has done so in concert and by agreement conspiring with Clanton.

237.    JCS operates a "for profit" enterprise that markets its services to various municipal and county governments and has contracted with over 100 cities and towns throughout Alabama, including Clanton. JCS's marketing approach to these cities emphasized that its fees will be paid by the "offender" before the municipal court and that its efforts would improve collection of court fines and costs at no cost to the City.

238.    JCS routinely used a form contract to establish its relationship with its customer cities and similarly trains its employees using a training manual replete with forms for court use and for contacting the "offenders" from whom it is seeking collection. As a result, the JCS approach is highly systemized and uniform.

239.    Under the system established by JCS, its employees are not required to have

criminal justice or legal training, nor are they required to have any social work education or meet any minimum law enforcement standards as is required of state probation officers. Instead, JCS requires only that its employees be 21 years old, a non felon, with two years of college who complete 40 hours of training by JCS on its processes. On satisfying those requirements, JCS employees are then labeled "Probation Officers" and permitted to carry the JCS issued badge in collecting its fees, court fines and costs.

240.    Under this system and by agreement and practice with Clanton, many administrative and judicial functions of Clanton's municipal court were unlawfully delegated to JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

241.    The agreement drafted by JCS and signed by the mayor of Clanton and JCS attests that the Clanton municipal "*court agrees that each court order shall provide* for the following:

>    a probation fee of $35.00 per month flat fee

>    One time probationer set up fee of $10.00. . . . " (*emphasis added*).

242.    JCS was, by virtue of this contract and practice with Clanton, clothed with the appearance of a state actor and its actions were inextricably interwoven with those of Clanton with which it conspired and acted in concert. Under its contract and its operations with Clanton, JCS employees represented themselves to the Plaintiffs and Class members to be "probation officers" acting as agent "on behalf of City of Clanton."

243.    The JCS system at Clanton provided "Order of Probation" forms to the municipal court with the printed requirement on each form that the "offender" pay JCS $35 per month plus $10 for a file set up charge. The orders supplied by JCS required the

individual to make payments to JCS of the fines, costs and additional monthly fees as required under its contract with the City.

244.    Under the JCS contract and procedures, the resulting policy and practice at Clanton's municipal court automatically required "probation" for any person who, despite having no jail sentence, was unable to fully pay the fine and costs when levied by the municipal court.

245.    The Plaintiffs were initially placed on "probation" with JCS under this practice despite the fact that many of the "cases" for which they were on "probation" were offenses for which there was no sentence for jail time.

246.    That "probation" requirement, under agreement between JCS and Clanton, was required to be part of every printed order at Clanton's municipal court and also required payment of monthly fees to JCS.

247.    The policy and practice method of JCS, after requiring probation orders for those unable to immediately pay their fines and adding additional, monthly fees for JCS, also imposed incarceration when payment was not forthcoming as JCS demanded.

248.    Incarceration of individuals who could not pay their fines and added fees, such as the Plaintiffs and Class members, was accomplished by JCS leveling charges against them for probation violation and requesting the person be arrested based upon JCS's conclusion that the person had not paid as directed.

249.    Though a determination of willful refusal to obey a court order as required by *Ala. Code* §15-18-62 can lawfully lead to incarceration, no such determinations were made under the JCS system and Clanton's policy and practice.

250.    JCS expressly denies any responsibility to determine indigency of the "offenders" such as the Plaintiffs or to determine any reasons for an inability to pay the fine.

Therefore, when an "offender" is unable to pay fines and additional fees required by JCS, JCS and Clanton cooperated with each other to issue arrest warrants requested by JCS based upon claims of "petitions for revocation of probation."

251.   The Plaintiffs were indigent at the time the fines were levied. The Plaintiffs and the Class members were all unable to pay the fines and fees demanded by JCS due to their indigency and some were incarcerated as stated in detail in the above facts upon JCS's recommendation to its conspirator Clanton which then used its police force to carry out the arrest.

252.   The incarceration process used by JCS included the use of JCS drafted forms that it sent to "probationers" and JCS forms it used to request that a person be arrested "if necessary."

253.   JCS's recommendations to jail people until a certain sum of money was paid were then approved by administrative personnel at Clanton without a hearing to determine indigency, without a hearing to determine willful refusal to pay or any hearing or finding to determine whether the "probation" was indeed violated.

254.   The JCS system and its "Probation Tracker" software is highly systemized and focuses on collections of fines and its fees -- not traditional probation services. That collection focus allows the "offenders" to mail in payments if they live 30 miles from the JCS office. The training manual used by JCS instructs its employees on the use of its computer systems in tracking the payments made by the "offenders" and provides court forms to order probation and payments to JCS. The JCS training system also provided sample letters for use after probation was ordered, threatening the "offender" that "a warrant will be issued for your arrest" and that their "court date cannot and will not be reset." Similar JCS forms instructed the "offender" that they could avoid the court date if

46

they paid an amount determined by JCS. The Court date itself is also set by JCS with the City's knowledge. Similarly, the setting for "compliance" hearings instituted by JCS was done uniformly, requiring people, after adjudication, to return to a court hearing to explain why they could not pay.

255.   The agreement and forms drafted by JCS are uniformly used by it and were used at Clanton.

256.   Clothing JCS with the color of state law and authority was purposely structured under the JCS system for it to extort and collect its fees, fines and costs from citizens such as the Plaintiffs, and is accomplished at Clanton by providing JCS control over the money collected, the payment amount required, schedule of appointments, the location where the money must be paid and control over how much will be credited for each payment to the collection "services" of JCS each month as opposed to how much of it would be rebated to Clanton toward the fines adjudged.

