**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **CANDICE CHAPMAN, MICHAEL LITTLEFIELD,** | ) | |
| **STEDMAN KINE, DEANGELO BARNETT, TRACY** | ) | |
| **DUBOSE, individually and for a class of** | ) | |
| **similarly situated persons or entities.** | ) | |
| | ) | |
| **Plaintiffs;** | ) | |
| **v.** | ) | **CIVIL ACTION NO:** |
| | ) | **2:15-cv-00125-WKW-CSC** |
| **THE CITY OF CLANTON, a municipal corporation;** | ) | |
| **JUDICIAL CORRECTION SERVICES, LLC.,** | ) | |
| **a limited liability company, f/d/b/a** | ) | **CLASS ACTION** |
| **JUDICIAL CORRECTION SERVICES, INC.;** | ) | |
| **CHC COMPANIES, INC., a corporation;** | ) | |
| **and CORRECT CARE SOLUTIONS, LLC,** | ) | |
| **a limited liability company.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO THE CITY OF CLANTON'S**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

G. Daniel Evans
ASB-1661-N76G
Alexandria Parrish
ASB-2477-D66P
Maurine C. Evans
ASB-1468-P16T
Attorneys for The Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209

William M. Dawson
ASB-3976-S80W
Attorney for the Plaintiffs
Dawson Law Office
1736 Oxmoor Road
Birmingham, Alabama 35209

# TABLE OF CONTENTS

I.   THE COMPLAINT PROPERLY ALLEGES UNCONSTITUTIONAL
     POLICIES AND PRACTICES OF THE CITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.  THE CITY OF CLANTON IS LIABLE FOR ITS POLICY AND PRACTICE
     INVOLVING ITS MUNICIPAL COURT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     A.   The JCS Contract is Not Authorized By Alabama Law. . . . . . . . . . . . . . . . . . . . 9
     B.   Municipal Courts are Maintained at the Option of the Municipality . . . . . . . . . 12
     C.   The City Judge and City Magistrate are not "State Officials.". . . . . . . . . . . . . . 14
     D.   Neither The Cannons of Judicial Ethics Nor The Jurisdiction of the Judicial
          Inquiry Commission Preclude the City's Liability. . . . . . . . . . . . . . . . . . . . . . . . 15
     E.   Municipalities Can Be Subject To Suit For Policies And Procedures Involving Its
          Municipal Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III. THE CITY'S UNCONSTITUTIONAL PRACTICES BEGAN WITH ITS CONTRACT
     WITH JCS BUT ARE NOT LIMITED TO IT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV.  PLAINTIFFS' CLAIMS FOR EQUITABLE RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . 25

V.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**PLAINTIFF'S RESPONSE IN OPPOSITION
TO THE CITY OF CLANTON'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

This litigation is one of many cases pending in Alabama federal courts against Judicial Correction Services, Inc. ("JCS"), Correctional Healthcare Companies, Inc. ("CHC"), CHC Companies, Inc. ("CHCC"), Correct Care Solutions, LLC ("CCS"), and various Alabama municipalities for similar civil rights and constitutional violations.[1] In *Ray v. Judicial Corrections Services, et al,* Judge Proctor for the Northern District of Alabama addressed arguments similar to those presented here by Clanton, ultimately denying the *Ray* defendants' motions to dismiss. *See Ray v. Judicial Corrections Services, et al.*, 2013 WL 5428360 (N.D. Ala. 2013); *Ray v. Judicial Corrections Services, et al.*, 2013 WL 5428395 (N.D. Ala. 2013). As in *Ray*, Clanton's Motion to Dismiss is due to be denied.

Clanton has attached to its Motion to Dismiss a flurry of exhibits, including an report drafted by Sue Bell Cobb in the *Ray* litigation, the Judicial Inquiry Commission complaint against Lester Hayes, and – bizarrely – two affidavits from the defense counsel discussing how they were appointed a "Deputy Attorney General for the State of Alabama..." None of the exhibits submitted by Clanton (i.e. Docs. 80-1 through 80-6) were relied upon by Plaintiffs' in their Second Amended Complaint and are therefore due to be stricken. Defendants have also failed to respond to discovery and instead

---

[1] Each of the federal cases involves a different municipality and different plaintiffs. Three actions are pending in the Northern District of Alabama before Judge Proctor: *Ray v. Judicial Correction Services, Inc., et al.*, No. 2:12-cv-02819-RDP (N.D. Ala. Filed Aug. 28, 2012); *Woods v. The City of Columbiana, et al.,* No. 2:15-cv-00493-RDP (N.D. Ala. Mar. 25, 2015); *Carden v. The Town of Harpersville*, Case No. 2:15-cv-01381-JHE (Aug. 14, 2015). In addition to this case, one other pending action is in the Middle District, currently before this Court: *Carter v. The City of Montgomery et al.,* No. 2:15-cv-00555 (M.D. Ala. Aug. 3, 2015). The remaining actions are currently before Judge Hopkins in the Northern District and are administratively stayed: *Hall v. Moore v. The City of Albertville, et al.,* No. 4:16-cv-00914-VEH (N.D. Ala. June 1, 2016); *Foshee v. The City of Anniston, et al.,* No. 1:16-cv-01030-VEH (N.D. Ala. June 23, 2016); *Hall v. The City of Fort Payne,* No. 4:15-cv-01656-VEH (N.D. Ala. Sept. 21, 2015).

moved that discovery be stayed. Therefore, if those or other factual matters outside the Complaint are to be considered, Plaintiffs request the Court to postpone ruling upon the City's motion until discovery is allowed so the motion may be considered under Fed.R.Civ.P. 56. Plaintiffs have submitted a Motion to Strike filed contemporaneously herewith along with an affidavit of counsel pursuant to Rule 56(d). Further, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 56(d). Because discovery has not begun, summary judgment is premature at this time.

In substance, Clanton's Motion and brief is a desperate attempt to recast the pleadings and then blame its municipal court for implementing the JCS system for which the City contracted. Clanton wholly ignores the allegations of the Second Amended Complaint and its detailed allegations of the City policy and practice and joint participation with JCS by claiming that Plaintiffs failed to allege an official policy or custom of the City that violated their rights. Plaintiffs' Complaint is replete with descriptions of the City's joint policy and practice with its cohort JCS – which began with Clanton's contract binding the City and its court to the use of the JCS collection system. (*See generally,* Doc. 74, ¶¶ 21, 23, 33, 34, 47, 203-205, 209). That system and joint scheme involved not only the city court but also Clanton's mayor, city council, treasure, police force, and jailers. (*See generally,* Doc. 74 ¶¶ 21, 23, 33, 44, 45, 204-206, 227, 231, 276, 277, 300). Tellingly, Clanton does not address these points at all.

