**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **CANDICE CHAPMAN,** *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 2:15-cv-125 (RCL)** |
| ) | |
| **THE CITY OF CLANTON,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## MEMORANDUM OPINION

This case is one of several before the Court that all contain similar allegations: that Alabama cities attempting to increase municipal budgets were running debtor's prisons and implementing policies that adversely impacted indigent residents of those cities. Currently before the Court are motions to dismiss plaintiffs' amended complaint under Federal Rule of Civil Procedure 12(b)(6). Such motions were filed by the City of Clanton, Judicial Correction Services (JCS), and CHC Companies, Inc. These motions will be granted in part and denied in part.

Though distinct in certain ways, this case is similar to other cases pending before this Court, most notably *McCullough v. City of Montgomery*, 2:15-cv-463, and *Carter v. City of Montgomery*, 2:15-cv-555. This memorandum opinion should be read in conjunction with the opinions issued in those cases, as the issues overlap and Court will not repeat its analysis in this memorandum opinion. The memorandum opinions in those cases can be found at docket entry 131 in *McCullough* and docket entry 97 in *Carter*.

## I.     Background

Like *Carter* and *McCullough*, this case concerns the policies and practices of an Alabama City that contracted with a private probation company, JCS, which is alleged to have denied indigent defendants a host of rights.

Specifically, they allege that the city of Clanton signed a contract with JCS that nominally allowed JCS to run probation services.  JCS ran on an "offender funded" model, where they would charge people on probation set-up as well as monthly fees to remain on probation.

When individuals were arrested for minor crimes and unable to pay fees, they were automatically placed into JCS probation and made monthly payments.  If individuals were unable to pay, their fees were converted to jail time with durations tied to the amounts owed.  For example, one plaintiff's fine of $1,415 was converted into 28.3 days in jail—a rate of $50 a day.  Another plaintiff was given 21.12 days.

Plaintiffs contend this was all done without any indigency determinations being made and without access to counsel.  They further argue that the entire contract between the City and JCS is unlawful.

## II.     Legal Standards

A motion to dismiss is appropriate when the complaint fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Such a failure occurs when the complaint is so factually deficient that the plaintiff's claim for relief is not plausible on its face.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Though facts in a complaint need not be detailed, Rule 8 "demands more than an unadorned, the-defendant-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must accept all factual statements as true when

deciding a Rule 12(b)(6) motion to dismiss. *Id.* at 678. However, conclusory legal allegations devoid of any factual support do not enjoy the same presumption of truth. *Id.* at 679. "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. This is not a high bar however, as plaintiffs need only plead facts sufficient to "nudge[] their claims across the line from conceivable to plausible." *Id.* at 547.

III.     Counts

This case contains eleven counts. The first is for denial of due process by the City of Clanton. The second is for denial of due process by JCS. The third and fourth counts are for violations of the fourth amendment by Clanton and JCS, respectively. Counts five and six allege violations of the sixth amendment by the City and JCS. Counts seven and eight allege violations of the eighth amendment. The ninth and tenth counts are for violations of equal protection by Clanton and JCS. The final count, eleven, is for declaratory and injunctive relief against both JCS and Clanton.

1. Violations by the City of Clanton

The City spends the bulk of their motion to dismiss arguing that they are not responsible for the actions of JCS or any actions taken by the Clanton Municipal Court. In this way, the City's argument is incredibly similar to that made by the City of Montgomery in *Carter* and *McCullough*. Here, they argue that because the municipal court is an arm of the State, not the City, it is impossible for the City to be liable for its actions. City Mot. Dismiss 26, ECF No. 80. Moreover, they claim the alleged violations of plaintiffs' rights arise from the municipal court, not the City. *Id.* at 42-43.

With respect to liability tied to the City contracting with JCS, the City claims that it hired JCS for the municipal court, and their actions are thus not attributable to the City, but rather the municipal court. *Id.* at 45-46. The City's arguments apply to all the substantive counts against them in the complaint.

Plaintiffs respond by alleging that the conduct in question is not limited to the municipal court, but involves a medley of city officials including clerks, the treasurer, and police. Resp. City's Mot Dismiss 6, ECF No. 85. To be more precise, the allegations include a "joint scheme" between JCS and the City that included, but was not limited to, actions occurring in or associated with the municipal courts. *Id.*

The City was the entity that decided to use JCS, signing the contract that allowed for the payment system and policies allegedly undertaken by JCS. Am. Comp. ¶ 33, ECF No. 74. The City allegedly allowed JCS employees to carry badges. *Id.* at ¶ 34. Were that insufficient, the complaint alleges "[t]his public ruse was maintained by Clanton and JCS for purposes of imposing and collecting fines and costs from citizens." *Id.* at ¶ 35.