257.   Despite the lack of authority to do so but in concert with Clanton, JCS, at its discretion, used threats of revoking probation, increased fines and costs and jail time for purposes of extorting collection. Under this system, when an individual failed to pay to the satisfaction of JCS, JCS would determine that the individual's "probation" should be revoked. Under the system operated jointly by Clanton and JCS, JCS' recommendation to arrest an individual was routinely accepted without conducting delinquency or probation hearings and without making any findings, much less any determination of indigency or appointment of counsel before taking such punitive action.

258.   The actions and efforts of JCS routinely resulted in court costs, fines and fees which exceed the jurisdictional maximum of $500 for municipal courts. Similarly, the periods of "probation" imposed for purposes of collecting fines and fees for JCS routinely

exceed the two-year statutory maximum, all of which resulted in JCS and Clanton taking action to detain and otherwise incarcerate individuals without any jurisdiction to do so.

259.    This system at Clanton used JCS' conclusion of a "probation violation" and employed JCS' recommendation for the issuance of warrants to incarcerate individuals who were poor and could not pay their fines - many of whom had no jail sentence adjudicated.

260.    In this process of converting fines to jail time, JCS and Clanton did not give adequate notice of the nature of any lawful charge, failed to conduct hearings, failed to make written findings concerning the reasons for revoking probation or the evidence relied upon, and failed to make written findings concerning any willful nonpayment of fines and costs before imposing incarceration for failure to pay fines and costs.

261.    Under this joint policy and practice of JCS and Clanton, when a simple fine was transformed into a jail sentence of an undetermined time, JCS and Clanton also failed to provide counsel for the "offenders."

262.    After jailing an "offender," JCS and Clanton acted to further violate the Plaintiff and Class members' constitutional rights by arbitrarily granting early release to some individuals while denying it to others under similar circumstances without any rational basis based upon the whim of JCS and payments it has secured. As a result, there was no consistent standard of review or logical system under which those incarcerated were granted release.

263.    Under the practice and policy of JCS used at Clanton, after a fine is levied, additional fees, costs and other charges were added to the "offender" bill with JCS.

264.    In some cases, under the practice and policy of JCS, even where there had been a deferred adjudication, the accused were nonetheless required to pay JCS fees.

265.    Even in cases where a charge was dismissed, costs and fees for JCS would be levied and collection pursued through threats and repeated incarceration.

266.    As a proximate consequence of this deprivation of due process, the Plaintiffs and Class members suffered injuries including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied all while being indigent.

267.    JCS continued its policies and practices of wholesale violation of the rights of indigent persons in the Clanton court system, as well as in scores of other municipal courts throughout the state of Alabama. The JCS system remained in place unabated in Clanton, with JCS capriciously requesting jail time and revocation of probation for Failure to Pay JCS until the end of May 2015.

268.    As a proximate consequence of this deprivation of due process, the Plaintiffs and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent and without counsel.

### COUNT THREE
### VIOLATION OF THE FOURTH AMENDMENT
### CITY OF CLANTON

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

269.   The Plaintiffs aver that Clanton, acting under color of state law in violation of 42 U.S.C. § 1983, has violated their Fourth Amendment rights and the rights of the Class members to be free from unreasonable seizure.

270.   By contract as discussed in detail above, Clanton by its contract, policy and practice has illegally delegated many administrative and judicial functions of its municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

271.   In addition to a denial of due process guaranteed the Plaintiffs under the Fourteenth Amendment, the arrest and detainment of these "offenders" who cannot pay the fine imposed under this system constitutes a "seizure" in violation of the Fourth Amendment as well.

272.   Under Alabama law, a simple fine can only be converted into jail time if the court makes findings under *Ala. Code,* Section 15-18-62 (1975) that a defendant has willfully failed to pay the fines.

273.   Clanton's policy and practice of including probation with JCS in every municipal court order to collect fines created the process by which misdemeanants are incarcerated without a willfulness hearing as required by *Ala. Code,* Section 15-18-62 and in violation of Alabama case law, the Alabama Constitution and the U.S. Constitution.

274.   Under Alabama case law, the Alabama Constitution and the U.S. Constitution, an indigent defendant cannot be required to serve jail time for nonpayment of fines or costs.[6]

---

[6]It is clear as a matter of constitutional law that an indigent defendant cannot be required to serve jail time for nonpayment of fine and costs. *Tate v. Short,* 401 U.S. 395 (1971); *Lingle v. State,* 51 Ala.App. 210, 283 So.2d 660 (1973); Smith v. State 51 Ala.App. 212, 283 So.2d 662 (1973). "To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws." *Barnett v. Hopper,* 548 F.2d 550, 554 (5th Cir.1977). This is not a case of a defendant

275.    Despite longstanding legal precedent prohibiting incarceration for one's inability to pay a fine/debt, as part of its policy and practice, Clanton's personnel working in conjunction with JCS unlawfully arrested and jailed the plaintiffs for their inability to pay a simple fine with added fees and costs dictated by the Clanton contract with JCS.

276.    Under its agreement with JCS and its policy and practice, Clanton's police, municipal court processes and jail access all became tools of collection under forms and processes issued by its agent JCS and which were routinely followed by Clanton. Clanton's policy and practice, after clothing its agent JCS with the appearance of state actor acting on their behalf, allowed JCS to threaten arrest or revocation of probation and/or incarceration in order to coerce these indigents to pay the city fines and fees for misdemeanor offenses not otherwise subject to jail time under the original adjudication.

277.    When these threats failed to produce sufficiently, Clanton police, clerks and other personnel, cooperated with JCS to arrest and jail the Plaintiffs such as the plaintiffs.

278.    The jailing of Plaintiffs by Clanton, as described and under the specific facts stated above, all constitute unlawful seizures in violation of the Fourth Amendment.[7]

---

who, though capable of paying a fine, refuses or neglects to do so.

Although Section 15-22-52, *Alabama Code* 1975, states that payment of fine and costs may be made a condition of suspension of sentence or probation, in *State v. Esdale*, 253 Ala. 550, 45 So.2d 865 (1950), our Supreme Court indicated that such a condition was contrary to our constitution.