Next, the City attempts to limit Plaintiffs' claims to only the JCS contract, arguing that because the contract did not explicitly permit JCS and Clanton to break the law, Plaintiffs' claims fail. This line of reasoning is specious, as no contract gives a party authority to violate the Constitution. Plaintiffs' Complaint makes plain that the contract – signed and executed by the City's

2

mayor and council – began a practice and joint scheme, which served as the moving force behind the violation of Plaintiffs' rights.

In addition to illuminating the joint operation of JCS and Clanton, the Complaint also lays out the specific effect of that joint scheme on Plaintiffs. Indeed, each of the Plaintiffs' stories are explained in detail. (Doc. 74 ¶¶ 47-191). Clanton does not address this and instead argues Plaintiffs were obligated to allege facts that "their supposed constitutional deprivation took place outside of the judicial process..." (Doc. 80, p. 7). According to Clanton, the City cannot be liable if its municipal court plays any part despite the fact it established this arrangement with JCS. (Doc. 80, p. 16 ("The City simply cannot be liable for ___any___ actions or omissions of the Clanton Municipal Court...")). Thankfully, such a simplistic defense is not valid. In fact, a robust body of law makes plain that a city *can* be liable for the actions of its municipal court. (See *Giles v. City of Prattville*, 556 F. Supp. 612 (M.D. Ala. 1983); *Coleman v. Watt*, 40 F. 3d 255 (8th Cir. 1994); *Oglala Sioux Tribe v. Hunnick,* 2016 WL 697117 (Feb. 19, 2016); *Owen v. City of Independence, Mo.,* 445 U.S. 622 (1980); *Johnson v. Board of Police Com'rs*, 370 F. Supp. 2d 892 (E.D. Mo. 2005); *Miller v. City of Red Lodge,* 314 Mont. 278 (Mont. 2003)). These cases are discussed in more detail below.

Clanton also argues that "Plaintiffs have nowhere alleged in the Complaint that they were innocent of the crimes for which they were adjudicated guilty" and that charges against Plaintiffs were not traffic tickets *per se*. (Doc. 80, p. 14 & 15). Clanton has once again missed the mark. Whether or not Plaintiffs were guilty or innocent of the misdemeanor charges brought against them is irrelevant. Plaintiffs are not contesting the underlying adjudication of those charges but rather *post*-adjudication activities, including the City's use of JCS "probation" for fine collection and the joint scheme that sprang therefrom. Likewise, the fact that some of the charges the Plaintiffs faced were

not "traffic tickets" does not help Clanton's cause. Constitutional protections are afforded to all, regardless of the title of the charge and regardless of whether the misdemeanant is innocent. These foundational, constitutional precepts appear to be lost on Clanton as the Complaint details. For the many reasons discussed below, Clanton's motion is due to be denied.

## I.   THE COMPLAINT PROPERLY ALLEGES UNCONSTITUTIONAL POLICIES AND PRACTICES OF THE CITY.

Clanton spends pages and pages of its brief preaching to the Court about the unified judicial system of Alabama and claiming that, somehow, this system protects the City from *all* liability if its municipal court is part of the scheme. There is no suggestion that the Chief Justice of Alabama had any part in hiring JCS or approving its system, much less in supervising this part-time judge who was hired and paid by the small town of Clanton.  More importantly, however, the joint scheme between JCS and the City is not limited solely to the actions of the City's municipal court and involves its clerks, treasurer, police and jail facilities as has been plead in great detail. Here, Plaintiffs' allegations must be taken as true and those allegations expose the extensive constitutional violations suffered by the Plaintiffs through the City's joint practice with JCS. (Doc. 74 ¶¶ 21, 257, 261, 310, 365, among others).

In Section II(a) of its brief, the City states:"[t]he Plaintiffs have nowhere identified what 'policymaking authority' performed what act – for which the City of Clanton had any responsibility ...." (Doc. 80, p. 24).  Despite Clanton's attestations, the Complaint alleges that the city council and mayor are the policy makers of the City. Among the many paragraphs discussing this point are the following:

> 11.   The City of Clanton, Alabama, ("Clanton") is a municipal corporation located within Chilton County, Alabama.  The City Council and Mayor <u>control the</u>

policy making for Clanton and also hired the municipal court judge and contracted for the services of JCS, a private probation company, to collect its municipal court fines.

20.    Additionally, the contract includes a requirement that every court order will require probationers to pay JCS an additional, monthly fee. The agreement between Clanton and JCS was **signed by the city mayor and binds Clanton's municipal court** stating "the City and Court enter into this agreement with JCS to provide probation services upon the terms set forth below, including the following Exhibits:
Exhibit A - Uniform Standards of Probation Supervision
Exhibit B - Services Provided by JCS
Exhibit C - Compensation to JCS

21.    Clanton, **through its mayor Billy Joe Driver**, approved the no bid contract with JCS, the City, and the court beginning on February 9, 2009 and continued the relationship until May 27, 2015 when the City of Clanton gave its 30-day notice to JCS that it was terminating its contract.

33.    **The City Council and Mayor control the policy making** for Clanton and also hires the municipal court judge and contracted for services of JCS at the municipal court. The decision to use this JCS system was an administrative decision of Clanton, by and through its mayor, and not a decision of the Chief Justice, or any other employee of the Administrative Office of Courts ('AOC').

(Doc. 74, ¶¶ 11, 20, 21, 33, among others).

Despite its contract, which its court followed, Clanton argues that it had no control over judicial acts of its city court. This misplaced argument is not new, as it was also raised and rejected by the Northern District in *Ray*. Unlike determining who is a policymaker, the question of whether there is a municipal policy or custom for purposes of § 1983 is "an ad hoc determination made on a case-by-case basis." Sword & Shield: A Practical Approach to Section 1983 Litigation 4th Edition, p. 292. The Eleventh Circuit Pattern Jury Instructions further confirm that this inquiry is factual (11th Cir. Patt. Jury Instructions 5.6).   This history and progeny of *Monell* all support Plaintiffs' claims.  Whether a Section 1983 policy or custom exits is factual and federal case law has set the

parameters of a policy, custom and practice for purposes of § 1983. Under 42 U.S.C. § 1983, local governmental entities may be sued in their own names for declaratory and injunctive relief as well as compensatory damages. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690 (1978).  Local government units are responsible under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or action may fairly be said to represent official policy, inflicts the injury." *Id.* at 694.