That is, plaintiffs allege not merely that the City is liable due to JCS's actions or the behavior of the municipal court, but also because the City itself was a party to a "ruse" designed to increase revenue. At this stage of the proceedings, this allegation is sufficient to state a claim. While the precise nature of the allegations vary by count, the underlying allegation is that the City and JCS together created a series of policies and practices designed to increase revenue. Plaintiffs here allege these policies or practices harmed them in a number of distinct ways, including violations of several constitutional rights. It is not necessary to examine the details of JCS or the municipal court's relationship to the City, as the plaintiffs allege the City acted in concert with

those other entities in creating the alleged violations. *See also id.* at ¶ 242 (discussing the "joint and inextricably interwoven" policies of the City and JCS).

### 2. Violations by JCS

At the core of the alleged violation of plaintiffs' rights are that they were forced onto JCS "probation" when they couldn't afford to pay fines. On probation, they were charged monthly fees and, if they could not pay, their fine was converted into a jail sentence. This was done without access to counsel or any indigency determinations being made. JCS argues that while indigency determinations may not have been made, and regardless of whether particular municipal court orders were proper, JCS had no duty to address many of the issues plaintiffs raise. On the contrary, JCS asserts the municipal court was responsible for many of the actions (or inaction) in question, relieving JCS of liability. JCS Mot. Dismiss14-18, ECF No. 86.

Much like the City pointing to JCS and the municipal courts, JCS points to the municipal courts and the City as the entities responsible for the actions in question. While JCS distinguishes between counts in a way the City does not, the core issue is the same across the counts. For example, when discussing violations of due process, JCS maintains it had no duty or authority to inquire into indigency, the municipal court did. JCS Mot. Dismiss 13-14. With respect to the fourth amendment, JCS maintains that the City, not JCS, issued the warrants in question and made arrests, *id.* at 20-21, and that the municipal court, not JCS, determined who would be placed on probation, *id* at 19-20.

As with the City, JCS fails to fully engage with the allegations levied against them. Plaintiffs maintain that the City and JCS's policies were "joint and inextricably interwoven," Am. Comp. at ¶ 242, and were "designed and sold to various cities" by JCS, Resp. JCS Mot. Dismiss

5, ECF No. 91. That is, plaintiffs are alleging JCS and the City were acting pursuant to a "joint scheme." *Id.* at 5. Plaintiffs allegations are not that things happened in some passive sense and they now seek the party liable, but rather that JCS and others actively planned to make things happened in pursuit of profits. As the "things" in the previous sentence are constitutional violations, they seek to hold the creators of the "scheme" of "joint and inextricably interwoven" policies—including JCS—accountable for their creation.

As with any case, plaintiffs' allegations or theory could turn out to be inaccurate. However, at this stage of the proceedings, where plaintiffs factual claims are accepted as true, plaintiffs make a broad claim that JCS is responsible, at least in part, for the policies in question as they were a joint participant in their creation.

This Court has already addressed in some detail various violations similar or identical to the ones present in this case, including in the *Carter* and *McCullough* memorandum opinions. The Court will not repeat its analysis here, but notes that the allegations include clear violations of constitutional rights, including jailing individuals for the inability to pay fines without inquiring as to their indigency and denying individuals counsel before incarcerating them.

Additionally, as noted in a prior memorandum opinion, the Court will not analyze every argument advanced by JCS. This is because the same arguments have been made, and rejected, in nearly identical circumstances. *See Higginbotham v. Judicial Corrections Servs., Inc.*, No. CV-13-BE-740-S, 2014 WL 507448, at *1 (N.D. Ala. Feb. 6, 2014) (noting that the City and JCS advanced arguments that had already been rejected in a similar case, including the City's authority, quasi-judicial immunity, and the *Rooker Feldman* doctrine).

### 3. Declaratory and Injunctive Relief

Plaintiffs concede their claim for declaratory and injunctive relief is due to be dismissed as to the City given the previous settlement between the parties. Order Granting Joint Motion to Dismiss, ECF No. 24. While plaintiffs contend that their request for declaratory and injunctive relief is aimed at both JCS and Clanton, and should not be dismissed with respect to JCS, the text of the count is very much focused on Clanton, with only passing mentions of JCS. In other memorandum opinions this Court has noted that cases of this type may allow for declaratory and injunctive relief even when the city in question is no longer contracting with JCS. *See McCullough*. This is because of the possibility that the allegations in question are capable of repetition while evading review. However, in this case plaintiffs have settled with the City and it is not clear what portion of their count would apply to JCS while not simultaneously be in contravention of the settlement agreement between the parties. *See* Am. Comp. ¶¶ 379-399 (requesting that the Court "declare that Clanton had no authority to contractually bind their municipal court," "declare the actions of Clanton under this contract to be unconstitutional," and "enjoin the actions of Clanton identified herein," while only occasionally referencing JCS).