"These benefits (probation and suspension of sentence) are not the subject of bargain and sale to be conditioned on the payment of costs and fees assessed as an incident to the prosecution and trial and to condition these benefits on the payment of such costs and fees violate the letter and spirit of Section 13 of the Constitution of 1901 which provides that 'justice shall be administered without sale, denial or delay.'" *Esdale*, 253 Ala. at 553.

*Crutcher v. State,* 439 So. 2d 725; 726 (Ala. Crim. App. 1983)

[7] "Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied." (internal quotation marks and emphasis omitted)); *Oliver*, 510 U.S. at 274 (plurality opinion) ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it.").

279.    As a proximate consequence of this unlawful seizure, the Plaintiffs and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, all while being indigent.

**COUNT FOUR**
**VIOLATION OF THE FOURTH AMENDMENT**
**JCS**

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

280.    The Plaintiffs aver that JCS, acting under color of state law in violation of 42 U.S.C. § 1983, has violated their Fourth Amendment rights and the rights of the Class members to be free from unreasonable seizure and has done so in concert and by agreement conspiring with Clanton.

281.    By contract, policy and practice as discussed in detail above, Clanton illegally delegated many administrative and judicial functions of its municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

282.    In addition to a denial of due process guaranteed the Plaintiffs and class members under the Fourteenth Amendment, the arrest and detainment of these "offenders" who could not pay the fines imposed under this system constitutes a "seizure" in violation of the Fourth Amendment as well.

283.    Under Alabama law, a fine can only be converted into jail time if the court makes findings under *Ala. Code* Section 15-18-62 (1975) that a defendant has willfully failed to pay the fines. Even there, the statute provides specifics as to potential jail time.

284.    Under the system created and implemented by JCS at Clanton, there is no

hearing to determine if an "offender" had willfully refused to pay nor any consideration of indigency and factors preventing payment.

285.    Under the system created and implemented by JCS at Clanton, every person who was unable to pay a simple fine and costs in full was placed on "probation." Though their inability to pay the fine in full gave immediate notice of the "offenders" financial limitations, the JCS system added further costs and fees each month to these "offenders" who were already unable to pay the fines levied. The result increased the financial burden of persons who were accused of no more than traffic violations or misdemeanors.

286.    Under Alabama case law, the Alabama Constitution and the U.S. Constitution, an indigent defendant cannot be required to serve jail time for nonpayment of fines or costs.[8]

287.    Despite longstanding law prohibiting incarceration for one's inability to pay a fine/debt, JCS requested the arrest warrants for the Plaintiffs and many Class members when JCS knew these people could not pay the fines and fees JCS demanded and despite the fact that many had no jail time assessed on their original conviction.

---

[8] It is clear as a matter of constitutional law that an indigent defendant cannot be required to serve jail time for nonpayment of fine and costs. Tate v. Short, 401 U.S. 395 (1971); Lingle v. State, 51 Ala.App. 210, 283 So.2d 660 (1973); Smith v. State 51 Ala.App. 212, 283 So.2d 662 (1973). "To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws." Barnett v. Hopper, 548 F.2d 550, 554 (5th Cir.1977). This is not a case of a defendant who, though capable of paying a fine, refuses or neglects to do so.

   Although Section 15-22-52, *Alabama Code* 1975, states that payment of fine and costs may be made a condition of suspension of sentence or probation, in *State v. Esdale*, 253 Ala. 550, 45 So.2d 865 (1950), our Supreme Court indicated that such a condition was contrary to our constitution. "These benefits (probation and suspension of sentence) are not the subject of bargain and sale to be conditioned on the payment of costs and fees assessed as an incident to the prosecution and trial and to condition these benefits on the payment of such costs and fees violate the letter and spirit of Section 13 of the Constitution of 1901 which provides that 'justice shall be administered without sale, denial or delay.'" *Esdale*, 253 Ala. at 553.

*Crutcher v. State,* 439 So. 2d 725; 726 (Ala. Crim. App. 1983)

288.   Unless prompt payment of its fees and fines was made as determined by JCS, JCS took steps to have the "probation" revoked beginning the process of incarcerating an individual who otherwise would never have seen jail under the original adjudication.[9]

289.   The Plaintiffs and many Class members were unlawfully jailed at Clanton under the JCS process as described and under the specific facts as stated above, all of which constitute unlawful seizures in violation of the Fourth Amendment.

290.   As a proximate consequence of this unlawful seizure, the Plaintiff and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, all while being indigent and without counsel.

**COUNT FIVE**
**VIOLATION OF THE SIXTH AMENDMENT**
**CITY OF CLANTON**

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

291.   The Plaintiffs aver that Clanton, acting under color of state law in violation of 42 U.S.C. § 1983, has violated their Sixth Amendment rights and the rights of the Class members.

292.   By contract, its policy and practice as discussed in detail above, Clanton has illegally delegated many administrative and judicial functions of their municipal court to its

---

[9] "Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied." (internal quotation marks and emphasis omitted)); *Oliver*, 510 U.S. at 274 (plurality opinion) ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it.").

agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

293.   Under the policy and practice at Clanton, when a simple fine is transformed into a jail sentence of an undetermined time, counsel is not provided for the indigent "offenders."

294.   Each of the named Plaintiffs was initially ordered to pay a fine at the Clanton Municipal Court, but due to their inability to immediately pay, each was placed on "probation" under JCS pursuant to JCS form orders, and the contract, policy and practice approved by Clanton.

295.   The contract signed by Clanton approved a "probation" process as a collection vehicle for the City to collect its fines. That agreement, as discussed above, conflicts with state statutes, violates state constitutional requirements for separation of power in the branches of government, and exceeds the authority of the mayor and council.

296.   Under that agreement, its policy and practices, Clanton allows JCS to add monthly fees to the "offender" who has already disclosed an inability to pay the fine when adjudicated and even though JCS provides no services to them.