Local governmental "policy or custom" actionable under § 1983 can exist in several forms. Certainly, there is an actionable policy when the appropriate officer or entity issues an ordinance, regulation, or other generally applicable policy statement and the subsequent, challenged action is an implementation of that official policy. *Id.* at 690. "[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298 (1986).  Here, the Mayor and council's policy decision in 2009 to bring JCS to the City for collection of city fines was the beginning of the practice challenged in this suit.  That practice involved not only that particular decision, but the resulting scheme using the city court, police, treasurer and other city employees for a period of over six years. The contract itself (despite the City's arguments) is not the sole basis for the Plaintiffs' claims, but instead the catalyst that began the challenged practice.  By virtue of the contract, the City and JCS combined in a joint effort to extort persons unable to pay fines and costs.

"A 'municipal act' is not ... limited to only decisions made by the city's official legislative body or in written agreements. City policy also may be implicated by the acts of individual policymaking officials or by pervasive city custom." *Brown v. City of Fort Lauderdale*,  923 F. 2d 1474, 1480 (11th Cir. 1991). Specifically, local government units may be liable for constitutional

6

violations caused by a "governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell*, 436 U.S. at 691. A plaintiff can establish a municipal custom by identifying "the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Brown v. City of Fort Lauderdale*, 923 F. 2d 1474, 1481 (11th Cir. 1991)(citations omitted). Such a practice is "deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1481 (11th Cir.1991)**.** The policymakers' deliberate indifference to or toleration of subordinate employees' behavior establishes a policy and practice attributable to the government entity, and that behavior is actionable under § 1983 if the plaintiffs' injuries were caused by acts taken pursuant to the policy, practice or custom. *See Canton v. Harris*, 489 U.S. 378, 390 (1989); *see also* 11th Cir. Patt. Jury Instructions 5.6.

The Complaint alleges that the City, acting through its mayor and council, entered into the contract with JCS to acquire free collection services of city fines. Under the agreement, the City promised to require its court to order each person unable to pay the fines in full to be assigned to JCS "probation" and to pay additional fees to JCS. The practice that followed lasted for six years until this litigation. This was an administrative decision of the City – not the municipal court. (Doc. 74 ¶ 33). A decision of the decision-making person or body is, by definition, a policy of the municipality. "A plaintiff may … confer liability on a local governmental body, by showing either that the 'ultimate decision-making authority acted to deprive the plaintiff of a constitutional right or that the ultimate decision-making authority acquiesced in the deprivation by allowing a custom or practice of such deprivation to exist." *Bland v. Madison County, Fla*., 895 F. Supp. 1515, 1520

7

(N.D. Fla. 1995) (citing *Felton v. Board Of Comm'rs Of The County Of Greene*, 5 F.3d 198, 203 (7th Cir. 1993)). Stated differently, a city is liable "when the action alleged to be unconstitutional 'implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers,' or the action is 'visited pursuant to governmental "custom" even though such custom has not received formal approval through the body's official decision making channels.'" *Doe v. Miami-Dade County*, 797 F. Supp. 2d 1296, 1307 (S.D. Fla. 2011) (quoting *Monell v. Department of Social Servs.*, 436 U.S. 658, 690-91 (1978)).

As alleged in the Complaint, the terms of the City's contract and widespread egregious practices resulting from the system implemented thereafter are the causes of Plaintiffs' constitutional deprivations. The Mayor, on behalf of the City, agreed that, in consideration for the JCS "probation" services, the municipal court had to include in "each Court Order" sending a person to JCS a probation fee of $35.00 per month and a one time set-up fee of $10.00.  That contract purported to bind its court, and the court obeyed. The result was the City profiting to the detriment of its poorest citizens. The lack of authority does not erase what was actually done or the system that sprang from that agreement. Nor, does the lack of authority avoid the fact that this was the City policy, implemented for years.

Regardless, none of these arguments support dismissal of the Complaint or change the fact that the allegations in the Complaint are properly pled. Plaintiffs' Complaint details the unconstitutional policies and practices of the City of Clanton and its agents and satisfies the necessary pleading standards.

## II.   THE CITY OF CLANTON IS LIABLE FOR ITS POLICY AND PRACTICE INVOLVING ITS MUNICIPAL COURT.

Clanton goes to great lengths to separate itself from its own court, claiming the court cannot set policy for purposes of § 1983. That is not the issue. Unquestionably, the city council (which approved the JCS contract) and the city Mayor (who signed the JCS contract) are policymakers for purposes of § 1983. As previously stated, a decision of the decision-making person or body is, by definition, a policy of the municipality. *Bland v. Madison County, Fla*., 895 F. Supp. 1515, 1520 (N.D. Fla. 1995) (citing *Felton v. Board Of Comm'rs Of The County Of Greene*, 5 F.3d 198, 203 (7th Cir. 1993)). The City of Clanton is liable because of its egregious practices resulting from the policy and practice it implemented with multiple city employees– only part of which were involved in its court. Simply, the fact that its court is one link in this extortion practice does not protect the City from liability for a practice it began and participated in for over six years.

### A.    The JCS Contract is Not Authorized By Alabama Law.

Plaintiffs do not dispute that a city can contract with a third party to provide administrative services to its municipal court. However, a city cannot contractually bind its municipal court to order extra fees for those unable to pay immediately in order to acquire free collection services – which is exactly what Clanton did here.  That lack of authority and the requirement of competitive bids however, was no impediment to Clanton (which nonetheless contracted with JCS under those terms). In an effort to distract, Clanton points to Wilkins v. Dan Haggerty & Association, 672 So. 2d 507, 510 (Ala. 1995), claiming that Alabama law authorizes the JCS contract. However, Wilkins does not provide Clanton with the shelter it seeks.

Wilkins was a class action brought against a municipality and a private debt collection agency based on a contract under which the agency was to recover fines owed to the city on delinquent traffic tickets and misdemeanors. In its contract, the city agreed that the agency was to

9

be paid on a contingency basis -- not with added fees like JCS. However, the judge testified that he, unilaterally, approved the addition of a 38% "delinquent fee"[2] to be paid to the agency on top of the fine and court costs owed for those individuals who failed to appear pre-sentencing. Id. at 509. No such additional fee was added to those unable to pay their fines post-sentencing. Id. at 510-511.