Given the previous settlement agreement between the plaintiffs and the City, the language of this count being clearly directed to the City, and the fact that no party contests JCS's representation that the contract between the City and JCS has been canceled and JCS does not do business in Alabama, the Court finds that count eleven is due to be dismissed as to JCS as well as the City.

4. CHCC's Motion to Dismiss and Statute of Limitations

As they have done in other cases, defendant CHC Companies, Inc. (CHCC) filed a motion

to dismiss. Here they articulate that the correct legal names for the companies in question are CHC

Companies, LLC (CHC Co.) and Correct Care Solutions, LLC (CCS, LLC).[1] CHCC Mot. Dismiss

1, ECF No. 82-1. In addition to the general types of arguments made by JCS, CHCC also argues

that there are no direct claims against CHCC and that adding them as a party runs afoul of the

statute of limitations in this case.

To the extent that CHCC is arguing that it is not liable given its distinct corporate structure,

the Court has already addressed a nearly identical argument in *Carter*. *Carter*, Mem. Op. 6-7,

2:15-cv-555. The same reasoning there, also raised by plaintiffs here, applies in this case.

However, CHCC also ties its argument to the statute of limitations, an argument also

advanced by JCS. CHCC and JCS argue that at least some of the plaintiffs did not raise their

claims in a timely manner, as the amended complaint was not docketed until December 2016 and

some of events described concluded in mid-2014.

As an initial matter, the Court notes that the statute of limitations was tolled when plaintiffs

filed for leave to amend in April 2016—not when this Court granted leave to amend in December

2016. *See Rademaker v. ED Flynn Export Co.*, 17 F. 2d 15, 17 (5th Cir. 1927) ("[W]e think the

better rule, supported by the weight of authority, is that an application for leave to amend, as full

and comprehensive as this one is in its averment of facts, stands in the place of an actual

amendment."). Additionally, while defendants argue that some of the events in question would

still be outside the statute of limitations, defendants do not address the doctrine of continuing

---

[1] For the purposes of this memorandum opinions, all of these entities are being referred to as CHCC.

violations. Though addressing discrimination, the Court finds the Circuit's language in *Perez v. Laredo Junior Coll.*, 706 F.2d 731, 733–34 (5th Cir. 1983), to be informative:

> If . . . the statutory violation does not occur at a single moment but in a series of separate acts and if the same alleged violation was committed at the time of each act, then the limitations period begins anew with each violation and only those violations preceding the filing of the complaint by the full limitations period are foreclosed. Similarly, if the statutory violation occurs as a result of a continuing policy, itself illegal, then the statute does not foreclose an action aimed at the company's enforcement of the policy within the limitations period.

As the Court understands this complaint, it addresses both JCS/CHCC policy and also repeated acts by JCS/CHCC. That is, it is not merely the first payment that a plaintiff had to pay to JCS, the allegation is that each payment over the course of the "probation" period was improper.

Moreover, and contrary to defendants' representations, plaintiffs appear to allege violations within the statute of limitations. For example, in CHCC's own motion they note that Candice Chapman was arrested, assessed fines, placed on probation, and jailed, between May and October 2014. CHCC Mot. Dismiss 8-9. Likewise, Deangelo Barnett allegedly had his fine converted into jail time in June 2014 and Tracy Dubose states she was making payments to JCS until June 2014. *Id.* at 9-10; Am. Comp. ¶ 189.

Accordingly, plaintiffs state a claim against CHCC.

IV.    Conclusion

Plaintiffs in this case allege a series of practices and policies that deprived them of their rights or visited unique harms upon them due to their indigency. While the complaint spans some 400 paragraphs and there is extensive briefing on the nature of the Alabama state court system and its relationship to Clanton's municipal court, the underlying issue is one of deep importance.

The fourteenth amendment, in declaring that no state 'shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws,' undoubtedly intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness, and acquire and enjoy property; that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of any one, except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition; and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed to all for like offenses.

*Barbier v. Connolly*, 113 U.S. 27, 31 (1884). In this case, plaintiffs are claiming they were denied the protections of due process, that impediments were imposed on them, and that the administration of justice was not prescribed in an alike manner for the poor. And those are only some of plaintiffs' claims. As with all claims, their validity will be tested in the crucible of litigation. The claims, however, have been stated.

ROYCE C. LAMBERTH
United States District Judge

Date: 4/25/17