297.   Under the agreement, its practices and with the knowledge and approval of Clanton, JCS represents itself as acting on behalf of the City which clothes it with that appearance.

298.   Under this agreement, its policies and practices, Clanton unlawfully invaded the province of the municipal court and mandated that each order there contain provisions for fees to JCS.

299.   By this agreement, its policies and practices, simple fines, even those without jail sentences, are automatically and illegally converted to probation under the JCS with

which it contracts if the offender cannot promptly pay the entire fine and costs.

300.    After this conversion from a fine to probation under this scheme and practice, threats of jail are used by JCS with the approval of Clanton and actual incarceration then takes place by police and other city personnel if the fines, fees and costs are not paid as scheduled.

301.    The jeopardy of jail vanishes when money is paid and jail time would not have been present but for Clanton's policy and practice adopting and using the JCS collection system in the administration of its court system illegally requiring "probation" for simple fines.

302.    With the Plaintiffs' inability to pay and Clanton's focus on collections, arrest warrants are routinely issued stating that the person should be arrested on the original charge -  a charge that has already been adjudicated - many of which were minor traffic offenses. These arrests are requested by JCS under its system and then approved by Clanton personnel.

303.    At that point, jail sentences become potential jeopardy for the "offenders" such as the Plaintiffs on charges that have already been adjudicated but for which no arrest is requested if money is paid.

304.    At the point when jail sentences become potential, Clanton does not provide notice of charges, nor are findings made as required for conviction or probation violation. Similarly, though JCS also regularly proposes a warrant be issued based on the person's non payment which Clanton then pursues, that is not a valid basis.  If willful failure to pay under state statutes such as *Ala. Code* Section 15-18-62 is used as the basis, under the Clanton's policy and practice with JCS, there is no finding or hearing on the issue of willfulness.

305.   The named Plaintiffs like other class members, while indigent, were unlawfully jailed by Clanton under this JCS system and was not provided any assistance of counsel in the process leading to their incarceration.

306.   These actions constitute a denial of the Plaintiffs' rights secured by the Sixth Amendment.

307.   As a proximate consequence of this violation of their Sixth Amendment rights, the Plaintiffs and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

## COUNT SIX
## VIOLATION OF THE SIXTH AMENDMENT
## JCS

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

308.   The Plaintiffs aver that JCS acting under color of state law in violation of 42 U.S.C. § 1983, has violated their Sixth Amendment rights and the rights of the Class members and has done so in concert and by agreement conspiring with Clanton.

309.   By contract, policy and practice as discussed in detail above, Clanton illegally delegated many administrative and judicial functions of its municipal court to JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

310.   Under this joint policy and practice of JCS at Clanton when a simple fine as transformed into a jail sentence of an undetermined time, counsel was not provided for the

indigent "offenders."

311.   The Plaintiffs were initially levied fines at the Clanton Municipal Court, but due to their inability to immediately pay, they were placed on "probation" under JCS pursuant to JCS form orders and its contract with the City.

312.   The "probation" process at JCS was essentially a collection vehicle for Clanton which added monthly fees to the "offender" who had already disclosed an inability to pay the fine. JCS provided no services to the Plaintiffs, but represented itself as acting on behalf of Clanton which clothed it with that appearance.

313.   JCS denies any responsibility to investigate the indigency of the "offenders" and thus took no action to determine or consider disabilities, employment status or other reasons justifying non payment.

314.   Simple fines were automatically and illegally converted to "probation" under the JCS system used at Clanton if the offender could not promptly pay the entire fine and costs.

315.   After this conversion from a fine to probation, JCS made threats of jail and actual incarceration if the fines, fees and costs were not paid as demanded by JCS.

316.   The jeopardy of jail vanishes when money is paid and jail time would not have been present but for Clanton's policy and practice adopting and using the JCS collection system in the administration of its court system illegally requiring "probation" for simple fines.

317.   With the Plaintiffs' inability to pay and the JCS' focus on collections, arrest warrants are routinely issued stating that the person should be arrested on the original charge - a charge that has already been adjudicated - many of which were minor traffic offenses. These warrant requests are initiated by JCS under its system and then approved

by Clanton personnel.

318.   At that point, jail sentences become potential jeopardy for the "offenders" such as the Plaintiffs on charges that have already been resolved but for which no arrest is requested if money is paid.

319.   At the point jail sentences were potential, the JCS system used at Clanton did not provide notice of charges, nor are findings made as required for conviction or probation revocation.  Similarly, though JCS also regularly requests a warrant be issued based on the person's non payment which Clanton then pursues, that is not a valid basis. If willful failure to pay under state statutes such as *Ala. Code* Section 15-18-62 is used as the basis, under the Clanton's system with JCS, there is no finding or hearing on the issue of willfulness.

320.   The named Plaintiffs like other class members, while indigent, were unlawfully arrested and jailed by Clanton under this JCS system and were not provided any assistance of counsel in the process leading to their incarceration.

321.   These actions constitute a denial of the Plaintiffs' rights secured by the Sixth Amendment.

322.   As a proximate consequence of this violation of their Sixth Amendment rights, the Plaintiffs and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

**COUNT SEVEN**
**VIOLATION OF THE EIGHTH AMENDMENT**
**CITY OF CLANTON**

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

323.    The Plaintiffs aver that Clanton, acting under color of state law in violation of 42 U.S.C. § 1983, has violated the Eighth Amendment prohibition against excessive fines, bail and cruel and unusual punishment in its actions with the Plaintiffs and Class members and did so as a matter of policy and practice in concert and by agreement conspiring with JCS.

324.    As discussed in detail above, by its agreement, policy and practice, Clanton has illegally delegated many administrative and judicial functions of their municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

325.    The Eighth Amendment prohibits cruel and unusual punishment and, as such, limits the kinds of punishment that can be imposed on those convicted of crimes, proscribes punishment grossly disproportionate to the severity of the crime and imposes substantive limits on what can be made criminal and punished as such and prohibits excessive bail.