On appeal, the Alabama Supreme Court addressed two separate issues. The first was whether the contract between the city and the debt collection agency was permitted under Alabama law. The Court found that it was. However, the city's contract there did not bind its court to impose an additional fee in every court order. Rather, the city merely "agreed to pay [the agency] for its collection services on a contingency basis." Id. at 508. The terms of that contract only permitted the collection agency to collect the total amount of fines and court costs that were owed and due - not extra fees for collection. Significantly, the Court made the point to note that, "the plaintiff class may be correct in arguing that a mayor or city council acting alone cannot legally impose an additional fine on persons who have already been ticketed or given a misdemeanor citation . . . " Id. at 510

The second issue addressed by the Court concerned the judge's unilateral decision outside the terms of the City's contract to assess "delinquent fees" on top of the fine and court costs assessed. In Wilkins, there were two categories of delinquent cases turned over to the agency: 1) people who had been given traffic tickets or citations for other misdemeanors that had failed to plead guilty or to appear to contest the charges against them ("Pre-sentencing FTA Cases"), and 2) people who had appeared in court, plead or were found guilty, and later failed to pay their fines ("Post-sentencing Cases"). Id.

The Court first evaluated the assessment of fines against the Pre-sentencing Failure To

---

[2]The judge's "delinquent fee" was calculated as 38% of the total fine and court costs owed. *Id.* at 508.

Appear Cases. The Court examined Alabama law and found that Ala. R. Jud. Adm. 19(C)(2) & 20(E)(3) granted to the judge the authority in assessing the delinquent fees. Rule 19(C)(2) states: "when a defendant fails to appear pursuant to a ticket issued to him, the court may, in its discretion, issue further notice and, if the offense is contained in a magistrate's fine schedule for the traffic offenses . . ., increase the amount of the fine above the scheduled amount for such offense . . . " Thus, because of this express grant of authority, the Court concluded that the municipal court could assess "delinquent fees" against those individuals who failed to appear before sentencing to contest or to plead guilty to the underlying offense. Id. at 510.[3] As this Court is aware, such pre-sentencing failure to appear cases are not part of the Plaintiffs' claims here.

The Court then turned to the Post-Sentencing Cases, i.e., those individuals who plead or were found guilty and later failed to pay their fines. Regarding this category, the Court found that the plaintiffs "produced no evidence showing that any of the members of this [post-sentencing] subclass ever paid a 'delinquent' fee." The municipal judge testified that "no additional 'delinquent fee' was intended to be added to any previously assessed fines of persons in this [post-sentencing] category and that so far as he knew no one in this subclass was assessed a 'delinquent fee.'" Id. at 511. In other words, these Post-Sentencing Cases were never intended to be assessed a "delinquent fee" on top of what the individuals already owed and none had been assessed and none had been damaged. In light of this, the Court refused to "consider the legality of the assessment of a 'delinquent fee' against persons who had previously been convicted or had previously pleaded guilty to traffic or misdemeanor offenses, but who had failed to promptly pay their fines." Id.

---

[3]Significantly, the Court even noted that "[n]one of the fines assessed [against in the Pre-Sentencing FTA Cases] exceeded the $500 jurisdictional limit placed on municipal court fines by Ala. Code 1975, § 11-45-9(b)." Id. at 510.

As shown by its facts, Wilkins does not help Clanton. Though the Alabama Supreme Court did not squarely address the legality of fees added on top of assessed fines and courts costs against individuals after being sentenced by the court, the Court correctly expressed concern about the legality of a contract like that between JCS and Clanton here, noting "the plaintiff class may be correct in arguing that a mayor or city council acting alone cannot legally impose an additional fine on persons who have already been ticketed or given a misdemeanor citation . . . " Id. at 510. Further, the Wilkins contract was a contingency contract (unlike the JCS contract which bound the city court to include fees). Nothing about the Wilkins opinion supports the legality of the JCS contract and Clanton's suggestion to the contrary is without merit.

### B.      Municipal Courts are Maintained at the Option of the Municipality.

Municipal courts in the state of Alabama are creatures of statute -- not a constitutional requirement. Unlike a constitutional basis where all the branches of government are created independently and arise from the same source authority, city courts in Alabama are branches of the city (not the state) and are created by, and serving at the pleasure of, the city officials. In addition to the city supervising the court employees, a municipal court may be created or abolished at a city's whim.  A court is not required for a city, which has certain rights of self government.  Specifically, the Alabama Code provides that a municipality's governing body may choose to have a local court or abolish it altogether and transfer jurisdiction to the county district court. Ala. Code §§ 12-14-1, 12-14-17(a). The city itself dictates the number of judges available to its court and determines the time and place where its court is to be held. Ala. Code § 12-14-3. Further, the city appoints the judges for its municipality and in the event the city has more than one judge, the mayor shall designate the presiding judge. Ala. Code § 12-14-30. The city provides the facilities, the necessary

supportive personnel, and the prosecutorial services. Ala. Code § 12-14-2. Simply, the city court is maintained at the expense and option of the municipality and can be disbanded at the City's command. Specifically, as stated by Ala Const. Art. VI, Section 145: "The governing body of a municipality shall have the right to elect at any time to abolish the municipal court within its limits. ... The governing body of a municipality, may, at its election, re-establish a municipal court after appropriate notice." Ala. Const. Art. VI, § 145.

The Complaint alleges that Clanton operated beyond the its constitutional limitations under the policies and practices its established in this collection scheme. Undoubtedly, the establishment of this scheme and the city's employment and payment of its part time court played a part in its acquiescence to this scheme, but that was only one of many participants under this practice. Clanton also spends pages discussing the fact that the Alabama Supreme Court is supposed to establish procedures and rules for municipal courts, but there is no suggestion here that any entity other than Clanton contracted with JCS or was involved in these "probation" activities of its court. Clanton, nonetheless, boldly concludes "Clanton Municipal Court was subject not to any policies or procedures established by the City of Clanton..." (Doc. 80, p. 29 (emphasis in original)). The alleged facts and the many people appearing in Clanton, belie this conclusion. As the legal profession is very aware, laws and constitutional precepts are not self-enforcing. The fact that the joint scheme in place at Clanton violates the Constitution does avoid the fact the scheme occurred for six years. As the Complaint alleges, the city judge did not follow any policies, practices, and procedures administered by the Alabama Supreme Court and there is no support for any claim of the Supreme Court's involvement here. In fact, under the Clanton practice the Rules of Criminal Procedure and State statutes were ignored in favor of collection:

13

1) "Rule 26.11 of the Alabama Rules of Criminal Procedure provides the method for dealing with fines, restitution and the failure to pay under a variety of circumstances, none of which were followed by Clanton."