326.    Under Alabama law, a municipal court has no authority to award a fine on any particular charge over $500, *Ala. Code §* 13A-5-12(a)(3), and even lawful probation for misdemeanors cannot, by statute, extend beyond a two-year period.  *See Ala. Code §* 15-22-54(a).

327.    As mentioned above, *Ala. Code §* 15-18-62 is the only statutory method

under which a fine levied by a court on adjudication can be converted to imprisonment, but that can legally occur **only** where the court finds willful nonpayment of the fine and cost.

328.   Even upon proper notice and a finding of willful nonpayment under § 15-18-62, the conversion of fine to imprisonment has a specific ratio such that a fine not to exceed $500 shall result in no more than 20 days.  *See  Ala. Code* § 15-18-62(2).

329.   Rule 26.11 of the Alabama Rules of Criminal Procedure provides the method for dealing with fines, restitution and the failure to pay under a variety of circumstances, none of which were followed by Clanton.

330.   Under these facts, Clanton  illegally contracted with JCS to add monthly fees and costs to each municipal court order. This agreement and the policy and practice of the City in its implementation increased the substantial fines levied against indigent persons such as the Plaintiffs.

331.   Neither Clanton, nor its agent JCS, made inquiry into the indigency of the "offenders" in the system.  As a result, only the Plaintiffs' failure to make payments as dictated resulted in threats of arrests.  If threats failed to produce the demanded payments, arrest and incarceration followed under the policy and practice at Clanton based upon JCS's recommendation that the offender had failed to pay money.

332.   These fines often exceeded the statutory limits of the municipal court and the incarceration periods imposed for the failure to pay exceeded those in *Ala. Code* §15-18-62.

333.   Before being arrested, JCS, with the City, calculates the amount claimed to be owed for fines, fees and costs which is then used to approximate the cash bail amount required for release. This cash bond requirement is made without consideration of factors

61

justifying release on recognizance or other factors provided for under Ala. Rule Crim. Pro. 7.2. This practice results in excessive bail requirements in violation of the Eighth Amendment.

334.    The practice and policy of imposing jail time for an inability to pay its fees, fines and costs violates the Eighth Amendment prohibition against excessive fines and cruel and unusual punishment.

335.    Each of the named Plaintiffs was at all pertinent times indigent and some were incarcerated by city personnel for their inability to pay fines, fees and costs.

336.    As a result of the violation of the Eighth Amendment, each of the Plaintiffs was subjected to excessive fines, fees, and costs in violation of the prohibition against excessive fines and cruel and unusual punishment.

337.    As a proximate consequence of this violation of their Eighth Amendment rights, the Plaintiffs suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

## COUNT EIGHT
## VIOLATION OF THE EIGHTH AMENDMENT
## JCS

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

338.    The Plaintiffs aver that JCS, acting under color of state law in violation of 42 U.S.C. § 1983, has violated the Eighth Amendment prohibition against excessive fines,

excessive bail and cruel and unusual punishment in its actions with the Plaintiff and Class members and did so in concert and by agreement conspiring with Clanton.

339.    By contract, policy and practice as discussed in detail above, Clanton illegally delegated many administrative and judicial functions of its municipal court to its agent JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

340.    The Eighth Amendment prohibits cruel and unusual punishment and, as such, limits the kinds of punishment that can be imposed on those convicted of crimes, proscribes punishment grossly disproportionate to the severity of the crime and imposes substantive limits on what can be made criminal and punished as such and prohibits excessive bail.

341.    Under Alabama law, a municipal court has no authority to award a fine on any particular charge over $500, *Ala. Code* § 13A-5-12(a)(3), and even lawful probation for misdemeanors cannot, by statute, extend beyond a two-year period. *See Ala. Code* § 15-22-54(a).

342.    As mentioned above, *Ala. Code* § 15-18-62 is the only statutory method under which a fine levied by a court on adjudication can be converted to imprisonment, but that can legally occur only where the court finds willful nonpayment of the fine and cost.

343.    Even upon proper notice and a finding of willful nonpayment under § 15-18-62, the conversion of fine to imprisonment has a specific ratio such that a fine not to exceed $500 shall result in no more than 20 days. *See Ala. Code* § 15-18-62(2). Rule 26.11 of the Alabama Rules of Criminal Procedure provides the method for dealing with fines, restitution and the failure to pay under a variety of circumstances, none of which were followed under the JCS system at Clanton.

344.   Under these facts, JCS, operating under an illegal contract with Clanton, increased the financial burden on the Plaintiffs by adding additional monthly fees and costs to their balance after fines were levied against these indigent persons.  For the Plaintiffs and Class members, the total amounts demanded by JCS regularly exceeded the $500 limitation on the municipal court authority.

345.   Under the JCS extortion system at Clanton, though JCS knew that the "probationers" were poor, unemployed, receiving disability checks, or in jail which made them unable to make payments, JCS routinely requested that they be arrested or brought to court because they could not pay as JCS demanded.

346.   The Plaintiffs and Class members were all indigent and their failure to pay JCS as demanded systematically resulted in threats of arrests and ultimately incarceration based upon JCS's recommendation that the offender be arrested for their failure to pay.

347.   These fines and fees levied against the Plaintiffs and Class members exceeded the statutory limits of the court and the incarceration periods imposed for the failure to pay exceeded those in *Ala. Code* §15-18-62.

348.   These fines exceeded the statutory limits of the municipal court and the incarceration periods imposed for the failure to pay exceeded those in *Ala. Code* §15-18-62.

349.   The practice and policy of JCS in instituting charges and requesting jail time for inability to pay its fees, fines and costs violate the Eighth Amendment prohibition against excessive fines and cruel and unusual punishment.