2) " Before being arrested, JCS, with the City, calculates the amount claimed to be owed for fines, fees and costs which is then used to approximate the cash bail amount required for release. This cash bond requirement is made without consideration of factors justifying release on recognizance or other factors provided for under Ala. Rule Crim. Pro. 7.2. This practice results in excessive bail requirements in violation of the Eighth Amendment."

3) These fines and fees levied against the Plaintiffs and Class members exceeded the statutory limits of the court and the incarceration periods imposed for the failure to pay exceeded those in Ala. Code § 15-18-62.

(Doc. 74, ¶¶ 329, 333, 347, among others)

The City's policy and practice criminalized poor people by agreeing with JCS to place them on "probation" due to their inability to immediately pay. That practice was supported by all branches of the City government in order to acquire increased revenue to the City and its confederate, JCS – all at the expense of constitutional principles. As the Complaint alleges, these constitutional violations were in place since 2009.  Numerous city employees, including its part-time judge, magistrate, city clerk, treasurer, mayor, city council, police, and its agent JCS were involved. As such, the City's Motion to Dismiss is due to be denied.

### C.    The City Judge and City Magistrate are not "State Officials."

The City claims its part-time judge and city magistrate are "state officials." This statement is contrary to the pleadings, contrary to the law, and factually incorrect.  Each of these is hired by and paid by the City. None is on the state payroll or state retirement.  The City's factual argument is not supported and is not appropriate for a motion to dismiss.  First, the City argues that, because its judge and magistrate take an oath of office, they are automatically "state officials." However, that

14

oath of office for both municipal judges and magistrates simply requires that they uphold the Alabama and United States Constitutions. With or without that oath, a judge and magistrates are supposed to uphold the law regardless of its source. Every member of the bar association and most city official take similar oaths but all are not "state officials." This is a desperate stretch and not a challenge to the sufficiency of the pleadings

Next, Clanton enters into a bizarre line of argument, claiming that all municipal judges are somehow state officials because of its current defense counsel was recently appoint as "Deputy Attorneys General." The purpose of these disclosures seems to be nothing more than defense counsel's desire to talk about what they perceive to be an accolade. However, whatever plaques defense counsel may have on their walls is not material and these arguments are wholly irrelevant.

**D.     Neither The Cannons of Judicial Ethics Nor The Jurisdiction of the Judicial Inquiry Commission Preclude the City's Liability**.

Next, Clanton argues that because of the Cannons of Judicial Ethics and the jurisdiction of the Judicial Inquiry Commission and the Court of the Judiciary, the City has no control over its municipal judges. The fact that a municipal judge is supposed to comply with the Cannons of Judicial Ethics and is overseen by the Judicial Inquiry Commission does not overcome City's involvement in the JCS scheme. As alleged in the Complaint, the municipal court is only one piece of the joint scheme that led to the constitutional violations of hundreds of individuals.  This argument is akin to suggesting that the fact an attorney is subject to Bar discipline gives his confederates a shield in a joint scheme.  Enforcement of judicial ethical standards does not involve the city or even consider constitutional claims, much less the other parties here.

Clanton next seeks shelter behind a JIC Complaint filed against a former Montgomery

municipal court judge, Lester Hayes, concerning his part in a similar scheme there.  However, that JIC Complaint does nothing to help Clanton's cause. The Alabama Judicial Inquiry Commission is a body of limited jurisdiction. Ala. Const. Art. VI § 156 explains the limited authority of the Judicial Inquiry Commission stating:

> (b) The commission shall be convened permanently with authority to conduct investigations and receive or initiate complaints concerning any judge of a court of the judicial system of this state. The commission shall file a complaint with the Court of the Judiciary in the event that a majority of the members of the commission decide that a reasonable basis exists, (1) to charge a judge with violation of any Canon of Judicial Ethics, misconduct in office, failure to perform his or her duties, or (2) to charge that the judge is physically or mentally unable to perform his or her duties. All proceedings of the commission shall be confidential except the filing of a complaint with the Court of the Judiciary. The commission shall prosecute the complaints.

Ala. Const. Art. VI § 156. Similarly, the Court of the Judiciary is a court of limited jurisdiction:

> The court shall be convened to hear complaints filed by the Judicial Inquiry Commission. The court shall have authority, after notice and public hearing (1) to remove from office, suspend without pay, or censure a judge, or apply such other sanction as may prescribed by law, for violation of a Canon of Judicial Ethics, misconduct in office, failure to perform his or her duties, or (2) to suspend with or without pay, or to retire a judge who is physically or mentally unable to perform his or her duties.

Ala. Const. Art. VI, § 157.

Neither the JIC nor the Court of the Judiciary has jurisdiction over civil rights actions under § 1983 nor, for that matter, civil actions of any kind much less those against municipalities.  Thus, it is not surprising that the JIC did not have the City of Montgomery before it nor any of the plaintiffs' legal claims as it would have no jurisdiction over such matters.  These bodies are specifically formulated to deal with ethics complaints against judges -- not civil actions against cities.  And, notably, Judge Hayes was not a judge at Clanton.

The fact that Judge Hayes, much like Judge Jackson in Clanton, was involved in

administering a city policy and practice that also violated judicial cannons, does not absolve the City

of its part under the scheme the City began. In short, the City's attempt to point to non-party judges

provides no defense for the City's practice. Plaintiffs' Complaint properly alleges the policy and

practice of Clanton began with the contract with JCS and the continued participation in systematic

extortion of the poor. The fact that a municipal court is one part of the mechanism put in place by

the City does not remove the City from its responsibility.

In summary, Plaintiffs certainly applaud the findings against Judge Hayes in light of the civil

immunity, which these individuals undeservingly enjoy. Sadly, all of the findings concerning his

actions are absolutely consistent with the details of the JCS system the Plaintiffs have disclosed both

here and in the Northern District Court. The JIC Complaint[4], while confirming the Plaintiffs'

allegations, provides no support for the City's position or defenses.