350.   The Plaintiffs and Class members were, at all pertinent times, indigent. Despite their indigency, many Class members were incarcerated at the behest of JCS for

their inability to pay fines, fees and costs on the schedule determined by JCS, though many had initially only received fines by the Clanton Municipal Court.

351.    Before being arrested, JCS, with the City, calculates the amount claimed to be owed for fines, fees and costs which is then used to approximate the cash bail amount required for release. This cash bond requirement is made without consideration of factors justifying release on recognizance or other factors provided for under Ala Rule Crim Pro. 7.2. This practice results in excessive bail requirements in violation of the Eighth Amendment.

352.    As a result of the violation of the Eighth Amendment, the Plaintiffs were subjected to excessive fines, fees, and costs beyond the jurisdictional limits of the municipality and violation of the prohibition against excessive fines and cruel and unusual punishment and excessive bail.

353.    As a proximate consequence of this violation of their Eighth Amendment rights, the Plaintiffs and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent and without counsel.

**COUNT NINE**
**DENIAL OF EQUAL PROTECTION**
**CITY OF CLANTON**

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

354.    Clanton has acted under color of state law in violation of 42 U.S.C. § 1983

to deny the Plaintiffs' and Class members' rights to equal protection secured by the Fourteenth Amendment.

355.   This is accomplished by the illegal contractual agreement Clanton has with JCS and its policy and practice in implementing that contract. Under that agreement, the actions of its agent JCS are inextricably intertwined in a practice and policy at Clanton. That practice and policy automatically requires "probation" for any person who, despite having no jail sentence, is financially unable to fully pay the fine and costs when levied by the municipal court.  That probation requirement is part of the agreement between Clanton and JCS and is part of every printed order at the municipal court and requires payment of monthly fees to JCS.

356.   Persons who are financially able to fully pay the levied fine and costs at Clanton are not placed on "probation" - and are not given jail sentences for minor crimes. As a result, those persons are not charged any fees for JCS and are not subjected to threats of arrest and incarceration in the collection process.  Furthermore, once the fines, fees and costs are fully paid, the probation is terminated.

357.   For those such as the Plaintiffs who are unable to fully pay the fine and costs when levied by the municipal court, not only are they required to come to court for traffic tickets, and charged court costs, they are also put on "probation" with JCS.

358.   This requirement was part of the Clanton contract and its policy practice with JCS. That contract, as mentioned above, exceeds the statutory and constitutional authority of municipalities and imposes on the municipal court an agreement in violation of the separation of powers doctrine between the branches of government.

359.   Once on "probation" for purposes of paying a fines and costs, this policy and practice at Clanton routinely imposes incarceration and additional costs on individuals who

66

are unable to pay fines and costs, without any determination of willfulness as would lawfully be required under Alabama statutes. *See Ala. Code* Section 15-18-62.

360.   This disparate treatment based upon the wealth of the "offender" before the municipal court is a violation of equal protection and cannot be justified on any legitimate rational state interest basis.

361.   This inequality of treatment is also beyond the authority of the municipal court which is required by Alabama statute to uniformly process traffic infractions and penalties for misdemeanors in accordance with specified maximum fines. *See Ala. Code* Section 12-14-8. The policy and practice at Clanton is not uniform with the procedures established by the Alabama Administrative Office of Courts because it adds fees only to "offenders" who cannot pay immediately and creates its own "rules" for penalizing individuals who cannot pay as directed.

362.   These additional JCS fines result in disparate treatment between those who can immediately pay the fine from those who are unable to immediately pay the fine. Furthermore, those "offenders" at Clanton with its JCS system, are processed and fined differently than "offenders" in jurisdictions that have not allowed JCS to charge additional fees to those who cannot pay. There is no state authority for such disparate treatment.

363.   Each of the Plaintiffs was required to pay the additional costs and fees under this disparate system and the named Plaintiffs were unlawfully jailed for their inability to pay as demanded.

364.   As a proximate consequence of this denial of the right to equal protection under the Fourteenth Amendment, the Plaintiffs and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for

undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent.

**COUNT TEN**
**VIOLATION OF EQUAL PROTECTION**
**JCS**

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

365.    JCS and Clanton have acted jointly under color of state law in violation of 42 U.S.C. § 1983 to deny the Plaintiffs and Class members' rights to equal protection secured by the Fourteenth Amendment and have done so in concert and by agreement conspiring with Clanton.

366.    JCS, though a private company, has been clothed with the color of state law by the specific actions, policy and practices of Clanton, and pursuant to an agreement between these parties.

367.    As referenced above, by agreement, policy and practice at Clanton, JCS employees attended all municipal court sessions, collected city fines and costs, were labeled as "probation officers" and regularly represented themselves as acting "on behalf of the City of Clanton." Additionally, the JCS forms were used at the municipal court and fees for JCS were included in every court order there.

368.    In the system established by an illegal agreement between JCS and Clanton, the actions of JCS were inextricably intertwined with those of its conspirator Clanton.

369.    The practice and policy under this agreement automatically required "probation" for any person who, despite having no jail sentence, was financially unable to fully pay the fine and costs when levied by the municipal court.  That probation requirement

was part of the agreement and practice between JCS and Clanton and was a required part of every printed order at the municipal court and required payment of monthly fees to JCS.

370.    Persons who were financially able to fully pay the levied fine and costs at Clanton were not placed on "probation."   As a result, those persons were not charged any fees for JCS and were not subjected to threats of arrest and incarceration in the collection process.

371.    For those such as the Plaintiffs and Class members who were unable to fully pay the fine and costs when levied by the municipal court, "probation" fees under JCS was required on every court order.

372.    This requirement on its municipal court was part of the JCS drafted contract with the City.  That contract, as discussed above, exceeded the statutory and constitutional authority of municipalities and imposed on the municipal court an agreement in violation of the separation of powers doctrine between the branches of government as embodied in the Alabama Constitution.  Ala. Const, Article 3, Section 43.