E.   **Municipalities Can Be Subject To Suit For Policies And Procedures Involving Its Municipal Court**.

Municipalities can be subject to suit under § 1983 for policies and practices involving its

municipal court.[5]  Judge Hobbs from the Middle District of Alabama addressed this issue in Giles

---

[4]It is worth noting that the Court of the Judiciary found Lester Hayes on all seven charges in the JIC Complaint. *Carter v. The City of Montgomery, et al*, Case No. 2:15-cv-555-RCL (Doc. 93 *et seq*.)

[5]On this point, *Nunez v. City of North Las Vegas*, 116 Nev. 535 (Nev. 2000) is instructive. That case concerned a city's liability under § 1983 for a municipal judge's termination of the court administrator. There, the court stated even though city courts were part of the state judicial system:

> [M]unicipal courts are primarily city, not state entities. Although municipal courts are created by the legislature pursuant to authority vested in that body by the Nevada Constitution, these courts are separate branches of their respective city governments. Accordingly, we conclude that the municipal court is not an extension of the state for purposes of suit under 42 U.S.C. § 1983. . . .We also conclude that the municipal courts of this state are separate branches of their respective municipal governments. **Because they are not state governmental entities, the respective municipalities may be subject to suits such as the instant matter.**

*Id.* at 962 (**emphasis added**).

v. City of Prattville, 556 F. Supp. 612 (M.D. Ala. 1983).  That case concerned a § 1983 claim regarding the constitutionality of a sitting municipal judge acting also as the city's prosecutor. There, the original plaintiff was arrested and charged with possession of marijuana. At his hearing before the city court, the plaintiff learned that the city judge was also the city prosecutor. The plaintiff moved for the appointment of a separate prosecutor in his case, objecting to the judge's dual role. However, the city judge denied the plaintiff's motion after which the plaintiff filed suit in federal court. Although Judge Hobbs' opinion addressed several issues, he ultimately concluded that "[s]ince it is without dispute that it was the City of Prattville's official policy to have the Municipal Court judge serve both as judge and prosecutor in the City's Municipal Court, the City will be liable to the plaintiffs for damages." *Id.* at 617.

Similarly, the City of Little Rock was held liable for the due process violations that began with actions taken by its municipal court in *Coleman v. Watt*, 40 F. 3d 255 (8ᵗʰ Cir. 1994). There, the judge of the city court issued an "order" directing officers of the Little Rock police department "to impound any vehicle stopped for violating any one or more of some fourteen state statutes." *Id*. at 258. The plaintiff brought suit against the City of Little Rock under § 1983 after his car was impounded without an opportunity to appear before the judge to present proof of his car's registration and insurance. Among his claims, the plaintiff asserted a claim against the City for violation of due process. **The Eighth Circuit held that the defendant city could be held liable for the plaintiff's due process rights due to the city's adoption of a municipal judge's impoundment order as city policy.** *Id*. at 262.  For this reason, the Eighth Circuit did not need to "decide whether a municipal court judge acts as an official policymaker for the City of Little Rock..." *Id.*  In the case at bar, *a fortiori*, the city contract signed by the Mayor even directed the contents of

its court's probation order.

It is also worth noting that court policies and practices in a joint enterprise with others bind the joint actors under § 1983. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970)  A federal district court in South Dakota granted partial in the plaintiffs' favor on this issue in *Oglala Sioux Tribe v. Hunnick,* 2016 WL 697117 (Feb. 19, 2016) under slightly different circumstances. That case centered on a series of policies and procedures put into place by the presiding judge of a judicial circuit in South Dakota relating to the removing of Indian children from their parents' care. *Oglala Sioux Tribe v. Hunnick*, No. 13-5020, Doc. 150 at p. 2 (W.D. S.D. Mar. 30, 2015). Plaintiffs, as putative class representatives, claimed these policies and practices violated Due Process and the Indian Child Welfare Act and sued the presiding judge, states attorney and employees from the Department of Social Services (DSS), all in their official capacities. *Id.* at 2-3. Plaintiffs then moved for partial summary judgment on several issues, one of which was whether the judge, states attorney and DSS employees were policy-makers and could be held liable in this joint enterprise for purposes of § 1983. The court ruled in the Plaintiffs' favor. Although the judge claimed the South Dakota Supreme Court was the final policy maker regarding the court policies at issue, the federal court first found that those policies were in fact created and revised by the presiding judge. Therefore, for purposes of those polices and procedures, the judge was the final policy-maker for purposes of § 1983. *Id.* at 25. The remaining defendants (i.e., the states attorney and DSS employees) took the position that they lacked the authority to challenge the court's policies and practices and therefore could not be liable under § 1983.  *Oglala Sioux Tribe v. Hunnick,* 2016 WL 697117, *7-8 (Feb. 19, 2016). The court found that the "[d]efendants' position [was] untenable." *Oglala Sioux Tribe v. Hunnick*, No. 13-5020, Doc. 150 at p. 26 (W.D. S.D. Mar. 30, 2015). The court stated that "[w]hen

19

these defendants did not challenge Judge Davis' policies for conducting 48-hour hearings, his policies became the official policy governing their own agencies." *Id.* (citing *Coleman v. Watt,* 40 F. 3d 255, 262 (8ᵗʰ Cir. 1994)). The Court went on to state that "'[b]y acquiescence in a longstanding practice' of Judge Davis 'which constitutes the standard operating procedure' of the Seventh Circuit Court, these defendants exposed themselves to liability." *Id.* at 27 (citations omitted). For those reasons, all defendants were subject to liability under § 1983.

There are even more examples that hit closer to home. Recently, the City of Harpersville here in Alabama has been held accountable for the actions of its court concerning a debtors prison scheme that mirrored Clanton's. In Judge Harrington's July 11, 2012 Order, he provided a thorough analysis of the extortion racket conducted by the Harpersville municipal court with JCS and went into detail about the City's rampant due process violations. Indeed, Judge Harrington noted that those "admitted violations are so numerous as to defy a detailed chronicling . . . " (*Carden v. The Town of Harpersville*, Case No. 2:15-cv-01381-JHE (Aug. 14, 2015) at Doc. 11-11 at p. 2). Judge Harrington first disbanded the Harpersville Municipal Court, and then enjoined the City of Harpersville from "incarcerating any individual in either the Shelby County jail or the Shelby County Community Corrections facility" without obtaining leave of court. (*Carden v. The Town of Harpersville*, Case No. 2:15-cv-01381-JHE (Aug. 14, 2015) at Doc. 11-11 at p. 5). The Order likewise prohibited the municipal court from incarcerating an individual without a hearing, making written findings of fact, and obtaining leave from the circuit court. The city – not the municipal court – was required to notify the court if any individual was convicted in the Harpersville Municipal Court and sentenced to serve any type of incarceration. Further, all city council members were required to attend each hearing before the court until final resolution.