373.    Once on "probation" for purposes of paying a fines and costs, this policy and practice at Clanton routinely imposed incarceration and additional costs on individuals who were unable to pay fines and costs, without any determination of willfulness as lawfully required under Alabama statutes.  *See* Ala Code, Section 15-18-62.

374.    This disparate treatment based upon the wealth of the "offender" before the municipal court was a violation of equal protection and cannot be justified on any legitimate rational state interest basis.

375.    This inequality of treatment was also beyond the authority of the municipal court which is required by Alabama statute to uniformly process traffic infractions and

penalties for misdemeanors in accordance with specified maximum fines.  *See Ala. Code* Section 12-14-8.  The JCS system at Clanton was not uniform with the procedures established by the Alabama Administrative Office of Courts because it added fees only to "offenders" who could not pay immediately and created its own

376.    These additional JCS fees resulted in disparate treatment between those who could immediately pay the fine from those who were unable to immediately pay the fine. Furthermore, those "offenders" within the Clanton/JCS arrangement were processed and fined differently than "offenders" in jurisdictions that have not allowed JCS to charge additional fees to those who cannot pay. There is no state authority for such disparate treatment.

377.    The Plaintiffs and Class members were required to pay the additional costs and fees under this disparate system. Arrest warrants were issued and many Class members were unlawfully jailed for their inability to pay as demanded.

378.    As a proximate consequence of this denial of the right to Equal Protection under the Fourteenth Amendment, the Plaintiffs and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS fees, costs and restitution levied, all while being indigent and without counsel.

**COUNT ELEVEN**
**DECLARATORY AND INJUNCTIVE RELIEF**
**BOTH JCS AND THE CITY OF CLANTON**

Plaintiffs incorporate by reference the previous paragraphs and make them a part

hereof.

379.    A real controversy exists between these parties concerning several issues, including the validity of Clanton's attempt to bind its municipal court and the legality of the actions taken in contracting with JCS, such that declaratory relief is appropriate.

### Contract between the City and JCS is void

380.    Plaintiffs request the Court to declare that Clanton had no authority to contractually bind their municipal court.

### City does not have the power to bind the Court

381.    Clanton entered into an agreement with JCS that exceeded both its statutory and constitutional limitations on municipalities.  Furthermore, that agreement violated the separation of powers doctrine embodied in the Alabama Constitution.  See *Ala. Const.,* Article 3, Section 43.   As a result, that agreement was void and due to be declared a nullity.

382.    Alabama state law also dictates a separation of the branches of government. *Ala. Const.,* Article 3, Section 43.   Under that doctrine, legislative powers granted to cities and towns are exercised by the city council, *Ala. Code* Section 11-43-43, while the mayor of the city is responsible for executive duties.  *Ala. Code,* Section 11-43-83.  If the town establishes a municipal court, its administration is supervised by the Chief Justice of Alabama.  *Ala. Code* Section 12-2-7 *et. seq*.; *Ala. Const.,* Art. 6, Section 139

383.    A city's mayor, such as Clanton's mayor, has the executive power to execute and enforce contracts and the city council has the legislative power to enact regulations and ordinances, but neither the mayor nor the council has the power to invade the administration of its judiciary.

71

384.    Clanton has exceeded its statutory authority and acted in conflict with state statute and constitutional limitations when, acting through its mayor, it agreed to require its municipal court to include probation and fees for JCS in every court order entered by its hired judge.  That action essentially sold the court process for purposes of increasing income to the City.

### Contract violates statutory limitation regarding traffic citations and municipal fines

385.    That agreement also violated the uniformity required by statute for processing traffic infractions and penalties for misdemeanors in accordance with specified maximum fines.  *See Ala. Code* Section 12-14-8.

386.    The process at Clanton was not uniform with the procedures established by the Alabama Administrative Office of Courts because it adds fees only to "offenders" who cannot pay immediately and creates other "rules" for further penalizing individuals who cannot pay as directed.   "Offenders" who were able to immediately pay the fine are charged one rate, but those that are unable to immediately pay for the same offense are charged the fine and required to pay JCS monthly fees that accumulate each month that passes.

387.    The "offenders" at Clanton were processed and fined differently than "offenders" in municipal jurisdictions which had not contracted for JCS to charge its fees to those who cannot pay and, as a result, violates uniformity requirements of *Ala. Code* Section 12-14-8.

### Contract overrides judicial authority and administration of municipal courts reserved to the Chief Justice

388.    The illegal agreement and policy of Clanton invades and overrides the judicial

authority and court administration reserved to the municipal judge and the Chief Justice.

### Contract is an exclusive franchise

389.   The contract between JCS and the City of Clanton grants an exclusive franchise for provision of probation services.

390.   The contract was not competitively bid, as required by Ala. Const. Art. I, § 22 and *Ala. Code* 1975; *Ala. Code*, §41-16-50.

391.   Because the contract was not bid, it is void and unenforceable.

392.   Plaintiffs also request the Court to declare the actions of Clanton under this contract to be unconstitutional under the premises discussed above.   Under this void agreement, Clanton has implemented policies and practices to prosecute persons such as the Plaintiffs where there is no jurisdiction or authority to do so under Alabama law, doing so intentionally in an effort to coerce payment of fines and costs from indigent people. These efforts have resulted in the illegal prosecution and incarceration of the Plaintiffs and their Class beyond the limited jurisdiction of the municipal courts.

393.   Further, Clanton has added increased punishment, fines and costs after adjudication and even where there has been no adjudication of guilt, all without jurisdiction or authority for such under Alabama law.

394.   Clanton has systematically applied *Ala. Code* § 15-18-62 in an unconstitutional fashion, denying the Plaintiffs and the Class they seek to represent constitutionally protected rights.