20

In summary, Clanton cannot avoid liability under § 1983 simply because its municipal court played a part in implementing the policy and practice resulting in constitutional violations.[6]

Similarly, judicial immunity does not shield Clanton from liability under § 1983. In *Giles v. City of Prattville*, 556 F. Supp. 612 (M.D. Ala. 1983), discussed above, Judge Hobbs found that the city could be liable to the plaintiff based on the municipal court's refusal to use a different prosecutor. The fact that the some defendant (*i.e.,* the judge of the city court) may have some form of immunity was no bar to the plaintiff's recovery. In reaching this, Judge Hobbs quoted Supreme Court precedent, stating: "a municipality has no immunity, either qualified or absolute, from liability for damages flowing from its constitutional violations, and that municipalities should be held accountable for their actions which inflict constitutional injury upon an individual." *Giles v. City of Prattville*, 556 F. Supp. 612, 618 (M.D. Ala. 1983)(citing *Owen v. City of Independence,* 445 U.S. 622 (1980)). Addressing municipal liability, the United States Supreme Court in *Owen* stated:

> By creating an express federal remedy, Congress sought to "enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Monroe v. Pape*, *supra*, 365 U.S., at 172, 81 S.Ct., at 476.  . . .
> A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been

---

[6] A municipal court is not a separate legal entity, apart from the municipality that created it. However, even if the municipal court was a separate entity, Clanton would still be liable for the constitutional violations made the basis of Plaintiffs' claims. *Johnson v. Board of Police Com'rs*, 370 F. Supp. 2d 892 (E.D. Mo. 2005) is compelling on this point. There, homeless persons brought a § 1983 claim against the city police captain and the city claiming that their Fourth, Thirteenth and Fourteenth Amendment rights were violated when they were periodically removed from downtown. In essence, the plaintiffs argued that the defendant police board, in connection with the city, had "a persistent custom of removing and discouraging homeless people from remaining in the Downtown area..." *Id*. at 895. The defendants moved to dismiss, which the trial court denied. The city argued there was no "legal tie" between the city and the police board and thus the city could not be liable for the alleged actions taken by the police officers. On this point, the court found that "the fact that the Defendants are separate legal entities does not prevent them from acting in concert to deprive constitutional rights pursuant to a joint policy or custom." *Id.* at 902. The fact that the city and its police board were "separate legal entities" did not bar the plaintiffs' § 1983 claims against the city.

established to protect the very rights it has transgressed. . . . .

Moreover, § 1983 was intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well. See *Robertson v. Wegmann*, 436 U.S. 584, 590–591, 98 S.Ct. 1991, 1995, 56 L.Ed.2d 554 (1978); *Carey v. Piphus*, 435 U.S. 247, 256–257, 98 S.Ct. 1042, 1048–1049, 55 L.Ed.2d 252 (1978). The knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights. Furthermore, the threat that damages might be levied against the city may encourage those in a policymaking position to institute internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights. Such procedures are particularly beneficial in preventing those "systemic" injuries that result not so much from the conduct of any single individual, but from the interactive behavior of several government officials, each of whom may be acting in good faith. Cf. Note, Developments in the Law: Section 1983 and Federalism, 90 Harv.L.Rev. 1133, 1218–1219 (1977).

*Owen v. City of Indep., Mo.,* 445 U.S. 622, 650 52, 100 S. Ct. 1398, 1415 16, 63 L. Ed. 2d 673

(1980). Simply put, "there is no tradition of immunity for municipal corporations. . ." *Owen v. City

of Independence, Mo.,* 445 U.S. 622 (1980). "[M]unicipalities do not enjoy immunity from suit –

either absolute or qualified – under § 1983." *Brannon v. City of Gadsden*, 2015 WL 1040824 at n.

20 (N.D. Ala. 2015)(citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination

Unit,* 507 U.S. 163 (1993) and *Owen v. City of Independence*, 445 U.S. 622, 650 (1980)); *see also

Coleman v. Watt,* 40 F. 3d 255 (8ᵗʰ Cir. 1994)(declining to extend judicial immunity to a municipality

in a § 1983 action when its employees acted pursuant to a court order and finding that the defendant

municipality could be held liable for the violation of the plaintiff's due process rights due to its

adoption of a municipal judge's impoundment order as city policy); *Johnson v. Board of Police

Com'rs*, 370 F. Supp. 2d 892 (E.D. Mo. 2005)("refusing to extend the doctrine of judicial immunity

to the City of St. Louis for the actions of its correctional officers based on a facially valid judicial

order."); *Miller v. City of Red Lodge,* 314 Mont. 278 (Mont. 2003).

III. **THE CITY'S UNCONSTITUTIONAL PRACTICES BEGAN WITH ITS CONTRACT WITH JCS BUT ARE NOT LIMITED TO IT.**

Throughout its brief, the City attempts to limit Plaintiffs' claims to the City's decision to hire its judge and to contract with JCS. However, the Complaint makes plain that these are part -- *but only part* -- of the Plaintiffs' claims. Noticeably, the City's Motion to Dismiss does not mention the alleged practice of using its police force and jails to extort money from its poorest citizens or its practice of converting simple fines to prison sentences. Under Alabama law, a fine can only be converted into jail time if the court makes findings under Ala. Code § 15-18-62 (1975) that a defendant has willfully failed to pay the fines. Yet, under the system disclosed by the Complaint, if a person is unable to promptly and fully pay their fine and court costs, that person is placed on "probation" with JCS- *but only until the money is paid*. The contract between JCS and Clanton requires that every court order from the municipal court sending a person to JCS to also include a fee to JCS of $35.00 per month and start up fee of $10.00 per month. Thus, a person financially unable to pay an adjudicated fine will be placed on "probation" and ordered to pay additional charges even though they could not pay the adjudicated fine in the first place. Clanton does not address this practice. Often these individuals' fines are for violations brought about due to poverty. The City jointly participated with JCS for years under this system, providing space for JCS in its buildings, and enforced its threats with its police, arrests and jail. The City's benefit from the extorted funds was the focus- not the protection of its citizens rights. To suggest now that this was not based upon City policy ignores this history and the facts pled.