395.   Section 15-18-62 provides for the imprisonment for the failure to pay fines

and costs in limited circumstances and only upon the finding of a willful nonpayment.[10]

396.    Under the policies and practices at Clanton, "offenders" before the municipal court, such as the Plaintiffs and the Class they seek to represent, were systematically imprisoned for nonpayment with no determination of willfulness and with no consideration of their indigency or ability to pay.

397.    Furthermore, once imprisoned, the requirements of time to be served under § 15-18-62 are ignored by the practice and policy of Clanton.

398.    The result of this consistent systematic policy and practice of Clanton is essentially a debtor's prison for fines and charges levied.

399.    Plaintiffs request the Court to enjoin the actions of Clanton identified herein to prevent the continuation of these violations of statutory and constitutional prohibitions.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs respectfully pray that the Court will take jurisdiction of this cause and upon the final hearing:

a.    Certify this matter as a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure for a plaintiff class;

b.    Award the Plaintiffs such damages as this Court shall find the

---

[10]**Section 15-18-62**
 **Imprisonment for failure to pay fines and costs.**

In cases of willful nonpayment of the fine and costs, the defendant shall either be imprisoned in the county jail or, at the discretion of the court, sentenced to hard labor for the county as follows:

(1) If the fine and costs do not exceed two hundred fifty dollars ($250), no more than 10 days;

(2) If the fine and costs exceed two hundred fifty dollars ($250) but do not exceed five hundred dollars ($500), no more than 20 days;

(3) If the fine and costs exceed five hundred dollars ($500), but do not exceed one thousand dollars ($1,000), no more than 30 days; and

(4) For every additional one hundred dollars ($100) or fractional part thereof, 4 days.

Plaintiffs have sustained, together with punitive, or exemplary damages as the law shall permit;

c.      Enter an injunction and other declaratory relief which declares that Clanton exceeded its authority by contracting to bind its judiciary and that such action is void and in violation of the statutory and constitutional limitations on municipalities;

d.      Enter an injunction and other declaratory relief which enjoins Clanton from engaging in the violations of law set forth hereinabove;

e.      Enter an injunction and other declaratory relief which prohibits Clanton in the future from placing persons on probation for collection of fines and declares that any current probation and fees for simple fines to be void;

f.      Enter an injunction and other declaratory relief which prohibits Clanton in the future from assessing fines in excess of $500 and/or extending probation periods beyond 24 months and declare that any previously assessed fines and probationary periods in excess of these limits to be void;

g.      Enter an injunction and other declaratory relief which prohibits Clanton in the future from imprisoning indigent persons for failure to pay fines and fees and ordering the release of any currently incarcerated indigent persons who were jailed for these reasons;

h.      Award to the Plaintiffs and Class members damages under 42 U.S.C. § 1983 equal to any amounts paid on fines and all fees to JCS and Clanton that are found unconstitutional and/or unlawful (along with

interest), and the annulment of any remaining unpaid fines and fees that are found unconstitutional and/or unlawful;

i.      Award to the Plaintiffs and Class the cost of this matter, including a reasonable attorneys' fee;

j.      Award to the Plaintiffs and the Class members such other, further and more general relief as the Court may deem appropriate under these circumstances, including cost of these proceedings.

RESPECTFULLY SUBMITTED,


s/ *G. Daniel Evans*
G. Daniel Evans
ASB-1661-N76G
Alexandria Parrish
ASB-2477-D66P
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone:  (205) 870-1970
Fax: (205) 870-7763
E-Mail: gdevans@evanslawpc.com
E-Mail: ap@evanslawpc.com


s/ *William M. Dawson*
William M. Dawson
ASB-3976-S80W
Attorney for the Plaintiffs
Dawson Law Office
1736 Oxmoor Road
Birmingham, Alabama 35209
Telephone: (205) 201-9005
E-Mail:  bill@billdawsonlaw.com

s/Matt Swerdlin
Matt Swerdlin
ASB-9090-M74S
Attorney for the Plaintiffs
1736 Oxmoor Road
Birmingham, Alabama 35209

76

Telephone: (205) 795-3517
Mobile: (205) 440-3214
Email: matt@attorneyswerdlin.com

s/Joseph M. McGuire
Joseph M. McGuire
ASB-8317-S69M
McGuire and Associates
31 Clayton St.
Montgomery, AL 36104
Telephone: (334) 517-1000
Email:  jmcguire@mandabusinesslaw.com
Attorneys for the Plaintiffs

## JURY DEMAND

Plaintiffs demand trial by struck jury on all issues in this action.

## CERTIFICATE OF SERVICE

I hereby certify that on this the 15th day of December, 2016, I electronically filed the foregoing Plaintiffs' Second Amended and Restated Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James W. Porter, II
R. Warren Kinney
Porter, Porter & Hassinger, P.C.
P.O. Box 128
Birmingham, AL 35201-0128

Will Hill Tankersley
Gregory C. Cook
L. Conrad Anderson IV
Chase T. Espy
Balch & Bingham LLP
1901 6th Ave. N. Ste. 1500
Birmingham, AL 35203
*Attorneys for the City of Clanton*

Defendants' Addresses:

JUDICIAL CORRECTION SERVICES, LLC.      **PLEASE SERVE BY CERTIFIED MAIL**
SERVE REGISTERED AGENT:
CORPORATE CREATIONS NETWORK, INC.

3411 SILVERSIDE ROAD
WILMINGTON, DE 19810

CHC COMPANIES, INC.                      **PLEASE SERVE BY CERTIFIED MAIL**
SERVE REGISTERED AGENT:
CORPORATE CREATIONS NETWORK, INC.
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL 35223

CORRECT CARE SOLUTIONS, LLC              **PLEASE SERVE BY CERTIFIED MAIL**
SERVE REGISTERED AGENT:
CORPORATE CREATIONS NETWORK, INC.
6 OFFICE PARK CIRCLE #100
MOUNTAIN BROOK, AL 35223

s/ *G. Daniel Evans*
G. Daniel Evans