Over 20 years ago, our state Court of Criminal Appeals opined on a very similar case before

it in *Crutcher v. State,* 439 So. 2d 725; (Ala. Crim. App. 1983). There, Mr. Crutcher had a suspended sentence revoked and was in jail for 30 days when he failed to pay a fine of $200.00 and court costs of $35.50 assessed to him when he pled guilty to a driving charge. Mr. Crutcher was poor like the Plaintiffs in this case and, like with JCS and Clanton, that fact did not matter. The Court of Criminal Appeals held:

> It is clear as a matter of constitutional law that an indigent defendant cannot be required to serve jail time for nonpayment of fine and costs. *Tate v. Short, 401 U.S. 395 (1971); Lingle v. State, 51 Ala.App. 210, 283 So.2d 660 (1973); Smith v. State 51 Ala.App. 212, 283 So.2d 662 (1973)*. "To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws." *Barnett v. Hopper, 548 F.2d 550, 554 (5th Cir.1977)*. This is not a case of a defendant who, though capable of paying a fine, refuses or neglects to do so.
>
> Although *Section 15-22-52, Alabama Code 1975*, states that payment of fine and costs may be made a condition of suspension of sentence or probation, in *State v. Esdale, 253 Ala. 550, 45 So.2d 865 (1950)*, our Supreme Court indicated that such a condition was contrary to our constitution.
>
> "These benefits (probation and suspension of sentence) are not the subject of bargain and sale to be conditioned on the payment of costs and fees assessed as an incident to the prosecution and trial and to condition these benefits on the payment of such costs and fees violate the letter and spirit of Section 13 of the Constitution of 1901 which provides that 'justice shall be administered without sale, denial or delay.'"*Esdale, 253 Ala. at 553.*

*Crutcher* at 726. As shown by the Complaint, the Plaintiffs' claims are not limited only to the JCS contract, but encompass the joint system of fine collection from impoverished persons which was operated by these Defendants and could not have existed without the City's knowledge and participation.

The contract itself is evidence of the City's joint policy and custom and is signed by JCS and Clanton's mayor. It provides that the "City through its duly elected or appointed officials, is

24

authorized to enter into a binding contract." (Doc. 12-6). That contract is for "probation supervision and related services for the benefit of the city and the court" and "the City and the Court enter into this agreement with JCS." (Doc. 12-6). The attachments to the contract require that every court order at the municipal court sending a person to JCS will require the payment of fees to JCS.  After being signed by the Mayor and adopted by the city council it was then followed by the city court with the system imposed on poor people owing the city simple fines.

Though Exhibit A to the contract provides that persons declared indigent by the court will not be charged the "standard probation fee," the actual application of this system avoided any such declaration. If a person stated an inability to pay the fines and costs in full when assessed, they were assigned to JCS "probation" and charged the added fees.  No further inquiry was undertaken as to the degree of their poverty for this assignment to occur and none was encouraged since these people were the source of JCS's compensation to afford free collection services for the city. As alleged, the named Plaintiffs were poor, they were assigned to JCS when they could not pay in full and they were charged those fees repeatedly for years. Furthermore, neither JCS nor the Court officials claims responsibility for making any official poverty ranking as this would obvious deplete the fees to JCS. These are allegations of Plaintiffs' Complaint, all of which are and must be taken as true for purposes of Clanton's Motion to Dismiss. Discovery will no doubt show further reprehensible action by these Defendants in their zealous collection of fines.

## IV.   PLAINTIFFS' CLAIMS FOR EQUITABLE RELIEF

In light of the Settlement Agreement reached between Clanton and Plaintiffs (Doc. 23-1), Plaintiffs agree that their claim for declaratory and injunctive relief as to the City of Clanton is due to be dismissed.  However, Count Eleven seeks equitable relief regarding both Clanton and JCS.

Because JCS was not a party to the Settlement Agreement, Plaintiffs' claim for declaratory and injunctive relief as to JCS is not due to be dismissed.

Further, in its argument, Clanton attempts to broaden the language of the Settlement Agreement by claiming Plaintiffs violated the agreement terms in amending their complaint twice. (Doc. 80, p. 40). The Settlement Agreement is limited to equitable relief concerning the City of Clanton. (Doc. 23-1 ("11. That both the Plaintiffs and the [City of Clanton] agree that this Settlement Agreement ...is limited only to equitable relief.")). Nothing in its terms prohibits Plaintiffs from amending their Complaint to assert other causes of action and adding other parties, which is what they have done. To the degree the City argues to the contrary, those arguments are without merit.

## V.    CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the Court, upon consideration of this Response, will deny the City of Clanton's Motion to Dismiss Plaintiffs' Second Amended Complaint.

RESPECTFULLY SUBMITTED,

s/ G. Daniel Evans
G. Daniel Evans
ASB-1661-N76G
Alexandria Parrish
ASB-2477-D66P
Maurine C. Evans
ASB-4168-P16T
Attorneys for The Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone: (205) 870-1970
Fax: (205) 870-7763
E-Mail: gdevans@evanslawpc.com
E-Mail: ap@evanslawpc.com

26

E-Mail: mevans@evanslawpc.com


s/ William M. Dawson
William M. Dawson
ASB-3976-S80W
Attorney for the Plaintiffs
Dawson Law Office
1736 Oxmoor Road
Birmingham, Alabama 35209
Telephone: 205-795-3512
E-Mail: bill@billdawsonlaw.com

### CERTIFICATE OF SERVICE

I hereby certify that on this the 19th day of January, 2017, I electronically filed the foregoing Plaintiffs' Response in Opposition to the City of Clanton's Motion to Dismiss the Second Amended Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James W. Porter, II
R. Warren Kinney
Porter, Porter & Hassinger, P.C.
P.O. Box 128
Birmingham, AL 35201-0128

Will Hill Tankersley
Gregory C. Cook
L. Conrad Anderson IV
Chase T. Espy
Balch & Bingham LLP
1901 6th Ave. N., Ste. 1500
Birmingham, AL 35203

William M Dawson, Jr.
Attorney at Law
1736 Oxmoor Road
Birmingham, AL 35209

Joseph Mitchell McGuire
McGuire & Associates LLC
31 Clayton Street
Montgomery, AL 36104

Matthew Swerdlin

27

Matthew Swerdlin, Attorney at Law
1736 Oxmoor Road, Suite 101
Homewood, AL 35209

                                                 s/ G. Daniel Evans
                                                 G. Daniel Evans